Print

# CASE INFORMATION

## CV-16-866246 GOOD NUTRITION, LLC, ET AL. vs. KINSALE INSURANCE COMPANY, ET AL.

### Docket Information

| Filing Date | Side | Type | Description | Image |
|---|---|---|---|---|
| 09/29/2017 | P1 | SF | DEPOSIT AMOUNT PAID DANIEL F GOURASH | |
| 09/29/2017 | P1 | CO | AMENDED COMPLAINT $75 AMENDED COMPLAINT FOR DECLARATORY RELIEF AND MONETARY DAMAGES | 📄 |
| 09/29/2017 | N/A | JE | CMC BY PHONE HELD ON 09/27/2017. COUNSEL PARTICIPATED AND AGREED TO THE FOLLOWING CASE SCHEDULE: DISCOVERY CUT-OFF IS 02/26/2018. DISPOSITIVE MOTION TO BE FILED BY 03/23/2018. RESPONSES DUE PER LOC.R. 11(I)(1). PARTIES SHOULD PROVIDE COURTESY COPIES TO THE COURT UPON FILING WHERE ANY ATTACHED EXHIBITS ARE NOT LEGIIBLE WHEN SCANNED AND/OR WHEN THE FILING IS VOLUMINIOUS. CASE REFERRED TO BUSINESS MEDIATION PURSUANT TO LOCAL RULE 21.2 ON 09/27/2017. CASE TO BE MEDIATED ON OR NO MORE THAN 30 DAYS BEFORE 4/30/2018. PARTIES TO CONTACT COURT ADR TO VERIFY SCHEDULED DATE FOR MEDIATION HEARING. MEDIATION CUT-OFF MAY NOT BE EXTENDED EXCEPT BY MOTION TO THE COURT. COUNSEL AND PARTIES REQUIRED TO BE PRESENT. FAILURE TO APPEAR MAY RESULT IN DISMISSAL AND/OR ADVERSE JUDGEMENT. FINAL PRETRIAL SET FOR 05/31/2018 AT 01:00 PM. FINAL PRETRIAL TO BE CONDUCTED IN COURTROOM 18-A. COUNSEL, PARTIES AND CHOSEN REPRESENTATIVES MUST BE PRESENT WITH FULL SETTLEMENT AUTHORITY, UNLESS THE COURT HAS GRANTED PERMISSION FOR REPRESENTATIVE(S) TO APPEAR BY PHONE. FAILURE TO APPEAR MAY RESULT IN SANCTIONS INCLUDING DISMISSAL AND/OR ADVERSE JUDGEMENT. PARTIES ARE TO CONVEY THEIR RESPECTIVE POSITIONS WITH REGARD TO ANY POTENTIAL DEMAND AND OFFER OF SETTLEMENT. PARTIES SHALL ABIDE BY THE COURT'S STANDING TRIAL AND FINAL PRETRIAL ORDERS AND LOC.R. 21. PARTIES SHALL ALSO FILE A PRETRIAL STATEMENT AT LEAST 7 DAYS IN ADVANCE OF THE FINAL PRETRIAL UNLESS PREVIOUSLY SUBMITTED WITHOUT CHANGE. PRETRIAL STATEMENTS MAY BE SUBMITTED WITHOUT FILING IF THE PARTIES WISH THEIR RESPECTIVE POSITIONS TO BE CONFIDENTIAL, BY EMAIL TO LACTON@CUYAHOGACOUNTY.US. JURY TRIAL SET FOR 06/18/2018 AT 09:00 AM. NOTICE ISSUED | 📄 |
| 09/06/2017 | N/A | SC | CMC BY PHONE PREVIOUSLY SCHEDULED FOR 09/06/2017 AT 03:40 PM IS RESCHEDULED FOR 09/27/2017 AT 01:20 PM (Notice Sent). | |
| 09/06/2017 | N/A | SC | CMC BY PHONE SCHEDULED FOR 09/06/2017 AT 03:40 PM IS CANCELLED. JUDGE: JOAN SYNENBERG (353) REASON: UNKNOWN (notice sent). | |
| 08/23/2017 | N/A | SC | CMC BY PHONE PREVIOUSLY SCHEDULED FOR 08/23/2017 AT 03:00 PM IS RESCHEDULED FOR 09/06/2017 AT 03:40 PM (Notice Sent). | |
| 08/23/2017 | N/A | SC | CMC BY PHONE SCHEDULED FOR 08/23/2017 AT 03:00 PM IS CANCELLED. ATTORNEY: CHARLES W ZEPP (0068129) REASON: UNKNOWN (notice sent). | |
| 08/16/2017 | N/A | JE | | 📄 |

| | | | |
|---|---|---|---|
| | | | PLAINTIFFS' MOTION FOR ORDER CONFIRMING ARBITRATION AWARD, FILED 08/08/2017, IS GRANTED. ***ORDER SEE JOURNAL. NOTICE ISSUED |
| 08/16/2017 | N/A | JE | PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED COMPLAINT FOR DECLARATORY RELIEF AND MONETARY DAMAGES, FILED 08/08/2017, IS GRANTED. PLAINTIFF SHALL PROMPTLY FILE AND SERVE THE AMENDED COMPLAINT IN ACCORDANCE WITH THE OHIO RULES OF CIVIL PROCEDURE. PLAINTIFF'S AMENDED COMPLAINT MAY DEVIATE FROM THE COPY ATTACHED TO PLAINTIFF'S MOTION FOR LEAVE TO THE EXTENT IT DEEMS APPROPRIATE TO REFLECT THE COURT'S ORDER CONFIRMING THE ARBITRATION AWARD AND/OR DEFENDANT'S RESPONSE TO THE MOTION FOR LEAVE. NOTICE ISSUED |
| 08/15/2017 | D1 | BR | REPLY BRIEF FILED BY D1 KINSALE INSURANCE COMPANY, LLC EDWARD T SYLVESTER 0073312 KINSALE¿S RESPONSE TO MOTION FOR LEAVE TO FILE AMENDED COMPLAINT FOR DECLARATORY RELIEF AND MONETARY DAMAGES |
| 08/14/2017 | D1 | BR | REPLY BRIEF FILED BY D1 KINSALE INSURANCE COMPANY, LLC EDWARD T SYLVESTER 0073312 KINSALE¿S RESPONSE TO MOTION FOR ORDER CONFIRMING ARBITRATION AWARD |
| 08/08/2017 | P | MO | MOTION FILED FOR PLAINTIFF(S) GOOD NUTRITION, LLC(P1) and JOHN HUFF(P2) DANIEL F GOURASH 0032413 MOTION FOR ORDER CONFIRMING ARBITRATION AWARD 08/16/2017 - GRANTED |
| 08/08/2017 | P | MO | MOTION FILED FOR PLAINTIFF(S) GOOD NUTRITION, LLC(P1) and JOHN HUFF(P2) DANIEL F GOURASH 0032413 MOTION FOR LEAVE TO FILE AMENDED COMPLAINT FOR DECLARATORY RELIEF AND MONETARY DAMAGES 08/16/2017 - GRANTED |
| 08/08/2017 | N/A | JE | PLAINTIFFS' MOTION TO LIFT STAY, FILED 07/17/2017, IS UNOPPOSED AND GRANTED. STAY IS LIFTED. CLERK ORDERED TO RETURN THIS CASE OT THE COURT'S ACTIVE DOCKET. COURT SET THE FOLLOWING CASE SCHEDULE: CMC BY PHONE SET FOR 08/23/2017 AT 03:00 PM. COUNSEL FOR PLAINTIFF(S) SHALL INFORM IN WRITING ALL UNREPRESENTED PARTIES OF THIS DATE AND TIME. PLAINTIFF'S COUNSEL SHALL INITIATE THE CONFERENCE CALL WITH OPPOSING COUNSEL, ANY UNREPRESENTED PARTIES AND THEN THE COURT (216-443-8606). IF THE COURT CANNOT BE REACHED, COUNSEL SHALL SEND AN EMAIL MESSAGE WITH CALLBACK PHONE NUMBER TO LACTON@CUYAHOGACOUNTY.US. FAILURE OF A PARTY TO APPEAR AT THE ABOVE SCHEDULED CMC OR ANY OTHER SCHEDULED COURT DATE OR OTHERWISE FAIL TO COMPLY WITH AN ORDER OF THE COURT MAY RESULT IN SANCTIONS AND/OR DISMISSAL OF THE CASE AND/OR ADVERSE JUDGMENT BEING RENDERED. DISCOVERY IS TO START IMMEDIATELY. PARTIES ARE TO CONVEY THEIR RESPECTIVE POSITIONS WITH REGARD TO ANY POTENTIAL DEMAND AND OFFER OF SETTLEMENT. NOTICE ISSUED |
| 07/17/2017 | P | MO | MOTION FILED FOR PLAINTIFF(S) GOOD NUTRITION, LLC(P1) and JOHN HUFF(P2) DANIEL F GOURASH 0032413 PLAINTIFFS' MOTION TO LIFT STAY 08/08/2017 - UNOPPOSED AND GRANTED |
| 06/29/2017 | N/A | JE | DEFENDANT KINSALE'S MOTION TO STAY, FILED 02/17/2017, IS GRANTED. PURSUANT TO R.C. 2711.02(B), AND THE DEFENDANT'S PREVIOUS REQUEST FOR A STAY PENDING ARBITRATION PURSUANT TO THE ARBITRATION PROVISION OF THE SUBJECT INSURANCE POLICY, THE CASE IS STAYED PENDING ARBITRATION. ALL OTHER MOTIONS ARE RENDERED MOOT. NOTICE ISSUED |
| 02/21/2017 | P | BR | REPLY BRIEF FILED BY PLAINTIFF(S) GOOD NUTRITION, LLC(P1) and JOHN HUFF(P2) DANIEL F GOURASH 0032413 PLAINTIFF'S BRIEF IN OPPOSITION TO KINSALE'S EMERGENCY MOTION TO STAY THE CASE SCHEDULES BECAUSE OF ITS PENDING, MERITORIOUS MOTION TO COMPEL ARBITRATION AND REQUEST FOR STATUS CONFERENCE |

| 02/17/2017 | D1 | MO | MOTION FILED FOR D1 KINSALE INSURANCE COMPANY, LLC EDWARD T SYLVESTER 0073312 KINSALE'S EMERGENCY MOTION TO STAY THE CASE SCHEDULING BECAUSE OF ITS PENDING, MERITORIOUS MOTION TO COMPEL ARBITRATION, AND REQUEST FOR STATUS CONFERENCE 06/29/2017 - GRANTED | |
| 01/13/2017 | P | OT | GENERAL PLEADING FILED BY PLAINTIFF(S) GOOD NUTRITION, LLC(P1) and JOHN HUFF(P2) ATTORNEY CHARLES W ZEPP 0068129 PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO STAY THE PARTIES' PROPOSED CASE SCHEDULES | |
| 01/06/2017 | D1 | MO | MOTION FILED FOR D1 KINSALE INSURANCE COMPANY, LLC EDWARD T SYLVESTER 0073312 KINSALE'S MOTION TO STAY THE PARTIES' PROPOSED CASE SCHEDULES 07/11/2017 - UNKNOWN | 📄 |
| 10/21/2016 | P | OT | GENERAL PLEADING FILED BY PLAINTIFF(S) GOOD NUTRITION, LLC(P1) and JOHN HUFF(P2) ATTORNEY CHARLES W ZEPP 0068129 PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF ITS COMBINED OPPOSITION TO MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING ARBITRATION AND DUTY TO DEFEND | |
| 10/18/2016 | P | OT | GENERAL PLEADING FILED BY PLAINTIFF(S) GOOD NUTRITION, LLC(P1) and JOHN HUFF(P2) ATTORNEY CHARLES W ZEPP 0068129 PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR EXTENSION OF TIME TO SUBSTANTIVE DUTY TO DEFEND ARGUMENTS | |
| 10/11/2016 | D1 | MO | MOTION FOR EXTENSION OF TIME KINSALE¿S MOTION FOR EXTENSION OF TIME TO RESPOND TO THE SUBSTANTIVE DUTY TO DEFEND ARGUMENTS BY GOOD NUTRITION AND HUFF 07/11/2017 - UNKNOWN | 📄 |
| 10/11/2016 | D1 | AF | AFFIDAVIT FILED BY D1 KINSALE INSURANCE COMPANY, LLC ATTORNEY EDWARD T SYLVESTER 0073312 DECLARATION OF CAITLIN SAUNDERS ON BEHALF OF KINSALE | 📄 |
| 10/11/2016 | D1 | BR | BRIEF FILED BY D1 KINSALE INSURANCE COMPANY, LLC EDWARD T SYLVESTER 0073312 KINSALE¿S RESPONSE IN OPPOSITION TO GOOD NUTRITION¿S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING ARBITRATION AND THE DUTY TO DEFEND | 📄 |
| 10/07/2016 | D2 | OT | GENERAL PLEADING FILED BY D2 BRITTON GALLAGHER FINANCIAL SERVICES, INC. ATTORNEY WILLIAM J O'NEILL 0029936 JOINT PROPOSED CASE MANAGEMENT ORDER OF PLAINTIFFS AND DEFENDANT BRITTON GALLAGHER FINANCIAL SERVICES, LLC | |
| 10/05/2016 | D1 | NT | NOTICE FILED BY D1 KINSALE INSURANCE COMPANY, LLC ATTORNEY EDWARD T SYLVESTER 0073312 PROPOSED CASE SCHEDULE | 📄 |
| 09/22/2016 | D2 | AN | ANSWER FILED BY D2 BRITTON GALLAGHER FINANCIAL SERVICES, INC. ATTORNEY WILLIAM J O'NEILL 0029936 ANSWER AND AFFIRMATIVE DEFENSES OF DEFENDANT BRITTON GALLAGHER FINANCIAL SERVICES, LLC | 📄 |
| 09/20/2016 | D1 | MO | MOTION FOR EXTENSION OF TIME KINSALE¿S MOTION FOR EXTENSION OF TIME TO RESPOND TO COMBINED MOTION FOR SUMMARY JUDGMENT ON THE DUTY TO DEFEND AND RESPONSE IN OPPOSITION TO MOTION TO DISMISS 02/16/2017 - GRANTED | 📄 |
| 09/19/2016 | N/A | JE | ATTORNEY SINA BAHADORAN'S MOTION FOR LEAVE TO APPEAR AS PRO HAC VICE COUNSEL FOR KINSALE, FILED 09/14/2016, IS GRANTED. ATTORNEY MICHELE A. VARGAS'S MOTION FOR LEAVE TO APPEAR AS PRO HAC VICE COUNSEL FOR KINSALE, FILED 09/14/2016, IS GRANTED. NOTICE ISSUED | 📄 |
| 09/16/2016 | N/A | JE | CMC BY PHONE HELD ON 9/14/2016. PARTIES APPEARED THROUGH COUNSEL. BY AGREEMENT OF THE PARTIES, COUNSEL TO SUBMIT PROPOSED CASE SCHEDULE TO THE COURT ON OR BEFORE 10/7/2016. COUNSEL TO INCLUDE ALL NECESSARY DATES INCLUDING DISCOVERY CUT-OFF, EXPERT REPORT DUE DATES, DISPOSITIVE MOTION DEADLINE, FINAL PRETRIAL, TRIAL AND ANY OTHER DATES | 📄 |

|  |  |  |  |  |
|---|---|---|---|---|
|  |  |  | NECCESARY TO COMPLETION OF THE CASE. FAILURE TO COMPLY MAY RESULT IN SANCTIONS. NOTICE ISSUED |  |
| 09/15/2016 | N/A | JE | DEFENDANT'S MOTION FOR AN EXTENSION OF TIME TO MOVE, PLEAD, OR OTHERWISE RESPOND TO PLAINTIFFS' COMPLAINT, FILED 09/13/2016, IS GRANTED. DEFENDANT GRANTED LEAVED UNTIL 9/26/2016 TO MOVE, PLEAD, OR OTHERWISE RESPOND TO PLAINTIFF'S COMPLAINT. NOTICE ISSUED | 📄 |
| 09/14/2016 | D1 | MO | MOTION FILED FOR D1 KINSALE INSURANCE COMPANY, LLC EDWARD T SYLVESTER 0073312 MOTION FOR LEAVE TO APPEAR AS PRO HAC VICE COUNSEL FOR KINSALE 09/19/2016 - GRANTED | 📄 |
| 09/14/2016 | D1 | MO | MOTION FILED FOR D1 KINSALE INSURANCE COMPANY, LLC EDWARD T SYLVESTER 0073312 MOTION FOR LEAVE TO APPEAR AS PRO HAC VICE COUNSEL FOR KINSALE 09/19/2016 - GRANTED | 📄 |
| 09/13/2016 | D2 | MO | MOTION FOR EXTENSION OF TIME UNOPPOSED MOTION FOR AN EXTENSION OF TIME TO MOVE, PLEAD, OR OTHERWISE RESPOND TO PLAINTIFFS' COMPLAINT 09/15/2016 - GRANTED | 📄 |
| 09/07/2016 | N/A | JE | DEFENDANT'S MOTION FOR AN EXTENSION OF TIME TO MOVE, PLEAD, OR OTHERWISE RESPOND TO PLAINTIFFS' COMPLAINT, FILED 08/16/2016, IS UNOPPOSED AND GRANTED. NOTICE ISSUED | 📄 |
| 09/06/2016 | P | OT | GENERAL PLEADING FILED BY PLAINTIFF(S) GOOD NUTRITION, LLC(P1) and JOHN HUFF(P2) ATTORNEY CHARLES W ZEPP 0068129 COMBINED OPPOSITION TO MOTION TO DISMISS AND MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING ARBITRATION AND DUTY TO DEFEND |  |
| 08/30/2016 | P | MO | MOTION FOR EXTENSION OF TIME MOTION FOR EXTENSION OF TIME TO RESPOND TO DEFENDANT'S MOTION TO DISMISS 09/06/2016 - UNOPPOSED AND GRANTED | 📄 |
| 08/23/2016 | P | MO | MOTION FOR EXTENSION OF TIME MOTION FOR EXTENSION OF TIME TO RESPOND TO DEFENDANT'S MOTION TO DISMISS 09/06/2016 - UNOPPOSED AND GRANTED | 📄 |
| 08/19/2016 | N/A | SR | SCHEDULE ATTORNEY NOTICE. NOTICE GENERATED FOR SYLVESTER/EDWARD/T 08/19/2016 17:05:17 |  |
| 08/19/2016 | N/A | SR | SCHEDULE ATTORNEY NOTICE. NOTICE GENERATED FOR O'NEILL/WILLIAM/J 08/19/2016 17:05:17 |  |
| 08/19/2016 | N/A | SR | SCHEDULE ATTORNEY NOTICE. NOTICE GENERATED FOR ZEPP/CHARLES/W 08/19/2016 17:05:17 |  |
| 08/19/2016 | N/A | SR | SCHEDULE ATTORNEY NOTICE. NOTICE GENERATED FOR GOURASH/DANIEL/F 08/19/2016 17:05:17 |  |
| 08/19/2016 | N/A | SR | SCHEDULE ATTORNEY NOTICE. NOTICE GENERATED FOR MUSKA/JOSEPH/M. 08/19/2016 17:05:16 |  |
| 08/19/2016 | N/A | SC | CMC BY PHONE SET FOR 09/14/2016 AT 02:20 PM. COUNSEL FOR PLAINTIFF(S) SHALL INFORM IN WRITING ALL UNREPRESENTED PARTIES OF THIS DATE AND TIME. PLAINTIFF¿S COUNSEL SHALL INITIATE THE CONFERENCE CALL WITH OPPOSING COUNSEL, UNREPRESENTED PARTIES AND THE COURT (216-443-8606). IF THE COURT CANNOT BE REACHED AT THE APPOINTED TIME, COUNSEL SHALL SEND AN EMAIL MESSAGE WITH CALLBACK PHONE NUMBER TO LACTON@CUYAHOGACOUNTY.US AND SHALL REMAIN AVAILABLE TO RECEIVE THE COURT'S CALL FOR 15 MINUTES AFTER THE APPOINTED TIME. FAILURE OF A PARTY TO APPEAR AT THE ABOVE SCHEDULED CMC OR ANY OTHER SCHEDULED COURT DATE MAY RESULT IN SANCTIONS AND/OR DISMISSAL OF THE CASE AND/OR ADVERSE JUDGMENT BEING RENDERED. DISCOVERY IS TO START IMMEDIATELY. PARTIES ARE TO BE READY WITH DEMAND AND OFFER OF SETTLEMENT. |  |
| 08/16/2016 | D1 | MO | MOTION TO DISMISS FILED 07/11/2017 - UNKNOWN | 📄 |
| 08/16/2016 | D2 | MO |  |  |

|            |     |    |                                                                                                                                                                              |   |
|------------|-----|----|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|---|
|            |     |    | MOTION FILED FOR D2 BRITTON GALLAGHER FINANCIAL SERVICES, INC. JOSEPH M. MUSKA 0089512 MOTION FOR AN EXTENSION OF TIME TO MOVE, PLEAD, OR OTHERWISE RESPOND TO PLAINTIFFS' COMPLAINT 09/07/2016 - UNOPPOSED AND GRANTED | 📄 |
| 07/20/2016 | N/A | SR | FEDEX RECEIPT NO. 29676979 DELIVERED BY FEDEX 07/19/2016 KINSALE INSURANCE COMPANY, LLC PROCESSED BY COC 07/20/2016. |   |
| 07/19/2016 | N/A | SR | FEDEX RECEIPT NO. 29676980 DELIVERED BY FEDEX 07/19/2016 BRITTON GALLAGHER FINANCIAL SERVICES, INC. PROCESSED BY COC 07/19/2016. |   |
| 07/15/2016 | N/A | SR | SUMMONS E-FILE COPY COST |   |
| 07/15/2016 | N/A | SR | SUMMONS E-FILE COPY COST |   |
| 07/15/2016 | D2  | CS | WRIT FEE |   |
| 07/15/2016 | D2  | SR | SUMS COMPLAINT(29676980) SENT BY FEDERAL EXPRESS. TO: BRITTON GALLAGHER FINANCIAL SERVICES, INC. 1375 EAST NINTH STREET 30TH FLOOR CLEVELAND, OH 44114 | 📄 |
| 07/15/2016 | D1  | CS | WRIT FEE |   |
| 07/15/2016 | D1  | SR | SUMS COMPLAINT(29676979) SENT BY FEDERAL EXPRESS. TO: KINSALE INSURANCE COMPANY, LLC 2221 EDWARD HOLLAND DRIVE SUITE 600 RICHMOND, VA 23230 | 📄 |
| 07/15/2016 | N/A | SF | JUDGE JOAN SYNENBERG ASSIGNED (RANDOM) |   |
| 07/15/2016 | P1  | SF | LEGAL RESEARCH |   |
| 07/15/2016 | P1  | SF | LEGAL NEWS |   |
| 07/15/2016 | P1  | SF | LEGAL AID |   |
| 07/15/2016 | P1  | SF | COURT SPECIAL PROJECTS FUND |   |
| 07/15/2016 | P1  | SF | COMPUTER FEE |   |
| 07/15/2016 | P1  | SF | CLERK'S FEE |   |
| 07/15/2016 | P1  | SF | DEPOSIT AMOUNT PAID DANIEL F GOURASH |   |
| 07/15/2016 | N/A | SF | CASE FILED: COMPLAINT | 📄 |

Only the official court records available from the Cuyahoga County Clerk of Courts, available in person, should be relied upon as accurate and current.

For questions/comments please click here.

Copyright © 2017 PROWARE. All Rights Reserved. 1.1.172



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed:**
**July 15, 2016 09:36**

By: DANIEL F. GOURASH 0032413

Confirmation Nbr. 803401

| | |
|---|---|
| GOOD NUTRITION, LLC, ET AL. | CV 16 866246 |
| vs. | **Judge:** |
| KINSALE INSURANCE COMPANY, ET AL. | |
| | JOAN SYNENBERG |

**Pages Filed:** 211

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| GOOD NUTRITION, LLC,<br>7710 First Place, Unit H<br>Oakwood Village, Ohio 44146,<br><br>And<br><br>JOHN HUFF<br>3120 Kingsley Road<br>Shaker Heights, Ohio 44122<br><br>　　Plaintiffs,<br><br>v.<br><br>KINSALE INSURANCE COMPANY, LLC<br>2221 Edward Holland Drive<br>Suite 600<br>Richmond, VA 23230,<br><br>And<br><br>BRITTON GALLAGHER FINANCIAL<br>SERVICES, INC.<br>1375 East Ninth Street<br>30th Floor<br>Cleveland, Ohio 44114,<br><br>　　Defendants. | CASE NO.<br><br>JUDGE<br><br><br>**COMPLAINT FOR DECLARATORY**<br>**RELIEF AND MONETARY DAMAGES**<br><br>**JURY DEMAND ENDORSED HEREON** |

　　　Now comes Plaintiffs, Good Nutrition, LLC ("Good Nutrition") and John Huff ("Huff"), by and through undersigned counsel, and for their Complaint for Declaratory Relief and Monetary Damages against Defendants Kinsale Insurance Company, LLC ("Kinsale") and Britton Gallagher Financial Services, LLC ("Britton Gallagher") states as follows:

## PARTIES

1.      Good Nutrition is a Delaware limited liability company with its principal place of business at 7710 First Place Unit H, Oakwood Village, OH 44146. Good Nutrition is registered to do in business and is in good standing in Ohio.

2.      John Huff is the Chief Executive Officer of Good Nutrition whose business address is at 7710 First Place Unit H, Oakwood Village, OH 44146.

3.      Kinsale is an excess and surplus lines insurance company that is domesticated in Arkansas and maintains its principal place of business at 2221 Edward Holland Drive, Suite 600, Richmond, Virginia 23230. At all times relevant hereto, Kinsale issued insurance policies to policyholders in Ohio and otherwise regularly conducted business in Ohio.

4.      Britton Gallagher is an Ohio limited liability company engaged in the business of insurance brokerage and risk management with its principal place of business at 1375 East Ninth Street, 30th Floor, Cleveland, Ohio 44114. At all times relevant hereto, Britton Gallagher regularly conducted business in Ohio.

## JURISDICTION AND VENUE

5.      This court has personal jurisdiction over Kinsale under RC 2307.382 (A)(1)(2) and (4) on the basis that Kinsale regularly transacts business in Ohio, entered into an insurance policy contract with Good Nutrition which is located in Ohio, and caused tortious injury to Good Nutrition and Huff in Ohio by acting outside of Ohio to decline coverage for Good Nutrition and Huff without a reasonable justification under the insurance policy it issued to Good Nutrition.

6.     This court has personal jurisdiction over Britton Gallagher under RC 2307.382 (A)(1) and (2) on the basis that Britton Gallagher regularly conducts business in Ohio and entered into a contract with Good Nutrition to provide insurance brokerage services in Ohio.

7.     Venue is proper in this court under Ohio R. Civ. Proc. 3 (B) (2), (3) and (7) on the basis that Britton Gallagher has its principal place of business in Cuyahoga County, Kinsale contracted to insure a risk within Cuyahoga County, and Good Nutrition and Huff reside in Cuyahoga County.

## THE KINSALE POLICY

8.     Kinsale issued Life Sciences General Liability—Claims Made Policy No. 0100030739-0 to Good Nutrition dba Good Greens effective 07/17/2015 to 07/17/2016 with limits of insurance of $2 million per claim and $4 million in the aggregate with a Retroactive Date of 06/09/2015 ("Policy"). A copy of the Policy is attached hereto as Exhibit A and incorporated as if fully set forth herein.

9.     The Insuring Agreement of Coverage B of the Policy contains a duty to defend a suit seeking damages because of "Personal and Advertising Injury" to which this insurance applies.

10.     "Personal and Advertising Injury" is defined to include certain offenses including, "b. Malicious Prosecution;" and "d. Oral or written publication, in any manner, of materials that slanders or libels a person's or organization's goods, products, or services."

11.     Under subsection 1.b.of the Insuring Agreement of Coverage B, coverage is afforded for an offense within the definition of "Personal and Advertising Injury"

arising out of Good Nutrition's business, but only if the offense was committed in the coverage territory, was not committed before the "Retroactive Date" of June 9, 2015, the claim was first made against any insured during the policy period, and the claim was first reported to Kinsale in writing during the policy period.

12.     Paragraph 11 of Section IV – GENERAL LIABILITY CONDITIONS, (the "Service of Suit Provision") states, in pertinent part, that "In the event of the failure of the Company to pay any amount claimed to be due under this Policy, the Company will submit to the jurisdiction of any court of competent jurisdiction within the United States of America or Canada."

13.     Paragraph 15 of Section IV – GENERAL LIABILITY CONDITIONS, (the "Arbitration Provision") states, in pertinent part, that "[a]ll disputes over coverage or any rights afforded under this Policy … shall be submitted to binding arbitration, which shall be the sole and exclusive means to resolve the dispute."  It further provides that "[t]he decision of the arbitration is final and binding on the parties."

14.     Britton Gallagher contracted with Good Nutrition to acquire the Policy from Kinsale through AmWINS Brokerage—Chicago, Illinois.

15.     Britton Gallagher did not provide Good Nutrition with an exemplar of the Policy form before Good Nutrition's purchase of the Policy.

16.     Britton Gallagher did not apprise Good Nutrition of the Arbitration Provision before Good Nutrition purchased the Policy.  The Arbitration Provision is not typical in the insurance industry and constitutes a material term of the Policy.  Good Nutrition would not have purchased the Policy if it had knowledge of the Arbitration Provision.

4

## UNDERLYING COMPLAINT

17.     On September 18, 2015 a complaint ("Underlying Complaint") was filed against Good Nutrition and Huff in a matter captioned, PurusHealth, LLC, et al. v. Good Nutrition, LLC, Case No. CV 15 851394, Court of Common Pleas, Cuyahoga County, Ohio (Calabrese, J.)("Underlying Litigation").   A copy of the complaint filed in the Underlying Litigation is attached hereto as Exhibit B and is incorporated by reference as if fully set forth herein.

18.     In Count X of the Underlying Complaint it is alleged that Good Nutrition engaged in "Malicious Civil Prosecution/Abuse of Process" by filing a civil action against PurusHealth,LLC, Dr. Sangeeta T. Mahajan and Keith Pabley in a matter captioned Good Nutrition, LLC v. Sangeeta T. Mahajan, et al., Case No. CV 15 847519, Court of Common Pleas, Cuyahoga County, Ohio (J.J. Russo, J.) ("GN Lawsuit") on June 25, 2015.  A copy of the complaint filed in the GN Lawsuit is attached hereto as Exhibit C and is incorporated by reference as if fully set forth herein.

19.     In Count XI of the Underlying Complaint it is alleged that Huff engaged in "Defamation" by making false and statements concerning Dr. Mahajan that were contained in an Affidavit filed in support of a motion for prejudgment interest on June 29, 2015 in the GN Lawsuit ("Affidavit").  A copy of the Affidavit is attached hereto as Exhibit D and is incorporated by reference as if fully set forth herein.

5

## THE TENDER AND DENIAL OF COVERAGE

20.    On December 11 and again on December 12, 2015, Good Nutrition and Huff, through counsel, tendered the Underlying Complaint to Kinsale, in writing and in accordance with the instructions for reporting a claim in the Policy, seeking defense and indemnity coverage under the Policy.

21.    On December 14, Kinsale responded to the tender by denying coverage, stating, "Please be further advised that there is no coverage for this claim under your Kinsale Policy. Kinsale will not be appointing defense counsel to defend you in this matter and therefore, you should take the appropriate steps to ensure that your interests are protected." A copy of the tender and denial email chain is attached hereto as Exhibit E and is incorporated by reference as if fully set forth herein.

22.    On December 17, 2015, Kinsale sent a letter to Good Nutrition setting forth the basis for its denial of coverage for the Underlying Complaint. In the denial letter, Kinsale stated, "If any of the information summarized in this letter is incorrect or if you otherwise have additional information you would like us to consider, please immediately forward it to our attention so we can reconsider our position." A copy of the denial letter is attached hereto as Exhibit F and is incorporated by reference as if fully set forth herein.

23.    On December 18, 2015, Plaintiffs' counsel responded to the denial letter expressing disagreement with the analysis regarding coverage for Huff and asking Kinsale to address coverage for Good Nutrition, a separate insured. A copy of the email is attached hereto as Exhibit G and is incorporated by reference as if fully set forth herein.

24.     On December 21, 2015, Katherine E. Miller informed Plaintiffs' counsel that her firm, Hinshaw & Culbertson, LLP would be representing Kinsale and would respond to Plaintiffs' counsel's December 18, 2015 email "shortly."  A copy of the letter from Kinsale's counsel is attached hereto as Exhibit H and is incorporated by reference as if fully set forth herein.

25.     On December 27, 2015, Britton Gallagher requested a response to Plaintiffs' counsel's email of December 18, 2015.  Kinsale referred Britton Gallagher to its counsel.  A copy of the email is attached hereto as Exhibit I and is incorporated by reference as if fully set forth herein.

26.     On December 28, 2015, Britton Gallagher requested an update from Kinsale's counsel regarding Plaintiffs' counsel's email of December 18, 2015.  A copy of the email is attached hereto as Exhibit J and is incorporated by reference as if fully set forth herein.

27.     On December 29, 2015, Plaintiffs' counsel asked for a specific date for Kinsale's coverage position for Good Nutrition's tender of December 11, 2015.   A copy of the email is attached hereto as Exhibit K and is incorporated by reference as if fully set forth herein.

28.     On December 29, 2015, Kinsale's counsel affirmed its denial of coverage for Good Nutrition and Huff.  A copy of the letter is attached hereto as Exhibit L and is incorporated by reference as if fully set forth herein.

29.     On December 29, 2015, Plaintiffs' counsel requested confirmation that there would not be a separate coverage analysis for Good Nutrition and/or that Kinsale intended to rely on the analysis for Huff for the Good Nutrition claim for coverage.  A

7

copy of the email is attached hereto as Exhibit M and is incorporated by reference as if fully set forth herein.

30.     On December 30, 2015, Counsel for Kinsale responded with a two-sentence letter, stating, in full: "Kinsale disclaimed coverage to Good Nutrition and John Huff.  A copy of the disclaimer is attached."  Kinsale's counsel attached the December 17, 2016 denial letter.  A copy of the letter is attached hereto as Exhibit N and is incorporated by reference as if fully set forth herein.

31.     On January 22, 2016, Plaintiffs' counsel emailed a seven-page letter to Kinsale's counsel requesting that Kinsale reconsider its decision disclaiming coverage.  A copy of the letter is attached hereto as Exhibit O and is incorporated by reference as if fully set forth herein.  In a January 27, 2016 email Plaintiffs' counsel pointed out a typographical error on page 2 of the January 22, 2016 letter.  Plaintiffs' counsel explained that the 1/22/16 letter incorrectly identified the retroactive date as June 9, 2016.  The correct retroactive date is June 9, 2015.  A copy of the email is attached hereto as Exhibit P and is incorporated by reference as if fully set forth herein.

32.     On January 27, 2016, Plaintiffs' counsel informed Kinsale's counsel that it intended to engage in settlement discussions with respect to the Underlying Complaint and renewed the request for reconsideration of the disclaimer.  A copy of the email is attached hereto as Exhibit Q and is incorporated by reference as if fully set forth herein.

33.     On February 11, 2016, Plaintiffs' counsel left a voicemail message for Kinsale's counsel asking whether Kinsale was going to reverse its denial of coverage on the duty to defend based on the recent communications.  Kinsale's coverage counsel never responded to the voicemail message.

8

34. To date, despite stating it would do so in the denial letter, Kinsale has not responded to Plaintiffs' request for reconsideration set forth in the January 22, 2016 letter.

35. Plaintiffs have incurred, and continue to incur, the costs of their defense in defending the Underlying Complaint.

**COUNT I**
**Breach of Contract (Kinsale)**

36. Plaintiffs repeat and reallege Paragraphs 1 through 34 as if fully set forth herein.

37. Plaintiffs have incurred, and continue to incur, the costs of their defense in the Underlying Litigation. Kinsale has refused to reimburse these costs and refused to provide Plaintiffs with a defense.

38. Pursuant to the Policy, Kinsale has a duty to defend and indemnify Plaintiffs for the claims set forth in the Underlying Complaint.

39. Kinsale breached its duties under the Policy by refusing to defend and/or indemnify Plaintiffs

40. Kinsale has breached the material terms of the Policy, under which Plaintiffs were insured, and has failed to perform its contractual obligations.

41. Plaintiffs have fully performed all their obligations under the Policy.

42. As a result of the breach by Kinsale, Plaintiffs have suffered direct and consequential damages, including but not limited to the continuing costs of their defense in the Underlying Litigation, plus attorney's fees and costs incurred in prosecuting this lawsuit.

Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

## COUNT II
### Declaratory Judgment– Arbitration Provision Does Not Apply (Kinsale)

43. Plaintiffs repeat and reallege Paragraphs 1 through 42 as if fully set forth herein.

44. The Service of Suit Provision states: "In the event of the failure of the Company to pay any amount claimed to be due under this Policy, the Company will submit to the jurisdiction of any court of competent jurisdiction within the United States of America or Canada."

45. Plaintiffs have incurred, and continue to incur the costs of their defense in the Underlying Litigation.

46. Kinsale is obligated to pay these defense costs under the Policy.

47. These defense costs constitute "any amount claimed to be due under the Policy" under the Service of Suit Provision.

48. The Service of Suit Provision is applicable to Plaintiffs' claim for defense costs, i.e., "any amount claimed to be due under the Policy.

49. The Arbitration Provision provides that "disputes over coverage or any rights afforded under this Policy … shall be submitted to binding arbitration, which shall be the sole and exclusive means to resolve the dispute." The Arbitration Provision does not apply to Plaintiffs' claims for defense costs.

50. Upon information and belief, Kinsale will claim the Arbitration Provision applies. In that event, there is a conflict between the Service of Suit Provision and the Arbitration Provision that renders the Arbitration Provision ambiguous.

51. To the extent the Policy is ambiguous, it should be construed in favor of Plaintiffs and against Kinsale, the author of the Policy language.

10

52.     There is an actual controversy between the parties concerning whether the Service of Suit Provision or the Arbitration Provision apply and whether the Arbitration Provision is ambiguous.

53.     A declaratory judgment will resolve this dispute between the parties concerning which provision applies and whether the Arbitration Provision is ambiguous.

54.     In accordance with R.C. Chapter 2721 and as otherwise permitted under Ohio law, Plaintiffs seek a judicial determination as to whether the Service of Suit Provision or Arbitration Provision applies and whether the Arbitration Provision is ambiguous.

## COUNT III
### Declaratory Judgment– Arbitration Provision is Unenforceable (Kinsale)

55.     Plaintiffs repeat and reallege Paragraphs 1 through 54 as if fully set forth herein.

56.     The Policy contains the Arbitration Provision which provides for final and binding arbitration for "all disputes over coverage or any rights afforded under this Policy."

57.     If the Arbitration Provision is applicable and unambiguous, it is not enforceable.

58.     The Arbitration Provisions is unreasonably favorable to Kinsale and unfair to Good Nutrition.  The Arbitration Provision is not commercially reasonable and does not comport with the standard provisions in the industry.  Before it purchased the Policy, Good Nutrition was not apprised of the Arbitration Provision and it was never explained to Good Nutrition.

59.     There is an actual controversy between the parties concerning whether the Arbitration Provision is enforceable.

60.     A declaratory judgment will resolve the dispute between the parties concerning whether the Arbitration Provision is enforceable.

61.     In accordance with R.C. Chapter 2721 and as otherwise permitted under Ohio law, Plaintiffs seek a judicial determination as to whether the Arbitration Provision in the Policy is enforceable.

### COUNT IV
### Declaratory Judgment – Duty to Defend (Kinsale)

62.     Plaintiffs repeat and reallege Paragraphs 1 through 61 as if fully set forth herein.

63.     Plaintiffs tendered the Underlying Complaint to Kinsale, in writing and in accordance with the instructions for reporting a claim in the Policy, seeking defense coverage under the Policy.

64.     Kinsale has denied that it has a duty to defend under the Policy.

65.     There is an actual controversy between the parties concerning whether Kinsale has a duty to defend.

66.     A declaratory judgment will resolve the dispute between the parties concerning whether Kinsale has a duty to defend.

67.     In accordance with R.C. Chapter 2721 and as otherwise permitted under Ohio law, Plaintiffs seek a judicial determination as to whether Kinsale is obligated under the Policy to defend Plaintiffs and to reimburse them for defense costs already incurred in connection with the Underlying Complaint.

## COUNT V
### Declaratory Judgment – Duty to Indemnify (Kinsale)

68.     Plaintiffs repeat and reallege Paragraphs 1 through 67 as if fully set forth herein.

69.     Plaintiffs tendered the Underlying Complaint to Kinsale, in writing and in accordance with the instructions for reporting a claim in the Policy, seeking indemnity coverage under the Policy.

70.     Kinsale has denied that it has a duty to indemnify Plaintiffs under the Policy.

71.     There is an actual controversy between the parties concerning whether Kinsale has a duty to indemnify.

72.     A declaratory judgment will resolve the dispute between the parties concerning whether Kinsale has a duty to indemnify.

73.     In accordance with R.C. Chapter 2721 and as otherwise permitted under Ohio law, Plaintiffs seek a judicial determination as to whether Kinsale is obligated under the Policy to indemnify Plaintiffs or to reimburse Plaintiffs for indemnity costs incurred in connection with the Underlying Complaint.

## COUNT VI
### Bad Faith (Kinsale)

74.     Plaintiffs repeat and reallege Paragraphs 1 through 73 as if fully set forth herein.

75.     Plaintiffs tendered the Underlying Complaint to Kinsale, in writing and in accordance with the instructions for reporting a claim in the Policy, seeking defense and indemnity coverage  under the Policy.

76.     Kinsale has not provided a defense, reimbursed defense costs or agreed to indemnify Plaintiffs in connection with the Underlying Complaint.

77.     Kinsale's actions and/or inactions are without reasonable justification and are in bad faith.

78.     As a result of Kinsale's bad faith, Plaintiffs have suffered direct and consequential damages, the exact amount of which will be proven at trial, plus punitive damages, attorney's fees and costs incurred in prosecuting this lawsuit.

**COUNT VII**
**Professional Negligence/Errors and Omissions (Britton Gallagher)**

79.     Plaintiffs repeat and reallege Paragraphs 1 through 78 as if fully set forth herein.

80.     Prior to purchasing the Policy, Good Nutrition discussed available options with Britton Gallagher that would provide actual coverage for malicious prosecution and defamation.

81.     Plaintiffs reasonably expected to be provided coverage for malicious prosecution and defamation.  In the absence of such coverage, the promises contained within the Policy were illusory and/or lacked sufficient consideration.

82.     Based on the refusal of Kinsale to provide coverage for malicious prosecution and defamation, Plaintiffs assert that Britton Gallagher and/or its agents negligently performed its job responsibilities by proposing and implementing an insurance policy that did not provide any actual coverage for malicious prosecution and defamation.

83.     Upon information and belief, Britton Gallagher, and/or its agents failed to use the skill and care that a reasonably careful insurance agent would have used in similar circumstances.

84.     As a direct and proximate result of Britton Gallagher's negligence, Plaintiffs have suffered damages which continue to accrue, including but not limited to potential uncovered liability to third parties, attorneys' fees, costs and other additional expenses.

## COUNT VIII
### Professional Negligence/Errors and Omissions (Britton Gallagher)

85.     Plaintiffs repeat and reallege Paragraphs 1 through 84 as if fully set forth herein.

86.     Britton Gallagher did not provide Plaintiffs with an exemplar of the Policy form before Good Nutrition purchased the Policy.

87.     Britton Gallagher did not apprise Plaintiffs of the Arbitration Provision before Good Nutrition purchased the Policy. The Arbitration Provision is not typical in the insurance industry and constitutes a material term of the Policy.

88.     Good Nutrition would not have purchased the Policy if it had knowledge of the Arbitration Provision.

89.     Plaintiffs assert that Britton Gallagher and/or its agents negligently performed its job responsibilities by failing to provide an exemplar of the Policy form and failing to inform them of the unreasonable Arbitration Provision.

90.     Upon information and belief, Britton Gallagher, and/or its agents failed to use the skill and care that a reasonably careful insurance agent would have used in similar circumstances.

Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

91.     As a direct and proximate result of Britton Gallagher's negligence, Plaintiffs have suffered damages which continue to accrue, including but not limited to potential uncovered liability to third parties, attorneys' fees, costs and other additional expenses.

**WHEREFORE**, Plaintiffs demand:

(1)     that judgment be granted in their favor and against Defendant Kinsale for compensatory and consequential damages in an amount in excess of $25,000, the exact amount of which will be proven at Trial, including but not limited to past and future defense costs that Plaintiffs have incurred and will continue to incur in defending the underlying Complaint, punitive damages, pre- and post-judgment interest, attorney's fees, costs and expenses incurred in prosecuting this lawsuit and for such other further relief, in equity or at law, as deemed proper by this Court; and

(2)     a declaratory judgment in their favor and against Defendant Kinsale holding that the Arbitration Provision is inapplicable, ambiguous, and/or unenforceable;

(3)     a declaratory judgment in their favor and against Defendant Kinsale holding that Kinsale is obligated under the Policy to defend Plaintiffs and/or to reimburse Plaintiffs for past and future defense costs incurred in defending the Underlying Complaint;

(4)     a declaratory judgment in their favor and against Defendant Kinsale holding that Kinsale is obligated under the Policy to indemnify Plaintiffs or to reimburse Plaintiffs for indemnity costs incurred in connection with the Underlying Complaint;

16

(5)     that judgment be granted in its favor and against Defendant Britton
Gallagher for compensatory and consequential damages in an amount in excess of
$25,000, the exact amount of which will be proven at Trial, pre- and post-judgment
interest, attorney's fees, costs and expenses incurred in prosecuting this lawsuit and for
such other further relief, in equity or at law, as deemed proper by this Court.

## JURY DEMAND

A trial by jury is hereby demanded on all issues so triable.

Respectfully submitted,

*/s/ Daniel F. Gourash*
Daniel F. Gourash (Bar No. 0032413)
Charles W. Zepp (Bar No. 0068129)
SEELEY, SAVIDGE, EBERT &
GOURASH CO. LPA
26600 Detroit Rd., Suite 300
Cleveland, Ohio 44145
(216) 566-8200;  (216) 566-0213 fax
dfgourash@sseg-law.com
czepp@sseg-law.com

*Attorneys for Plaintiffs*

# EXHIBIT A

**KINSALE INSURANCE COMPANY**
2221 Edward Holland Drive, Suite 600
Richmond, Virginia 23230

## DECLARATIONS - LIFE SCIENCES
## GENERAL LIABILITY - CLAIMS MADE

| | |
|---|---|
| Policy Number: | 0100030739-0 |
| Producer Number: | 10508 |
| Name and Address: | AmWINS Brokerage - Chicago, IL |
| | 10 LaSalle Street, Suite 2000 |
| | Chicago, IL 60603 |

| | |
|---|---|
| **NAMED INSURED:** | Good Nutrition LLC |
| | dba Good Greens |
| **MAILING ADDRESS:** | 2000 Auburn Rd, Suite 200 |
| | Beachwood, OH 44122 |
| **POLICY PERIOD:** | FROM 07/17/2015 TO 07/17/2016 at 12:01 AM at the address of the named insured as shown above. |

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

| LIMITS OF INSURANCE | | |
|---|---|---|
| Each Claim Limit | $2,000,000 | |
| Damage to Premises Rented to You Limit | $50,000 | Any one premises |
| Personal and Advertising Injury Limit | $2,000,000 | Any one person or organization |
| General Aggregate Limit | $4,000,000 | |
| Products/Completed Operations Aggregate Limit | $4,000,000 | |

| DEDUCTIBLE(S) | |
|---|---|
| Each Claim Deductible | $5,000 |

| RETROACTIVE DATE | |
|---|---|
| General Liability | 06/09/2015 at 12:01AM at the address of the named insured as shown above. |

THIS INSURANCE DOES NOT APPLY TO INJURY OR DAMAGE WHICH OCCURS BEFORE THE APPLICABLE RETROACTIVE DATE, SHOWN ABOVE.

| DESCRIPTION OF BUSINESS | |
|---|---|
| **DESCRIPTION OF OPERATIONS:** | Manufacturer of Wellness Bars and Powders |
| Business Type: | Limited Liability Co |

| ALL PREMISES YOU OWN, RENT OR OCCUPY (if different from mailing address) | |
|---|---|
| LOCATION | ADDRESS OF ALL PREMISES YOU OWN, RENT OR OCCUPY |
| 1 | 2000 Auburn Rd, Suite 200, Beachwood, OH 44122 |

| CLASSIFICATION AND PREMIUM | | | | | |
|---|---|---|---|---|---|
| CLASS CODE | CLASS DESCRIPTION | BASIS OF PREMIUM | EXPOSURE | RATE | PREMIUM |
| 80248.02.11 | Nutrition | per $1,000 of Revenue | 5,000,000 | 3.38 | $16,900 |

| | | | |
|---|---|---|---|
| | TOTAL PREMIUM (MINIMUM AND DEPOSIT): | | $16,900 |
| | COMPANY FEE: | | $300 |
| | TOTAL PAYABLE AT INCEPTION: | | $17,200 |

| POLICY SUBJECT TO AUDIT: | Y | AUDIT PERIOD: | Annual |
|---|---|---|---|

| FORMS AND ENDORSEMENTS |
|---|
| Refer to ADF4001, SCHEDULE OF FORMS |

THESE DECLARATIONS, TOGETHER WITH THE COMMON POLICY CONDITIONS AND COVERAGE FORM(S) AND ANY
ENDORSEMENT(S), COMPLETE THE ABOVE NUMBERED POLICY.

## NOTICE—WHERE TO REPORT A CLAIM

It is important that you report claims or incidents (if incident reporting is permitted under your policy) in writing and directly to Kinsale Insurance Company. Reporting claims or incidents to your insurance agent or broker is not notice to Kinsale Insurance Company. Failure to report may jeopardize your coverage under the Policy. Our contact information is listed below.

**By E-mail:**
Newclaimnotices@kinsaleins.com

**By FAX:**
1-804-482-2762, Attention Claims Department

or

**By Mail:**
Kinsale Insurance Company
Attention: Claims Department
P. O. Box 17008
Richmond, Virginia 23226

**Street Address:**
2221 Edward Holland Drive, Suite 600
Richmond, Virginia 23230

# SCHEDULE OF FORMS

| Attached To and Forming Part of Policy<br>0100030739-0 | Effective Date of Endorsement<br>07/17/2015 12:01AM at the Named Insured<br>address shown on the Declarations | Named Insured<br>Good Nutrition LLC |
|---|---|---|
| Additional Premium:<br>$0 | | Return Premium:<br>$0 |

LSC1002-0713 - Declarations - Life Sciences General Liability - Claims Made
ADF9013-1011 - Notice - Where To Report A Claim
ADF4001-0110 - Schedule of Forms
LSC0001-1014 - Life Sciences General Liability Coverage Form - Claims Made and Reported
AHL2009-0110 - Amendment - Definition of Insured Contract
AHL2039-0910 - Stop Gap Liability Coverage Endorsement
LSC2011-0713 - Claims Made Endorsement
AHL4009-0413 - Minimum Policy Premium
LSC4001-0110 - Life Sciences - Composite Rate Endorsement
ADF3011-0115 - Exclusion of Other Acts of Terrorism Committed Outside the United States; Exclusion of Punitive Damages
Related to a Certified Act of Terrorism; Cap on Losses from Certified Acts of Terrorism
LSC3001-0713 - Additional Exclusions- Life Sciences
LSC3003-1214 - Exclusion- Ingredients or Additives
LSC3009-0713 - Exclusion - Transmissible Spongiform Encephalopathy (TSE)
LSC5004-0713 - Additional Insured - Managers or Lessors of Premises
LSC5005-0713 - Additional Insureds - Vendors
LSC5006-0713 - Additional Insured as Required By Written Contract - Trade Event
ADF9010-0115 - Notice of Terrorism Insurance Coverage
ADF9004-0110 - Signature Endorsement
ADF9009-0110 - U.S. Treasury Department's Office of Foreign Assets Control (OFAC) Advisory Notice to Policyholders

# LIFE SCIENCES

## GENERAL LIABILITY COVERAGE FORM—CLAIMS MADE AND REPORTED

THIS IS A CLAIMS MADE AND REPORTED POLICY. THE COVERAGE REQUIRES THAT A CLAIM BE FIRST MADE AGAINST AN INSURED DURING THE POLICY PERIOD AND BE REPORTED IN WRITING TO THE COMPANY WITHIN THE POLICY PERIOD OR AN EXTENDED REPORTING PERIOD, IF APPLICABLE. THE LIMIT OF INSURANCE WILL BE REDUCED BY PAYMENT OF DAMAGES AND SUPPLEMENTARY PAYMENTS. PLEASE READ THE ENTIRE POLICY CAREFULLY.

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy the words "you" and "your" refer to the "named insured" shown in the Declarations, and any other person or organization qualifying as a "named insured" under this Policy. The words "we", "us" and "our" refer to the Company providing this insurance. Other words and phrases that appear in quotation marks have special meaning. Refer to **SECTION VII – DEFINITIONS.**

### SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. **Insuring Agreement**

    a. We will pay those sums that the "insured" becomes legally obligated to pay as "damages" because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the "insured" against any "suit" seeking those "damages". However, we will have no duty to defend the "insured" against any "suit" seeking "damages" for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any "claim" or "suit" that may result. But:

        (1) The amount we will pay for "damages" is limited as described in Section III – **LIMITS OF INSURANCE AND DEDUCTIBLE**; and

        (2) Our right and duty to defend ends when we have used up the applicable Limit of Insurance in the payment of judgments, settlements and Supplementary Payments under Coverages A or B.

        No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

    b. This insurance applies to "bodily injury" and "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

        (2) The "bodily injury" or "property damage" did not occur before the "retroactive date", if any, shown in the Declarations or after the end of the "policy period"; and

        (3) A "claim" for "damages" because of the "bodily injury" or "property damage" is first made against any "insured", in accordance with Paragraph c. below, during the "policy period" or any Extended Reporting Period we provide under Section VI – Extended Reporting Period; and

        (4) A "claim" for "damages" because of the "bodily injury" or "property damage" is first reported in writing to the Company during the "policy period".

    c. All "claims" for "damages" because of "bodily injury" to the same person, including "damages" claimed by any person or organization for care, loss of services, or death resulting at any time from the "bodily injury", will be deemed to have been made at the time the first of those "claims" is made against any "insured".

        All "claims" for "damages" because of "property damage" causing loss to the same person or organization will be deemed to have been made at the time the first of those "claims" is made against any "insured".

    d. For the purposes of this insurance, all "bodily injury" or "property damage" logically or causally connected by any common fact, circumstance, situation, transaction, event, service, advice or decision will be deemed to have first taken place at the time the first of such "bodily injury" or "property damage" took place. All such "bodily injury" or "property damage" will be deemed to be the same "bodily injury" or "property damage" even though the nature and extent of any resulting injury or damage may change and even though the resulting injury or damage may be

continuous, progressive, cumulative, changing or evolving, and even though the resulting injury or damage may be or may involve a continuous or repeated exposure to substantially the same general harm.

e.  Where there is no coverage under this Policy, there is no duty to defend.

## 2. Exclusions Applicable to Coverage A

This insurance does not apply to:

### a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured". This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

### b. Liquor Liability

"Bodily injury" or "property damage" for which any "insured" may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

### c. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the "insured" arising out of and in the course of:

(a) Employment by any "insured"; or

(b) Performing duties related to the conduct of any "insured's" business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether an "insured" may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury and to liability assumed under any contract or agreement.

The word "employee" as used in this exclusion includes any member, associate, "leased worker", contract worker, casual worker, "temporary worker" or any persons loaned to or volunteering services to you.

### d. Absolute Pollution and Pollution Related

(1) Any "claim" or "suit" for "bodily injury" or "property damage" or other injury or damage arising directly or indirectly out of, related to, or, in any way involving:

Pollution/environmental impairment/contamination or any expenses or any obligation to share damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising out of or alleged to have arisen out of same. All liability and expense arising out of or related to any form of pollution, whether intentional or otherwise and whether or not any resulting injury, damage, devaluation, cost or expense is expected by any "insured" or any person or entity, is excluded throughout this Policy.

(2) Any "damages", "claim", or "suit" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" including but not limited to any:

(a) "Bodily injury" or "property damage" or other injury or damages for the devaluation of property, or for taking, use or acquisition or interference with the rights of others in or on property or air space, or any other type injury or expense; or

(b) Any loss, cost, expense, fines and/or penalties arising out of any (i) request, demand, order, governmental authority or directive that of any private party or citizen action that any "insured", or others, test for, monitor, clean up, remove, contain, treat, detoxify or neutralize or in any way respond to, or assess same, the effects of "pollutants", environmental impairments, contaminants or (ii) any litigation or administrative procedure in which any "insured" or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of "pollutants", environmental impairments, or contaminants into or upon land, premises, buildings, the atmosphere, any water course, body of water, aquifer or ground water, whether sudden, accidental or gradual in nature or not, and regardless of when.

These exclusions apply regardless of whether:

(1) Injury or damage claimed is included within the "products-completed operations hazard" of the Policy; or

(2) An alleged cause for the injury or damage is the "insured's" negligent hiring, placement, training, supervision, retention, act, error or omission.

**e. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any "insured". Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any "insured" allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that "insured", if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any "insured".

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 50 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the "insured";

(4) "Bodily injury" or "property damage" arising out of:

(a) The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b) The operation of any of the machinery or equipment listed in Paragraph **f. (2)** or **f. (3)** of the definition of "mobile equipment".

**f. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any "insured"; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**g. Damage To Property**

"Property damage" to:

(1) Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

(2) Premises you sell give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the "insured";

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate Limit of Insurance applies to Damage To Premises Rented to You as described in **SECTION III – LIMITS OF INSURANCE AND DEDUCTIBLE**.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**h. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**i. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

**j. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**k. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**l. Personal and Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**m. Access Or Disclosure Of Confidential Or Personal Information And Data-related Liability**

Damages arising out of:

**(1)** Any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information; or

**(2)** The loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of that which is described in Paragraph **(1)** or **(2)** above.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

Exclusions **b.** through **k.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate Limit of Insurance applies to this coverage as described in **SECTION III – LIMITS OF INSURANCE AND DEDUCTIBLE.**

**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**

**1. Insuring Agreement**

**a.** We will pay those sums that the "insured" becomes legally obligated to pay as "damages" because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the "insured" against any "suit" seeking those "damages". However, we will have no duty to defend the "insured" against any "suit" seeking "damages" for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any "claim" or "suit" that may result. But:

    (1) The amount we will pay for "damages" is limited as described in **SECTION III – LIMITS OF INSURANCE AND DEDUCTIBLE**; and

    (2) Our right and duty to defend end when we have used up the applicable Limit of Insurance in the payment of judgments, settlements or Supplementary Payments under Coverages A or **B**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and **B**.

**b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business, but only if:

    (1) The offense was committed in the "coverage territory";

    (2) The offense was not committed before the "retroactive date", if any, shown in the Declarations or after the end of the "policy period"; and

    (3) A "claim" for "damages" because of the **"personal and advertising injury"** is first made against any "insured", in accordance with Paragraph **c.** below, during the "policy period" or any Extended Reporting Period we provide under Section **V** – Extended Reporting Periods; and

    (4) A "claim" for "damages" because of "personal and advertising injury" is first reported in writing to the Company during the "policy period".

**c.** All "claims" for "damages" because of "personal and advertising injury" to the same person or organization as a result of an offense will be deemed to have been made at the time the first of those "claims" is made against any "insured".

**d.** For the purposes of this insurance, all offenses logically or causally connected by any common fact, circumstance, situation, transaction, event, service, advice or decision will be deemed to have first taken place at the time the first of such offenses took place. All such offenses will be deemed to be the same offense even though the nature and extent of any resulting injury may change and even though the resulting injury may be continuous, progressive, cumulative, changing or evolving, and even though the resulting injury may be or may involve a continuous or repeated exposure to substantially the same general harm.

**e.** Where there is no coverage under this Policy, there is no duty to defend.

**2.** Exclusions applicable to Coverage B

This insurance does not apply to:

  **a.** **Knowing Violation Of Rights Of Another**

    "Personal and advertising injury" caused by or at the direction of the "insured" with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

  **b.** **Material Published With Knowledge Of Falsity**

    "Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

  **c.** **Material Published Prior To Retroactive Date**

    "Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the Retroactive Date shown in the Declarations.

  **d.** **Breach Of Contract**

    "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

  **e.** **Quality Or Performance Of Goods – Failure To Conform To Statements**

    "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

  **f.** **Wrong Description Of Prices**

    "Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

  **g.** **Insureds In Media And Internet Type Businesses**

    "Personal and advertising injury" committed by an insured whose business is:

    (1) Advertising, broadcasting, publishing or telecasting;

**(2)** Designing or determining content of web-sites for others; or

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**h.  Electronic Chat Rooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chat room or bulletin board the "insured" hosts, owns, or over which the "insured" exercises control.

**i.  Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**j.  Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**k.  Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**l.  Access Or Disclosure Of Confidential Or Personal Information**

"Personal and advertising injury" arising out of any access to or disclosure of any person's or organization's confidential or personal information, including patents, trade secrets, processing methods, customer lists, financial information, credit card information, health information or any other type of nonpublic information.

This exclusion applies even if damages are claimed for notification costs, credit monitoring expenses, forensic expenses, public relations expenses or any other loss, cost or expense incurred by you or others arising out of any access to or disclosure of any person's or organization's confidential or personal information.

**ADDITIONAL EXCLUSIONS – COVERAGES A AND B** (the following exclusions apply to both **BODILY INJURY AND PROPERTY DAMAGE LIABILITY** and **PERSONAL AND ADVERTISING INJURY LIABILITY**)

This insurance does not apply to:

**a.  Prior Or Known Claims**

Any prior or known claims:

**(1)** Disclosed in the application for this Policy;

**(2)** Disclosed to any other insurance company or other source from which payment might be made prior to the effective date of the "policy period" of the first policy issued by us;

**(3)** Based on, arising out of or resulting from:

**a.** An "occurrence" or offense, any portion of which took place prior to the "retroactive date" specified for the "named insured";

**b.** Any act, omission or circumstance that could reasonably have been foreseen to give rise to a "claim" prior to the effective date of the "policy period" of the first policy in a series of continuous policies issued by us; or

**c.** Proceedings that were initiated against any "insured" prior to the effective date of the "policy period" of the first policy in a series of continuous policies issued by us.

b. **Criminal Acts**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of any criminal act, including but not limited to abuse , molestation or fraud, committed by or at the direction of the "insured".

c. **Dishonest, Fraudulent Or Malicious Acts**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of any dishonest, fraudulent or malicious act, including reckless violation of any statute, or any act deemed uninsurable by law, committed by or at the direction of any "insured".

d. **Professional Services**

"Bodily injury", "property damage" or "personal and advertising injury" that results from the performance of or failure to perform professional services.

e. **Business Conduct**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of, related to, or, in any way involving:

(1) Any actual or alleged anti-trust law violation, unfair competition, price fixing or agreement or conspiracy to restrain trade;

(2) Any actual or alleged infringement of copyright, patent, trademark, service mark, right of publicity, slogan, trade secret, trade dress, trade name, or other intellectual property;

(3) Actual or alleged false advertising, false designation of origin, product disparagement, trade libel, or other causes of action arising out of unfair competition;

(4) Any actual or alleged violation by any "insured", or by anyone with the "insured's" knowledge, of any law or regulation imposing criminal liability; or

(5) Any products or goods manufactured, sold, handled or distributed or work completed by the "insured" or others operating under the direction or control of the "insured" in violation of any law, statute or ordinance of any federal, state or municipal government, or any agencies thereof, including violations of the Lanham Act or other unfair competition statutes.

f. **Fee Dispute**

Any commingling, conversion, embezzlement or misappropriation of, inability or failure to pay, collect or return, any money or fees for services.

g. **Laws**

Violation of any laws including:

(1) Any workers' compensation, disability benefits or unemployment compensation law, social security or similar law;

(2) Employee Retirement Income Security Act of 1974 (ERISA) including any fiduciary liability or liability due to the administration of any employee benefit plan; the Fair Labor Standards Act; the National Labor Relations Reconciliation Act of 1938; the Consolidated Omnibus Budget Reconciliation Act of 1985; or the Occupational Safety and Health Act;

(3) Any Medicare or Medicaid regulations;

(4) Any Health Insurance Portability and Accountability Act (HIPAA) or Americans with Disabilities Act (ADA)rules, regulations or laws; or

(5) Any rules or regulations promulgated under any of the foregoing, amendments thereto, or any similar provisions of any federal, state or local laws.

h. **Distribution Of Material In Violation Of Statutes**

Violation of The Telephone Consumer Protection Act (TCPA), The CAN-SPAM Act of 2003, the Fair Credit Reporting Act (FCRA), the Fair and Accurate Credit Transaction Act (FACTA) and any amendments to such law; and including violation of any other statute, ordinance or regulation that limits or prohibits the printing, dissemination, disposal, collecting, recording, transmitting, communicating, sending or distribution of any material or information.

i. **Abuse Or Molestation**

"Bodily injury", "property damage" or "personal and advertising injury" arising out of:

(1) Any conduct, physical act, gesture, sexual contact (whether or not consensual), sexual molestation, sexual or physical assault or battery, sexual abuse, sexual harassment or exploitation, harmful, unwanted or offensive contact or spoken or written words of a sexual or physically violent nature whether provoked or unprovoked;

(2) The "insured's" actual or alleged negligent employment, investigation, supervision, hiring, training or retention of any "employee", "insured" or person for whom the "insured" is legally responsible and whose conduct falls within paragraph (1) above; or

(3) The failure to provide an environment safe from or warn of the dangers of, or prevent or fail to report to the proper authorities, any conduct described in paragraph (1) above.

### j. Contractual Liability

"Bodily injury", "property damage" or "personal and advertising injury" for which the "insured" is obligated to pay "damages" by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for "damages":

(1) that the "insured" would have in the absence of the contract or agreement; or

(2) assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement.

### k. Communicable Disease

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of, related to, or, in any way involving any form of communicable disease, including any form of inhalation of, absorption of or contact with communicable disease. This exclusion includes but is not limited to:

(1) Any sexually transmitted disease;

(2) Acquired Immunodeficiency Syndrome or Human Immunodeficiency Virus, or exposure to another having the same, or to substances or materials contaminated with the same, or fear of contracting Acquired Immunodeficiency Syndrome, Human Immunodeficiency Virus or any other communicable disease;

(3) The failure to provide an environment safe from or the failure to warn of the dangers of communicable diseases or their transmission to others;

(4) The prevention or suppression, or the failure to prevent or suppress communicable diseases or their transmission to others;

(5) The reporting or failure to report to the proper authorities; or

(6) The negligent hiring, employment, training, supervision, or retention of any "insured", "employee", agent or other person with respect to items (1) through (5) above.

### l. Fungi And Bacteria

"Bodily injury", "property damage" or "personal and advertising injury" that in any way, in whole or in part, arises out of, relates to or results from:

(1) Actual, alleged or threatened exposure to, consumption of, ingestion of, inhalation of, absorption of, existence of or presence of "fungi or bacteria" in any manner or form whatsoever;

(2) The actual or alleged failure to warn, advise or instruct related to "fungi or bacteria" in any manner or form whatsoever;

(3) The actual or alleged failure to prevent exposure to "fungi or bacteria" in any manner or form whatsoever; or

(4) The actual or alleged presence of "fungi or bacteria" in any manner or form whatsoever, in any place whatsoever, whether or not within a facility owned or used by the "named insured", including the contents of such facility.

This exclusion includes, but is not limited to, compliance with any request, demand, order, or statutory or regulatory requirement, or any other action authorized or required by law, or any other "claim", demand, loss, cost, or expense arising out of, relating to or resulting from the investigation of, abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi or bacteria", as well as any loss, costs, fees, expenses, penalties, judgments, fines, or sanctions arising out of, relating thereto or resulting from "fungi or bacteria".

This exclusion does not apply to any "fungi or bacteria" that are, are on, or are contained in, a good or product intended for bodily consumption.

As used in this exclusion, "fungi or bacteria" include, without limitation, mold, mildew, yeast, spores, mycotoxins, endotoxins, or other pathogens, as well as any particulates or byproducts of any of the foregoing, either directly or indirectly.

### m. Insured Vs. Insured

Any "claim" or "suit" for "bodily injury", "property damage" or "personal and advertising injury" brought by one "insured" against any other "insured".

n. **Other Coverage Form**

"Bodily injury", "property damage" or "personal and advertising injury" which is also covered under any insuring agreement of any other Coverage Form attached to this Policy.

o. **Lead, Asbestos, Silica**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of, related to, or, in any way involving asbestos, lead or silica, including any claim or suit for expenses or any obligations to share damages with or repay anyone else who must pay damages from asbestos, lead or silica. With respect to silica, this exclusion does not apply to injury or damages caused by "your products" that are in compliance with Title 21 Code of Federal Regulations, Part 172, Subpart E, or to materials that are used as packaging of "your products".

This exclusion applies to:

(1) Any "bodily injury", "property damage" or "personal and advertising injury" of any type arising out of the inhalation, ingestion, exposure to, absorption of, or toxic substance from asbestos, lead or silica in any form or from any goods, products or structures containing same; or

(2) The existence of asbestos, lead or silica in any form in occupancy or construction or the manufacture, sale, transportation, handling, storage, disposal, or removal of same or goods or products containing asbestos, lead or silica.

p. **Discrimination**

"Bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of, related to, or, in any way involving discrimination of any kind, whether actual or alleged, nor to any expenses or obligation to share damages with or repay another who must pay damages from discrimination.

q. **Employment Practices**

Liability for employment-related practices, regardless of allegations, nor to any expenses nor to any obligation to share damages with or repay anyone else who must pay damages from same including but not limited to:

(1) Refusal to employ or termination of employment;

(2) Discrimination, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment in any form, humiliation or other employment-related practices, policies, acts or omissions; or

(3) Consequential "bodily injury" or "personal and advertising injury" as a result of (1) or (2) above.

r. **Nuclear, Biological or Chemical Materials**

Any "claim" or "suit" for "bodily injury", "property damage" or "personal and advertising injury" arising directly or indirectly out of or relating to any activity by an individual acting alone, or individuals acting as part of a group, that involves any violent act, including the threat of any activity or preparation for an activity that involves the use, release, dispersal, discharge, escape or application of:

(1) Nuclear materials, or directly results in nuclear reaction or radiation or radioactive contamination; or

(2) Pathogenic or poisonous biological or chemical materials.

s. **War**

Any "claim" or "suit" for "bodily injury", "property damage" or "personal and advertising injury" or other injury or damage, arising directly or indirectly out of, related to, or, in any way involving:

(1) Hostile or warlike action in time of peace or war, including any action in hindering, combating or defending against an actual impending or expected attack by:

a. Any government or sovereign power (de jure or de facto), or by any authority maintaining or using military, naval or air forces;

b. Military or naval or air forces, or

c. An agent of a. or b. above, it being understood that any discharge, explosion or use of any weapon of war employing nuclear fission or fusion, or biological, chemical or radiological discharge shall be conclusively presumed to be such hostile or warlike action by such a government, power, authority or forces.

(2) Insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

t. **Classification Limitation**

Locations and operations that are not described on the Declarations page(s) of this Policy or in an endorsement to this Policy. If any location(s) and or operation(s) are not described, they are not covered.

u. **FDA Limitation**

Any "claim" or "suit" for "bodily injury", "property damage" or "personal and advertising injury" arising out of products manufactured, sold, handled, or distributed by you or by others trading under your name:

(1) and which are subject to approval by, but prior to sale or distribution have not yet been approved by the U.S. Food and Drug Administration (FDA); or

(2) the use of which is contrary to or is not approved by the U.S. Food and Drug Administration (FDA) regulations.

However, this exclusion does not apply to "your products" which are manufactured solely for use in U.S. Food and Drug Administration approved "human clinical trials" to which this insurance applies.

"Human clinical trials" means any study conducted on human subjects to discover or verify clinical data, including the testing of "material" upon or within human subjects to establish the effectiveness of, safety of or to provide clinical data for the assessment of such "material".

"Material" means articles or substances intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, including without limitation, drugs, biologics, vaccines, tissues, genetic materials, devices and therapies, cellular therapies, blood and blood products and allergenics.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1. We will pay, with respect to any "claim" we investigate or settle or any "suit" against an "insured" we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable Limit of Insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the "insured" at our request to assist us in the investigation or defense of the "claim" or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   e. All costs taxed against the "insured" in the "suit".

   f. Prejudgment interest awarded against the "insured" on that part of the judgment we pay. If we make an offer to pay the applicable Limit of Insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable Limit of Insurance.

   These payments will reduce the limits of insurance.

2. If we defend an "insured" against a "suit" and an indemnitee of the "insured" is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   a. The "suit" against the indemnitee seeks "damages" for which the "insured" has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   b. This insurance applies to such liability assumed by the "insured";

   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the "insured" in the same "insured contract";

   d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the "insured" and the interests of the indemnitee;

   e. The indemnitee and the "insured" ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the "insured" and the indemnitee; and

   f. The indemnitee:

      (1) Agrees in writing to:

         (a) Cooperate with us in the investigation, settlement or defense of the "suit";

         (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

         (c) Notify any other insurer whose coverage is available to the indemnitee; and

         (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      (2) Provides us with written authorization to:

         (a) Obtain records and other information related to the "suit"; and

         (b) Conduct and control the defense of the indemnitee in such "suit".

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   a. An individual, you are an "insured", but only with respect to the conduct of a business of which you are the sole owner.

   b. A partnership or joint venture, you are an "insured". Your members, your partners, and their spouses are also "insureds", but only with respect to the conduct of your business.

   c. A limited liability company, you are an "insured". Your members are also "insureds", but only with respect to the conduct of your business. Your managers are "insureds", but only with respect to their duties as your managers.

   d. An organization other than a partnership, joint venture or limited liability company, you are an "insured". Your "executive officers" and directors are "insureds", but only with respect to their duties as your officers or directors. Your stockholders are also "insureds", but only with respect to their liability as stockholders.

   e. A trust, you are an "insured". Your trustees are also "insureds", but only with respect to their duties as trustees.

2. Each of the following is also an "insured":

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are "insureds" for:

      (1) "Bodily injury" or "personal and advertising injury":

         (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

         (b) To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph (1) (a) above;

         (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

         (d) Arising out of his or her providing or failing to provide professional health care services.

      (2) "Property damage" to property:

         (a) Owned, occupied or used by,

         (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

         you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

   b. Any person or organization having proper temporary custody of your property if you die, but only:

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed.

   c. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Form.

No person or organization is an "insured" with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a "named insured" in the Declarations.

## SECTION III – LIMITS OF INSURANCE AND DEDUCTIBLE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

   a. "Insureds";

   b. Claims made or "suits" brought; or

   c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

    **a.** "Damages" under Coverage **A**, except "damages" because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

    **b.** "Damages" under Coverage **B**; and

    **c.** Supplementary Payments.

**3.** The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage **A** for "damages" and Supplementary Payments because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

**4.** Subject to **2.** above, the Personal and Advertising Injury Limit is the most we will pay under Coverage **B** for the sum of all "damages" and Supplementary Payments because of all "personal and advertising injury" sustained by any one person or organization.

**5.** Subject to **2.** or **3.** above, whichever applies, the Each Claim Limit is the most we will pay for the sum of:

    **a.** "Damages" under Coverage **A**; and

    **b.** Supplementary Payments

    because of all "bodily injury" and "property damage" arising out of any one "occurrence".

**6.** Subject to **5.** above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage **A** for "damages" because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

The Limits of Insurance of this Coverage Form apply separately to each "policy period" and to any remaining period of less than 12 months, starting with the beginning of the "policy period" shown in the Declarations, unless the "policy period" is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

All "claims" based upon logically or causally connected injury or damage or offenses shall be deemed to constitute a single "claim" and be subject to a single Each Claim Limit of Insurance.

Stacking of the Limits of Insurance of any one Coverage Form of this Policy with the Limits of Insurance of any other Coverage Form of this Policy is not permitted.

**7.** Deductible

    We shall only be liable for those amounts payable as "damages" and Supplementary Payments incurred in the defense of a "claim" or "suit" which are in excess of the applicable deductible stated in the Declarations.

    **a.** We shall have no obligation to make payments within the deductible and then seek reimbursement from the "insured". However, we may at our discretion pay any part or all of the deductible amount to effect the settlement of a "claim" or "suit" and, upon notification of the action taken, you shall reimburse us within thirty (30) days of the notification for such part of the deductible amount as has been paid by us.

    **b.** The deductible amount reduces the Limit of Insurance payable under this Policy.

    **c.** The deductible amount applies to "damages" and Supplementary Payments and shall be applicable to each "claim".

## SECTION IV –GENERAL LIABILITY CONDITIONS

**1. Bankruptcy**

    Bankruptcy or insolvency of the "insured" or of the "insured's" estate will not relieve us of our obligations under this Coverage Form.

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

    **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or offense which may result in a "claim". To the extent possible, notice should include:

        **(1)** How, when and where the "occurrence" or offense took place;

        **(2)** The names and addresses of any injured persons and witnesses; and

        **(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

    Notice of an "occurrence" or offense is not notice of a "claim".

    **b.** If a "claim" is received by any "insured", you must:

        **(1)** Immediately record the specifics of the "claim" and the date received; and

        **(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the "claim" as soon as practicable.

c. You and any other involved "insured" must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "claim" or a "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the "claim" or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the "insured" because of injury or damage to which this insurance may also apply.

d. No "insured" will, except at that "insured's" own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

3. **Legal Action Against Us**

No one may bring a legal action against us under this Policy unless there has been full compliance with all of the terms of this Policy.  No suit, action or proceeding for the recovery of any claim under this Policy shall be sustainable in any court of law or equity unless it is commenced within twelve (12) months next after discovery by the "insured" of the occurrence which gives rise to the claim, provided however, that if by the laws of the state within which this Policy is issued, such limitation is invalid then any such claims shall be void unless such action, suit or proceeding is commenced within the shortest limit of time permitted by the laws of such state.  We will not be liable for damages that are not payable under the terms of this Policy or that are in excess of the applicable Limit of Insurance.

4. **Other Insurance**

If other valid and collectible insurance is available to the "insured" for a loss we cover,  this insurance is excess over any other valid insurance, whether such insurance is considered contributory, excess, primary or otherwise, unless such insurance specifically applies in excess of this Policy.

When this insurance is excess, we will have no duty to defend the "insured" against any "suit" if any other insurer has a duty to defend the "insured" against that "suit".

5. **Premium Audit**

a. We will compute all premiums for this Coverage Form in accordance with our rules and rates.

b. Premium shown in this Coverage Form as advance premium is a deposit premium only. We may examine and audit your books and records as they relate to this Policy at any time during the "policy period" and up to three years afterward.

c. The first "named insured" must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. **Representations**

By accepting this Policy, you agree that:

a. The application, and all other information and statements provided to us are true, accurate and complete and that the application and all such information and statements are made part of this Policy;

b. The application, and all other information and statements provided to us are representations and warranties made to us on behalf of all "insureds";

c. This Policy has been issued in reliance upon the truth and accuracy of those representations and warranties; and

d. Concealment, misrepresentation or fraud in the procurement of this Policy which, if known by us, would have led us to refuse to enter into this contract at its current terms, conditions or pricing, or to provide coverage for a "claim" hereunder, will be deemed material and this Policy shall be void. In such an event, the Company shall have no obligation to return any portion of the premium.

7. **Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Form to the first "named insured", this insurance applies:

a. As if each "named insured" were the only "named insured"; and

b. Separately to each "insured" against whom "claim" is made or "suit" is brought.

8. **Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this Policy has rights to recover damages from another, those rights are transferred to us. That person or organization must do nothing after loss to impair them. At our request, the "insured" will bring "suit" or transfer those rights to us and help us enforce them.

9. **Cancellation**

   a. The first "named insured" shown in the Declarations may cancel this Policy by mailing or delivering to us advance written notice of cancellation.
   b. We may cancel this Policy by mailing or delivering to the first "named insured" written notice of cancellation at least:
   (1) Ten (10) days before the effective date of cancellation if we cancel for non-payment of premium; or
   (2) Thirty (30) days before the effective date of cancellation if we cancel for any other reason.
   c. We will mail or deliver our notice to the first "named insured's" last mailing address known to us.
   d. Notice of cancellation will state the effective date of cancellation. The "policy period" will end on that date.
   e. If this Policy is cancelled, we will send the first "named insured" any refund due subject to the minimum earned premium provisions of the Policy. If we cancel for reasons other than non-payment of premium, the refund will be pro rata. If we cancel due to non-payment of premium or if the first "named insured" cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.
   f. If notice is mailed, proof of mailing will be sufficient proof of notice.

10. **Non-Renewal**

   a. If we elect not to renew this Policy we shall mail written notice to the first "named insured" at the address shown in the declarations. Such written notice of non-renewal shall be mailed at least thirty (30) days prior to the end of the "policy period".
   b. If notice is mailed, proof of mailing will be sufficient proof of notice.

11. **Service Of Suit**

In the event of the failure of the Company to pay any amount claimed to be due under this Policy, the Company will submit to the jurisdiction of any court of competent jurisdiction within the United States of America or Canada. All matters arising under this Policy shall be determined in accordance with the choice of law rules of such court. Nothing in this clause constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

Service of process in any such suit may be made upon the President and Chief Executive Officer of the Company or his designee at the address shown on the Declarations of this Policy. In any suit instituted upon this contract and against the President and Chief Executive Officer of the Company or his designee, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal. The President and Chief Executive Officer of the Company or his designee are authorized and directed to accept service of process.

Pursuant to any statute of any state, territory or district of the United States of America, the Company designates the Superintendent, Commissioner or Director of Insurance or other officer specified for the purpose in the statute, or his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary under this Policy arising out of this contract of insurance. The Company designates the above-named as the person to whom said officer is authorized to mail such process or a true copy of such process.

12. **Deterrence of Loss**

In the event of an "occurrence" or a "claim" involving the operations, premises, goods or products covered by this insurance, the "insured" shall promptly, at the "insured's" expense, take any and all reasonable steps to prevent additional "bodily injury", "property damage" or "personal and advertising injury" arising out of the same or similar circumstances.

13. **Material Changes in Operations, Products or Premises**

This Policy contains all the agreements between you and us concerning the insurance afforded. The first "named insured" shown in the Declarations is authorized to make changes in the terms of this Policy with our consent. This Policy's terms can be amended or waived only by endorsement issued by us and made a part of this Policy.

The "insured" shall report promptly to us any material changes, as described below, in operations, products or premises and we reserve the right to adjust the premium and/or Deductible based upon the material changes from the time the Policy was originally underwritten. You agree to report the following:

a. Any material changes in operations which are not currently included in the Description of Operations on the Declarations.

b. Any material changes in manufacturing or servicing operations which will result in a twenty-five percent (25%) or more annual increase in gross revenues and/or payrolls.

c. Any material changes in premises requiring structural alterations, or acquisition of additional premises, locations or operations.

### 14. Newly Acquired Entities

To request coverage for newly acquired entities, you must report any entity you acquire after the inception date of this Policy to us and request coverage for such entity. Coverage will apply only if we agree to provide such coverage by issuing an endorsement to the Policy.

### 15. Binding Arbitration

a. All disputes over coverage or any rights afforded under this Policy, including whether an entity or person is a "named insured", an "insured", an additional insured, or entitled to coverage under the Supplementary Payments provisions of this Policy or the effect of any applicable statutes or common law upon the contractual obligations owed, shall be submitted to binding arbitration, which shall be the sole and exclusive means to resolve the dispute. Either party may initiate the binding arbitration.

b. The arbitration forum and process shall be agreed to by the parties. In the event the parties cannot agree on an arbitration forum and process, the matter shall be submitted to the American Arbitration Association. The Arbitration shall be before a panel of three arbitrators, unless the parties agree to one arbitrator, all of whom shall have experience in insurance coverage of the type afforded by this Policy. If the parties select a panel of three arbitrators, each party shall select an arbitrator and the chosen arbitrators shall select a third arbitrator. The American Arbitration Association shall decide any disputes concerning the selection of the Arbitrators. The potential arbitrators from which the arbitrators shall be selected shall not be confined to those provided by the American Arbitration Association. Each party shall bear the costs of its arbitrator and shall share equally the costs of the third arbitrator and arbitration process. In the event of a single arbitrator, the cost shall be shared equally by the parties. The decision of the arbitration is final and binding on the parties.

### 16. Fraudulent Acts

If any "insured" commits fraud in connection with any "claim" submitted to the Company, this insurance shall become void from the date such fraudulent "claim" is submitted. In such event, the Company shall have no obligation to return any portion of the premium.

### 17. Assignment Of Interest Limitation

Assignment of interest by you under this Policy shall not bind us unless we agree and endorse the assignment onto this Policy.

## SECTION V—ADDITIONAL TIME IN WHICH TO REPORT CLAIMS FIRST MADE AT THE END OF THE POLICY PERIOD

If a "claim" is first made against any "insured" during the last fourteen (14) calendar days of this "policy period", such "claim" will be treated as if it had been reported to the Company during this "policy period" if:

1. The "insureds" demonstrate reasonable efforts to report such "claim" to us; and

2. The "insureds" provide us with written notice of such "claim" no later than thirty (30) calendar days after the end of this "policy period".

This **SECTION V** does not apply to any "claim" or "suit" that is covered in whole or in part under any other insurance, except for insurance purchased specifically to apply as excess over this Policy. This applies whether that other insurance is issued by the Company or any other insurer, and to any "claim" or "suit" that would be covered by that other insurance but for the exhaustion of the limit of insurance or but for failure of any "insured" to comply with the terms and conditions of that other insurance.

## SECTION VI—OPTIONAL EXTENDED REPORTING PERIOD

If this Policy is cancelled or non-renewed for reasons other than non-payment of premium or non-payment of deductible, non-compliance with the Policy's terms and conditions, or for misrepresentation or fraud; or we renew or replace this Coverage Form with insurance that has a "retroactive date" later than the date shown in the Declarations of this Coverage Form; or that does not apply to "bodily injury", "property damage" or "personal and advertising injury" on a claims-made basis; then you shall have the right to purchase an Extended Reporting Period endorsement subject to all the terms and conditions of this Policy and as described below:

1. The "named insured" shall have the right to purchase an Extended Reporting Period during which you may report to us a "claim" that is first made against any "insured" during such Extended Reporting Period and that results from "bodily injury" or "property damage" that takes place or "personal and advertising injury" caused by an offense committed subsequent to the Policy "retroactive date" and before the end of this "policy period" and to which this Policy applies.

2. The Extended Reporting Period is provided by endorsement for an additional premium computed as a percentage of the combined sum of the Policy premium and any premium adjustments by endorsement, not including a cancellation endorsement if applicable. The premium for the Extended Reporting Period is deemed fully earned and is non-refundable the first day the Extended Reporting Period is effective.

3. Once in effect, the Extended Reporting Period may not be cancelled by you or us.

4. You must provide us a written request for the Extended Reporting Period endorsement and pay any premium due within thirty (30) days after the end of the "policy period". The Extended Reporting Period will not go into effect unless you pay the additional premium promptly when due.

Any change to this Policy's premiums, limits or terms, or to the premium, limits or terms of a renewal policy do not consti-tute a refusal to renew.

The Limit of Insurance for "claims" made during the Extended Reporting Period is considered part of, and is not in addition to, the Limit of Insurance referenced in **SECTION III: LIMITS OF INSURANCE AND DEDUCTIBLE**. The fact that the period during which "claims" may be first made and reported to us under this Policy is extended by activation of the Extended Reporting Period does not in any way increase or reinstate the available limits of insurance of this Policy.

If purchased, the Extended Reporting Period does not apply to any "claim" or "suit" that is covered in whole or in part under any other insurance, except for insurance purchased specifically to apply as excess over this Policy. This applies, whether that other insurance is issued by the Company or any other insurer, and to any "claim" or "suit" that would be covered by that other insurance but for the exhaustion of the limit of insurance or but for the failure of any "insured" to comply with the terms and conditions of that other insurance.

## SECTION VII– DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this defini-tion:

   a. Notices that are published include material placed on the Internet or on similar electronic means of communication; and

   b. Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

   However, "auto" does not include "mobile equipment".

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Claim" means a written demand for monetary "damages".

5. "Damages" means judgments, awards and settlements that the "insured" becomes legally obligated to pay as a result of a covered "claim". "Damages" do not include declarative, injunctive or other non-pecuniary or equitable relief, puni-tive or exemplary damages, or the amount of any multiplied damages awarded that is in excess of the damage award so multiplied.

6. "Coverage territory" means:

   a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

   b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

   c. All other parts of the world if the injury or damage arises out of:

      (1) Goods or products made or sold by you in the territory described in a. above;

      (2) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; or

**(3)** "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the "insured's" responsibility to pay "damages" is determined in a "suit" on the merits, in the territory described in **a.** above.

**7.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**8.** "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

**9.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**a.** The repair, replacement, adjustment or removal of "your product" or "your work"; or

**b.** Your fulfilling the terms of the contract or agreement.

**10.** "Insured" means any person or entity qualifying as such under **SECTION II: WHO IS AN INSURED**.

**11.** "Insured contract" means:

**a.** A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

**b.** A sidetrack agreement;

**c.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

**d.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality; or

**e.** An elevator maintenance agreement.

**12.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**13.** "Loading or unloading" means the handling of persons or property:

**a.** After being moved from the place where accepted for movement into or onto an aircraft, watercraft or "auto";

b. While in or on an aircraft, watercraft or "auto"; or

**c.** While being moved from an aircraft, watercraft or "auto" to the place where finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

**14.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

**a.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

**b.** Vehicles maintained for use solely on or next to premises you own or rent;

**c.** Vehicles that travel on crawler treads;

**d.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

**(1)** Power cranes, shovels, loaders, diggers or drills; or

**(2)** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**e.** Vehicles not described in **a., b., c.** or **d.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

**(1)** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

**(2)** Cherry pickers and similar devices used to raise or lower workers;

    f. Vehicles not described in **a., b., c.** or **d.** above maintained primarily for purposes other than the transportation of persons or cargo.

    However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

    (1) Equipment designed primarily for:

        (a) Snow removal;

        (b) Road maintenance, but not construction or resurfacing; or

        (c) Street cleaning;

    (2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

    (3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**15.** "Named insured" means a person or entity specifically identified as a "named insured" in the Declarations or in an endorsement to this Policy.

**16.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**17.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor.

    d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

    f. The use of another's advertising idea in your "advertisement"; or

    g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

**18.** "Policy Period" means the period shown in the Declarations, unless the Policy is terminated at an earlier date.

**19.** "Pollutants" mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radiation, acid, alkalis, petroleums, chemicals or "waste". "Waste" includes medical waste, biological infectants, and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed.

**20.** "Products-completed operations hazard":

    a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

    (1) Products that are still in your physical possession; or

    (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

        (a) When all of the work called for in your contract has been completed.

        (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

        (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

        Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    b. Does not include "bodily injury" or "property damage" arising out of:

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any "insured";

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a Policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**21.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from, computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**22.** "Retroactive date" means the date specified in the Declarations or endorsements to this Policy after which "bodily injury", "property damage" must take place or an offense must be committed.

**23.** "Suit" means a civil proceeding in which "damages" because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged.

**24.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**25.** "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

**26.** "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

(2) The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**27.** "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work" and

(2) The providing of or failure to provide warnings or instructions.

**NUCLEAR ENERGY LIABILITY EXCLUSION**

**1.** The insurance does not apply:

A. Under any Liability Coverage, to "bodily injury" or "property damage":

(1) With respect to which an "insured" under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

B. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

(1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

(2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

(3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this provision:

"Hazardous properties" includes radioactive, toxic or explosive properties.

"Nuclear material" means "source material", "special nuclear material" or "by-product material".

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# AMENDMENT - DEFINITION OF INSURED CONTRACT

| Attached To and Forming Part of Policy 0100030739-0 | Effective Date of Endorsement 07/17/2015 12:01AM at the Named Insured address shown on the Declarations | Named Insured Good Nutrition LLC |
|---|---|---|
| Additional Premium: $0 | Return Premium: $0 | |

This endorsement modifies insurance provided under the following:

**ALLIED HEALTH GENERAL LIABILITY COVERAGE**
**LIFE SCIENCES GENERAL LIABILITY COVERAGE**
**LIFE SCIENCES PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE**

SCHEDULE

| Name of Person(s) or Organization | Location(s) of Covered Operations |
|---|---|
| Wal-Mart Stores, Inc, Its Subsidaries & Its Affiliates 702 SW 8th Street, Bentonville, AR 72716-3570 Attn: Insurance Compliance McLane Company, Inc. 4747 McLane Parkway, Temple, TX 76504 | |

Solely with respect to the person or organization named in the Schedule above, the definition of "insured contract" in the **DEFINITIONS** Section is deleted and replaced by the following:

"Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement with the person(s) or organization(s) shown in the Schedule above and pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of the person(s) or organization(s) shown in the Schedule above to pay for "bodily injury" or "property damage" to a third person or organization, provided the "bodily injury" or "property damage" to a third person or organization, is caused, in whole or in part by you or by those acting on your behalf. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and

    (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## STOP GAP LIABILITY COVERAGE ENDORSEMENT

| Attached To and Forming Part of Policy | Effective Date of Endorsement | Named Insured |
|---|---|---|
| 0100030739-0 | 07/17/2015 12:01AM at the Named Insured address shown on the Declarations | Good Nutrition LLC |
| Additional Premium: | Return Premium: | |
| $0 | $0 | |

This endorsement modifies insurance provided under the following:

**ALLIED HEALTH GENERAL LIABILITY COVERAGE**
**LIFE SCIENCES GENERAL LIABILITY COVERAGE**

### SCHEDULE

| Limits of Insurance | |
|---|---|
| Bodily Injury by Accident: | $1,000,000 Each Accident |
| Bodily Injury by Disease: | $1,000,000 Aggregate Limit |
| Bodily Injury by Disease: | $1,000,000 Each Employee |
| Designated State: | WASHINGTON, WYOMING, NORTH DAKOTA, OHIO |

**A. The following is added to SECTION I- COVERAGES:**

**COVERAGE- STOP GAP LIABILITY**

**1. Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated by law in the applicable state(s) named in the Schedule above, to pay as damages because of "bodily injury by accident" or "bodily injury by disease" to your "employee" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages to which this insurance does not apply. We may, at our discretion, investigate any accident and settle any claim or "suit" that may result. But:

        **(1)** The amount we will pay from damages is limited as described in the **LIMIT OF INSURANCE AND DEDUCTIBLE** section of this Policy; and

        **(2)** Nothing in this endorsement will increase the Limits of Insurance shown in the Declarations of this Policy; and

        **(3)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under this coverage.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments.

**b.** This insurance applies to "bodily injury by accident" or "bodily injury by disease" only if:

    **(1)** The:

        **(a)** "Bodily injury by accident" or "bodily injury by disease" takes place in the "coverage territory";

        **(b)** "Bodily injury by accident" or "bodily injury by disease" arises out of and in the course of the injured "employee's" employment by you; and

        **(c)** "Employee", at the time of injury, was reported and declared under and subject to a "worker's compensation law" of one of the states named in the Schedule above; and

    **(2)** The:

        **(a)** "Bodily injury by accident" is caused by an accident that occurs during the policy period; or

        **(b)** "Bodily injury by disease" is caused by or aggravated by conditions of employment by you and the injured "employee's" last day of last exposure to the conditions causing or aggravating such "bodily injury by disease" occurs during the policy period.

**c.** The damages we will pay, where recovery is permitted by law, include damages:

    **(1)** For:

        **(a)** Which you are liable to a third party by reason of a claim or "suit" against you by that third party to recover the damages claimed against such third party as a result of injury to your "employee";

        **(b)** Care and loss of services; and

        **(c)** Consequential "bodily injury by accident" or "bodily injury by disease" to a spouse, child, parent, brother or sister or the injured "employee";

        provided that these damages are the direct consequence of "bodily injury by accident" or "bodily injury by disease" that arises out of and in the course of the injured "employee's" employment by you; and

    **(2)** Because of the "bodily injury by accident" or "bodily injury by disease" to your "employee" that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

## 2. Exclusions

This insurance does not apply to:

**a. Intentional Injury**

"Bodily injury by accident" or "bodily injury by disease" intentionally caused or aggravated by you, or "bodily injury by accident" or "bodily injury by disease" resulting from an act which is determined to have been committed by you if it was reasonable to believe that an injury is substantially certain to occur.

**b. Fines or Penalties**

Any assessment, penalty or fine levied by any regulatory agency or authority.

**c. Statutory Obligations**

Any obligation of the insured under any worker's compensation, disability benefits or unemployment compensation law or any similar law.

**d. Contractual Liability**

Liability assumed by you under any contract or agreement.

**e. Violation of Law**

"Bodily injury by accident" or "bodily injury by disease" suffered or caused by any employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your "executive officers".

**f. Termination, Coercion or Discrimination**

Damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, discrimination against or termination of any "employee", or arising out of other employment or personnel decisions concerning the insured.

g. **Failure to Comply with "Workers Compensations Law"**

"Bodily injury by accident" or "bodily injury by disease" to any "employee" when you are:

(1) Deprived of common law defenses; or

(2) Otherwise subject to penalty;

Because of your failure to secure your obligations or other failure to comply with any "worker's compensation law".

h. **Violation of Age Laws of Employment of Minors**

"Bodily injury by accident" or "bodily injury by disease" suffered or caused by any person;

(1) Knowingly employed by you in violation of any law as to age; or

(2) Under the age of 14 years, regardless of any such law.

i. **Federal Laws**

Any premium, assessment, penalty, fine, benefit, liability or other obligation imposed by or granted pursuant to:

(1) The Federal Employer's Liability Act (45 USC Section 51-60);

(2) The Non-appropriated Fund Instrumentalities Act (5 USC Sections 8171-8173);

(3) The Longshore and Harbor Workers' Compensation Act (33 USC Sections 910-950);

(4) The Outer Continental Shelf Lands Act (43 USC Section 1331-1356);

(5) The Defense Base Act (42 USC Section 1651-1654);

(6) The Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901-942);

(7) The Migrant and Seasonal Agricultural Worker Protection Act (29 USC Sections 1801-1872);

(8) Any other workers compensation, unemployment compensation or disability laws or any similar law; or

(9) Any subsequent amendments to the laws listed above.

j. **Punitive Damages**

Multiple, exemplary or punitive damages.

k. **Crew Members**

"Bodily injury by accident" or "bodily injury by disease" to a master or member of the crew of any vessel or any member of the flying crew of an aircraft.

B. The **SUPPLEMENTARY PAYMENTS** provisions of this Policy apply to **COVERAGE-STOP GAP LIABILITY.**

C. For the purposes of this endorsement, **SECTION II-WHO IS AN INSURED, is** deleted and replaced by the following:

If you are designated in the Declarations as:

1. An individual, you and your spouse are insured, but only with respect to the conduct of a business of which you are the sole owner.

2. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

3. A limited liability company, you are an insured. Your members are insureds, but only with respect to their duties as your managers.

4. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured on the Declarations.

D. For the purposes of this endorsement, the **LIMITS OF INSURANCE AND DEDUCTIBLE** section of this Policy is amended by adding the following:

1. The "Bodily Injury By Accident"- Each Accident Limit shown in the Schedule of this endorsement is the most we will pay for all damages covered by this insurance because of "bodily injury by accident" to one or more "employees" in any one accident.

2. The "Bodily Injury By Disease"- Aggregate Limit shown in the Schedule of this endorsement is the most we will pay for all damages covered by this insurance and arising out of "bodily injury by disease", regardless of the     number of "employees" who sustain "bodily injury by disease".

3. Subject to Paragraph **D.2** of this endorsement, the "Bodily Injury By Disease" - Each "Employee" Limit shown in the Schedule of this endorsement is the most we will pay for all damages because of "bodily injury by disease" to any one "employee".

The Limits of Insurance in this endorsement apply separately to the "policy period" shown in the Declarations of this Policy. If the "policy period" is extended after issuance for an additional period of less than 12 months, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

E. For the purposes of this endorsement, the following Condition, **Duties In The Event Of Occurrence, Offense, Claim Or Suit** of the Conditions Section of this Policy is deleted and replaced by the following:

**Duties In The Event Of Injury, Claim Or Suit**

a. You must see to it that we or our agent are notified as soon as practicable of a "bodily injury by accident" or "bodily injury by disease" which may result in a claim. To the extent possible, notice should include:

    (1) How, when and where the "bodily injury by accident" or "bodily injury by disease" took place;

    (2) The names and addresses of any injured persons and witnesses; and

    (3) The nature and location of any injury.

b. If a claim is made or "suit" is brought against any insured, you must:

    (1) Immediately record the specifics of the claim or "suit" and the date received; and

    (2) Immediately notify us.

    You must see to it that we immediately receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

    (1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the injury, claim, proceeding or "suit";

    (2) Authorize us to obtain records and other information;

    (3) Immediately forward all technical reports, laboratory data, filed notes or any other documents generated by persons hired by the insured to investigate the claim;

    (4) Cooperate with us and assist us, as we may request, in the investigation or settlement of the claim or defense against the "suit";

    (5) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury to which this insurance may also apply; and

    (6) Cooperate with us and provide us with all the information and assistance which we reasonably request including without limitation, attend hearings, depositions and trials and assisting in effecting settlements, securing and giving evidence and conducting the defense of any claim covered by this Policy. You shall do nothing that may prejudice our position.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

F. For the purposes of this endorsement, the definition of "coverage territory" in the **DEFINITIONS** Section of this Policy is deleted and replaced by the following:

"Coverage territory" means:

a.  The United States of America (including its territories and possessions), Puerto Rico and Canada;

b.  International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in a. above; or

c.  All other parts of the world if the injury or damage arises out of the activities of a person whose home is in the territory described in a. above, but who is away for a short time on your business;

provided the insured's responsibility to pay damages is determined in the United States (including its territories and possessions), Puerto Rico, or Canada, in a "suit" on the merits in the territory described in a. above.

G.  The **DEFINITIONS** Section of this Policy is amended by adding the following:

1.  "Workers Compensation Law" means the Workers Compensation Law and any Occupational Disease Law of the state(s) named in this endorsement. This does not include provisions of any law providing non-occupational disability benefits.

2.  "Bodily injury by accident" means bodily injury, sickness or disease sustained by a person, including death, resulting from an accident. A disease is not "bodily injury by accident" unless it results directly from "bodily injury by accident".

3.  "Bodily injury by disease" means a disease sustained by a person, including death. "Bodily injury by disease" does not include a disease that results from an accident.

H.  For the purposes of this endorsement, the definition of "bodily injury" does not apply.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# CLAIMS MADE ENDORSEMENT

| Attached To and Forming Part of Policy 0100030739-0 | Effective Date of Endorsement 07/17/2015 12:01AM at the Named Insured address shown on the Declarations | Named Insured Good Nutrition LLC |
|---|---|---|
| Additional Premium: $0 | | Return Premium: $0 |

This endorsement modifies insurance provided under the following:

LIFE SCIENCES GENERAL LIABILITY COVERAGE

All references in this Policy to Claims Made and Reported are deleted and replaced with the term Claims Made.

Paragraph **1. b.** of in **SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**, is deleted and replaced by the following:
  **b.**This insurance applies to "bodily injury" and "property damage" only if:
    **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
    **(2)** The "bodily injury" or "property damage" did not occur before the "retroactive date", if any, shown in the Declarations or after the end of the "policy period"; and
    **(3)** A "claim" for "damages" because of the "bodily injury" or "property damage" is first made against any "insured", in accordance with Paragraph **c.** below, during the "policy period" or any Extended Reporting Period we provide under Section **V** – Extended Reporting Periods.

Paragraph **1. b.** of **SECTION I – COVERAGES, COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**, is deleted and replaced by the following:
  **b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business, but only if:
    **(1)** The offense was committed in the "coverage territory";
    **(2)** The offense was not committed before the "retroactive date", if any, shown in the Declarations or after the end of the "policy period"; and
    **(3)** A "claim" for "damages" because of the "personal and advertising injury" is first made against any "insured", in accordance with Paragraph **c.** below, during the "policy period" or any Extended Reporting Period we provide under Section **VI** – Extended Reporting Period.

**SECTION V—ADDITIONAL TIME IN WHICH TO REPORT CLAIMS FIRST MADE AT THE END OF THE POLICY PERIOD**, is deleted and replaced by the following:
  **SECTION V—CLAIM REPORTING PROVISION**
  The "insured" shall give to the Company written notice in accordance with the Duties in the Event of Occurrence, Offense, Claim or Suit Condition, of any "claim" first made against the "insured" during the "policy period" or the Extended Reporting Period, if applicable.

**SECTION VI—OPTIONAL EXTENDED REPORTING PERIOD**, paragraph **1.** is deleted and replaced by the following;

The "named insured" shall have the right to purchase an Extended Reporting Period during which you may report to us a "claim" that is first made against any "insured" during the "policy period" or such Extended Reporting Period and that results from a "bodily injury" or "property damage" that takes place or "personal and advertising injury" caused by an offense committed subsequent to the Policy "retroactive date" and before the end of this "policy period" and to which this Policy applies.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## MINIMUM POLICY PREMIUM

| Attached To and Forming Part of Policy 0100030739-0 | Effective Date of Endorsement 07/17/2015 12:01AM at the Named Insured address shown on the Declarations | Named Insured Good Nutrition LLC |
|---|---|---|
| Additional Premium: $0 | | Return Premium: $0 |

This endorsement modifies insurance provided under the following:

**ALL COVERAGE FORMS**

### SCHEDULE

| A. | Minimum and Deposit Premium: | 100% |
|---|---|---|
| B. | Percentage of Minimum Premium retained: | 25% |

This endorsement sets forth the minimum earned premium for this policy. The minimum earned premium for this policy is calculated as follows:

1. The minimum and deposit premium for this policy is shown in item A. of the Schedule above and is a percentage the total policy premium shown on the Declarations page of the policy plus any premium adjustments by endorsements and any additional premium developed by audit.

2. Audits that indicate a return premium will not reduce the minimum premium stated in paragraph 1. above.

3. If the insured cancels this policy and the policy is not subject to audit, the return premium will be 90% of the unearned policy premium, however in no event will the Company retain less than the percentage that is shown in item B. of the Schedule above of the minimum premium described in paragraph 1. above.

4. If the insured cancels this policy and the policy is subject to audit, the earned premium will be determined by final audit however in no event will it be less than the percentage that is shown in item B. of the Schedule above of the minimum premium described in paragraph 1. above.

5. If the Company cancels the policy for any reason other than nonpayment of premium then the insured will be returned the full amount of the unearned premium as determined by premium audit and without any minimum premium restrictions.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# LIFE SCIENCES - COMPOSITE RATE ENDORSEMENT

| Attached To and Forming Part of Policy<br>0100030739-0 | Effective Date of Endorsement<br>07/17/2015 12:01AM at the Named Insured<br>address shown on the Declarations | Named Insured<br>Good Nutrition LLC |
|---|---|---|
| Additional Premium:<br>$0 | Return Premium:<br>$0 | |

This endorsement modifies insurance provided under the following:

ALL COVERAGE FORMS

### SCHEDULE

| Rate: | Premium Basis: |
|---|---|
| $3.38 | per $1,000 of Revenue |

A.  The premium stated in the Declarations of this policy is an estimated premium only.  Upon expiration or cancellation of the policy, the earned premium shall be computed by applying the rate shown in the Schedule above as it applies to the premium basis shown in the Schedule above.

If the earned premium thus computed exceeds the estimated premium paid, you shall pay the excess to us.

A complete re-survey of the exposures and revision of rate may be made at any time at our request.  You agree to notify us at any time your operations or exposures change.

B.  The first Named Insured must keep records of the information we need for premium computation and send us copies at such times as we may request.  We have the right, but not the obligation, to conduct a physical audit of those records needed for premium computation after the expiration of this policy.

C.  Any refusal by you to maintain or provide needed reports or any refusal to allow us to conduct a physical audit of needed records will result in our developing and calculating a final audit premium based on information available to us and without your cooperation and assistance.  If final premium audits calculated without your cooperation and assistance result in additional premium owed to us, you are obligated and agree to pay such additional premium.

D.  The basis used for determining the premium charge for each classification indicated in the Classification and Premium section of the Declaration. The definition of each basis of premium is as follows:

1.  Area

The total number of square feet of floor space at the insured premises, computed as follows:

a.  For entire buildings, by multiplying the product of the horizontal dimensions of the outside of the outer building walls by the number of floors, including basements but do not use the area of the following:

(1) Courts and mezzanine types of floor openings.

(2) Portions of basements or floors where 50% or more of the area is used for shop or storage for building maintenance, dwelling by building maintenance employees, heating units, power plants or air-conditioning equipment.

b.  For tenants, determine the area they occupy in the same manner as for entire buildings.

c.   The rates apply per 1,000 square feet of area.

2.   Receipts or Revenue

a.   Definition

The gross amount charged by the named insured, concessionaires of the named insured or by others trading under the insured's name for:

(1)   All goods or products, sold or distributed;

(2)   Operations performed during the "policy period";

(3)   Rentals; and

(4)   Dues or fees.

b.   Inclusions

The following items shall not be deducted from gross sales:

(1)   Foreign exchange discounts;

(2)   Freight allowance to customers;

(3)   Total sales of consigned goods and warehouse receipts;

(4)   Trade or cash discounts;

(5)   Bad debts; and

(6)   Repossession of items sold on installments (amount actually collected).

c.   Exclusions

The following items shall be deducted from gross sales:

(1)   Sales or excise taxes which are collected and submitted to a governmental division;

(2)   Credits for repossessed merchandise and products returned.

(3)   Allowances for damaged and spoiled goods;

(4)   Finance charges for items sold on installments;

(5)   Freight charges on sales if freight is charged as a separate item on customers invoice;

(6)   Royalty income from patent rights or copyrights which are not product sales, and

(7)   Rental receipts for products liability coverage only.

d.   Application

The rates apply per $1,000 of Gross Sales.

3.   Participants

a.   Definition

The total annual number of individuals who enroll as test subjects in clinical trials covered during the "policy period".

b.  Inclusions

The following people shall be included as a participant:

(1)  Individuals who participate in a pre-trial evaluation to determine acceptance into the trial based on inclusion/exclusion criteria.

(2)  Individuals who enroll as a test subject and abandon the study at any time.

c.  Application

The rates apply per Participant.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES; EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

| Attached To and Forming Part of Policy<br>0100030739-0 | Effective Date of Endorsement<br>07/17/2015 12:01AM at the Named Insured<br>address shown on the Declarations | Named Insured<br>Good Nutrition LLC |
|---|---|---|
| Additional Premium:<br>$0 | Return Premium:<br>$0 | |

This endorsement modifies insurance provided under the following:

ALL COVERAGE FORMS

A. The following exclusions are added:

This insurance does not apply to:

TERRORISM

"Any injury or damage" arising, directly or indirectly, out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, this exclusion applies only when one or more of the following are attributed to such act:

1. The total of insured damage to all types of property exceeds $25,000,000 (valued in U.S. dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

2. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ; or

3. The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

4. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

5. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs 1. and 2. describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

TERRORISM PUNITIVE DAMAGES

Damages arising directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

B. The following definitions are added:

   1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Policy to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "personal injury", "injury" or "environmental damage" as may be defined in any applicable Policy.

   2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

      a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

      b. The act resulted in damage:

         (1) Within the United States (including its territories and possessions and Puerto Rico); or

         (2) Outside of the United States in the case of:

            (a) An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

            (b) The premises of any United States mission; and

      c. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

   3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

   Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

C. The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for injury or damage that is otherwise excluded under this Policy.

D. If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ADDITIONAL EXCLUSIONS- LIFE SCIENCES

| Attached To and Forming Part of Policy 0100030739-0 | Effective Date of Endorsement 07/17/2015 12:01AM at the Named Insured address shown on the Declarations | Named Insured Good Nutrition LLC |
|---|---|---|
| Additional Premium: $0 | Return Premium: $0 | |

This endorsement modifies insurance provided under the following:

**ALLIED HEALTH GENERAL LIABILITY COVERAGE**
**LIFE SCIENCES GENERAL LIABILITY COVERAGE**
**LIFE SCIENCES PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE**

The following exclusions are added to this Policy:

1. This insurance does not apply to any "claim" or "suit" for "bodily injury", "property damage", "personal injury" or "personal and advertising injury" arising out of, related to, caused by, contributed to by, or in any way connected with the manufacturing, distribution, sale, disposal, testing, handling, application, consumption or use of, or exposure to any of the following, by whatever name manufactured, distributed or sold:

   a. any of the ingredients or additives listed below;
   b. any products which contain ingredients or additives similar to the chemical formulary of the ingredients or additives listed below;
   c. any product, ingredient or additive which is a derivative of an ingredient or additive listed below; or
   d. any ingredient or additive which is generally known in the trade in which it is used as having a formulation, structure or function similar to those listed below; or
   e. any product that contains, regardless of the measure or amount, any of the ingredients or additives listed below, regardless of whether or not any of these ingredients or additives contributed to any actual or alleged "bodily injury", "property damage", "personal injury" or "personal and advertising injury":

      (1) Birth Control or fertility drugs, medications or devices
      (2) Bisphosphonates
      (3) Cisapride
      (4) Cox -2 Inhibitors including Vioxx, Celebrex and Bextra or other rofecoxib, celecoxib or Valecoxib products
      (5) Di(2-ethylhexyl) phthalate (DEHP)
      (6) DES (Diethylstilbestrol and/or Dienestrol)
      (7) Fenfluramine, Dexfenfluramine
      (8) Fentanyl
      (9) Isotretinoin (Accutane)
      (10) Latex
      (11) Melamine
      (12) Metoclopramide
      (13) Oxycodone (controlled release), Oxycodone Hydrochloride, Oxycontin and its bioequivalent (generic) version
      (14) Phentermine
      (15) Phenylpropanolamine (PPA)
      (16) Silicone
      (17) Thalidomide

(18) Thimerosal
(19) Troglitazone

2.  This insurance does not apply to "bodily injury" or "property damage" arising out of the actual, alleged or threatened hazardous properties of any goods or products declared unsafe by any governmental or regulatory authority on the basis of such hazardous properties, regardless of whether such goods or products were declared unsafe before or after they were disposed of, distributed, handled, manufactured or sold; or before such damages were incurred.

However, this exclusion does not apply to "your product", to which this insurance applies, if it was disposed of, distributed, handled, manufactured and sold before such product was declared unsafe, if it was declared unsafe after the beginning of the "policy period".

3.  This insurance does not apply to "bodily injury" or "property damage" in connection with any "human clinical trial" if such injury or damage arises out of any unapproved exposure to material, upon or within human beings during such a trial, that occurs after any of the following actions by any governmental or regulatory authority having jurisdiction:

a.  placement of a hold on the trial;

b.  withdrawal of approval for an Investigational New Drug Application, Investigational Device Exception Application or similar authorization applicable to the trial; or

c.  order to discontinue the trial.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION- INGREDIENTS OR ADDITIVES

| Attached To and Forming Port of Policy 0100030739-0 | Effective Date of Endorsement 07/17/2015 12:01AM at the Named Insured address shown on the Declarations | Named Insured Good Nutrition LLC |
|---|---|---|
| Additional Premium: $0 | Return Premium: $0 | |

This endorsement modifies insurance provided under the following:

**ALLIED HEALTH GENERAL LIABILITY COVERAGE**
**ALLIED HEALTH PROFESSIONAL LIABILITY COVERAGE**
**LIFE SCIENCES GENERAL LIABILITY COVERAGE**
**LIFE SCIENCES PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE**

The following exclusion is added to this Policy:

This insurance does not apply to any "claim" or "suit" for "bodily injury", "property damage", "personal injury" or "personal and advertising injury" arising out of, related to, caused by, contributed to by, or in any way connected with the manufacturing, distribution, sale, disposal, testing, handling, application, consumption or use of, or exposure to any of the following, by whatever name manufactured, distributed or sold:

a. any of the ingredients or additives listed below;
b. any products which contain ingredients or additives similar to the chemical formulary of the ingredients or additives listed below;
c. any product, ingredient or additive which is a derivative of an ingredient or additive listed below; or
d. any ingredient or additive which is generally known in the trade in which it is used as having a formulation, structure or function similar to those listed below; or
e. any product that contains, regardless of the measure or amount, any of the ingredients or additives listed below, regardless of whether or not any of these ingredients or additives contributed to any actual or alleged "bodily injury", "property damage", "personal injury" or "personal and advertising injury":

    (1) Anabolic-Androgenic Steroids
    (2) Androstenedione and any derivatives and all steroid precursors
    (3) Aristolochia spp., aristolochia, aristolochic acids, aristolochia fangchi, asarum app., bragantia spp., clematis spp., akebia spp., cocculus spp., diploclisia spp., menispernum spp., sinomenium spp., mu tong, fang ji, guang fang ji, kanmokutsu, mokutsu, and any adulterated botanicals, botanical derivatives or other products that contain aristolochic acid, aristolochic acid derivatives or aristolochic acid extracts
    (4) Beta-methylphenethylamine
    (5) Bitter Orange, Citrus Aurantium
    (6) Chaparral
    (7) Colloidal Silver
    (8) Comfrey
    (9) Dendrobium, Dendrobe Noble, Dendrobium Extract, Dendrobium nobile, Dendrobium officinale, Extrait de Dendrobium, Jin Chai Shi Hu (D. nobile), Nobile Dendrobium (D. nobile), Orchid Stem, Stem-Orchid, Tie Pi Shi (D. officinale), Vinterdendrobium (D. nobile), Phenylethylamine
    (10) DMAA, 1,3-dimethylamylamine, Geranamine, 1,3-dimethylpentylamine, methylhexanamine, geranium oil, geranium extract
    (11) DMBA, 1,3-Dimethylbutylamine, 4-amino-2-methylpentane citrate, AMP citrate
    (12) Ephedrine alkaloids including ephedra and ephedrine (also known as Ma Huang, Bishops Tea and Chi Powder), methylephedrine, norephedrine (also known as phenylpropanolamine), pseudoephedrine & norpseudoephedrine
    (13) Gamma Hydroxy Butrate (GHB), Gamma Butyrate (GBL), 1,4 Butanediol (BD)

(14) Germander

(15) Germanium

(16) Glyburide, unlabeled glyburide, Liqiang 4, Liqiang Xiao Ke Ling (Liqiang Thirst Quenching Efficacious)

(17) Higenamine, 1-[(4-Hydroxyphenyl)methyl]-1,2,3,4-tetrahydroisoquinoline-6,7-diol; 1-(p-hydroxybenzyl)-6,7-Dihydroxy-1,2,3,4-Tetrahydroisoquinolin; 1(S)-Norcoclaurine; dl-Demethylcoclaurine; DMC; Higénamine; Higenamine Hydrobromide; Higenamine Hydrochloride; Higenamine Oxalate; Higenamine Tartrate; Norcoclaurine; O-Demethylcoclaurine

(18) Hormone Replacement Therapy products of animal origin

(19) Jin Bu huan

(20) Kava, ava, ava pepper, awa, kava root, kava-kava, kawa, Piper methysticum Forst. f., Piper Methysticum G. Forst, rauschpfeffer, intoxicating pepper, kava kava, kava pepper, kawa kawa, kawa-kawa, kew, Piper methysticum, sakau, tonga, wurzelstock, yangona

(21) Lobelia

(22) Magnolia or Stephania, or any adulterated botanicals, botanical derivatives or any other products that contain Magnolia or Stephania, or any Magnolia or Stephania derivates or extracts

(23) Organ/Glandular Extracts

(24) Pennyroyal Oil

(25) Pyrrolizidine alkaloids

(26) Sildenafil, tadalafil or vardenafil

(27) Yohimbe, Yohimbe Bark, Yohimbine

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION - TRANSMISSIBLE SPONGIFORM ENCEPHALOPATHY (TSE)

| Attached To and Forming Part of Policy<br>0100030739-0 | Effective Date of Endorsement<br>07/17/2015 12:01AM at the Named Insured<br>address shown on the Declarations | Named Insured<br>Good Nutrition LLC |
|---|---|---|
| Additional Premium:<br>$0 | Return Premium:<br>$0 | |

This endorsement modifies insurance provided under the following:

**ALL COVERAGE FORMS**

The following exclusion is added to this policy:

This insurance does not apply to any claim or suit for "bodily injury", "property damage", "personal injury" or "personal and advertising injury" or any other injury, loss or damage arising directly or indirectly out of, related to, or, in any way involving Transmissible Spongiform Encephalopathy (TSE), including, but not limited to Creutzfeldt-Jakob Disease, New Variant Creutzfeldt-Jakob Disease (nv-CJD), Gerstmann-Straussler-Scheinker Encephalopathy or Bovine Spongiform Encephalopathy (BSE), sometimes referred to as mad cow disease.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED - MANAGERS OR LESSORS OF PREMISES

| Attached To and Forming Part of Policy 0100030739-0 | Effective Date of Endorsement 07/17/2015 12:01AM at the Named Insured address shown on the Declarations | Named Insured Good Nutrition LLC |
|---|---|---|
| Additional Premium: $0 | | Return Premium: $0 |

This endorsement modifies insurance provided under the following:

**LIFE SCIENCES GENERAL LIABILITY COVERAGE**
**LIFE SCIENCES PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE**

### SCHEDULE

| Name and Address of Additional Insured Person(s) or Organization(s): |
|---|
| Blanket - Where Required By Written Contract |

A. **SECTION II- WHO IS AN INSURED** is amended to include any person or organization shown in the above Schedule as an Additional Insured but only for the vicarious liability imposed on the Additional Insured that is solely caused by the ownership, maintenance or use of that part of the premises leased to you by the Additional Insured shown in the above Schedule.

B. The insurance provided to the Additional Insured under this endorsement is limited as follows:

    1. This insurance does not apply to :
        a.  Any "occurrence" which takes place after you cease to be a tenant in that premises;
        b.  Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the above Schedule; or
        c.  Any "bodily injury", "property damage" or "personal and advertising injury" arising out of:
            (1) The sole negligence of the Additional Insured or any employees of the Additional Insured; or
            (2) Any obligation of the Additional Insured to indemnify another because of damages arising out of such injury or damage.
    2. Where there is no duty to defend the Named Insured, there is no duty to defend the Additional Insured. Where there is no duty to indemnify the Named Insured, there is no duty to indemnify the Additional Insured.

C. Duties of the Additional Insured In the event of an "occurrence", offense, claim or "suit":

    1. The Additional Insured must promptly give notice of an "occurrence", an offense which may result in a claim, a claim which is made, or, a "suit" to any other insurer which has insurance for a loss to which this insurance may apply.
    2. The Additional Insured must promptly tender the defense of any claim made or "suit" to any other insurer which also issued insurance to the Additional Insured as a Named Insured or to which the Additional Insured may qualify as an Additional Insured for a loss to which this insurance may apply.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSUREDS - VENDORS

| Attached To and Forming Part of Policy 0100030739-0 | Effective Date of Endorsement 07/17/2015 12:01AM at the Named Insured address shown on the Declarations | Named Insured Good Nutrition LLC |
|---|---|---|
| Additional Premium: $0 | | Return Premium: $0 |

This endorsement modifies insurance provided under the following:

**LIFE SCIENCES GENERAL LIABILITY COVERAGE**
**LIFE SCIENCES PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE**

SCHEDULE

| Name of Additional Insured | Your Products |
|---|---|
| Blanket - All Vendors | |

A. **SECTION II - WHO IS AN INSURED** is amended to include as an Additional Insured the person or organization shown in the above Schedule but only with respect to the distribution or sale in the regular course of the Additional Insured's business of "your products" shown in the above Schedule and for "bodily injury" or "property damage" that was proximately caused by the defective manufacturing, designing or warning of "your product." The coverage afforded to the Additional Insured is limited to vicarious liability proximately caused by "your products" for the Additional Insured.

B. The insurance provided to the Additional Insured under this endorsement is limited as follows:

   1. The insurance afforded to the person or organization shown in the above Schedule does not apply to:
      a. "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability from damages that the vendor would have in the absence of the contract or agreement;
      b. Any express warranty unauthorized by you;
      c. Any physical or chemical change in the product made intentionally by the vendor;
      d. Repackaging, unless unpacked solely for the purpose of inspection, demonstration, testing or the substitution of parts under instruction from the manufacturer, and, then repackaged in the original container;
      e. Any failure to make sure inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business , in connection with the distribution or sale of the products;
      f. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the product;
      g. Products which, after distribution or sale by you, have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor;
      h. "Bodily injury" or "property damage", arising out of the sole negligence of the Additional Insured; or
      i. "Bodily injury" or "property damage" to any employee of the Named Insured or to any obligation of the Additional Insured to indemnify another because of damage arising out of such injury.

   2. This insurance does not apply to any insured person or organization, from whom you have acquired such products, or any ingredient, part or container, entering into, accompanying or containing such products.

   3. In the event the written contract requires limits of insurance in excess of the Limits of Insurance provided by this Policy, the Limits of Insurance and Deductible provided by this Policy shall apply and not the limits required by the written contract. This endorsement shall not increase the Limits of Insurance and Deductible stated in the Declarations of this Policy.

   4. Where there is no duty to defend the Named Insured, there is no duty to defend the Additional Insured. Where there is no duty to indemnify the Named Insured, there is no duty to indemnify the Additional Insured.

C.  Duties of the Additional Insured In the event of "occurrence", claim or "suit":

1.  The Additional Insured must promptly give notice of an "occurrence", a claim which is made or a "suit", to any other insurer which has insurance for a loss to which this insurance may apply.

2.  The Additional Insured must promptly tender the defense of any claim made or "suit" to any other insurer which also issued insurance to the Additional Insured as a Named Insured or to which the Additional Insured may qualify as an Additional Insured for a loss to which this insurance may apply.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# ADDITIONAL INSURED AS REQUIRED BY WRITTEN CONTRACT - TRADE EVENT

| Attached To and Forming Part of Policy 0100030739-0 | Effective Date of Endorsement 07/17/2015 12:01AM at the Named Insured address shown on the Declarations | Named Insured Good Nutrition LLC |
|---|---|---|
| Additional Premium: $0 | | Return Premium: $0 |

This endorsement modifies insurance provided under the following:

**LIFE SCIENCES GENERAL LIABILITY COVERAGE**
**LIFE SCIENCES PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE**

A.   **SECTION II – Who Is An Insured** is amended to include any person or organization for whom you are participating in a Trade Event if you are required to include such person or organization as an Additional Insured on this Policy by written contract in effect during the "policy period" and executed prior to the "occurrence" of the "bodily injury", "property damage" or "personal and advertising injury". The insurance afforded under this endorsement to the Additional Insured is only for the vicarious liability imposed on the Additional Insured resulting from your participation in the Trade Event provided that such liability is caused by the sole negligent conduct of the Named Insured.

B.   The insurance provided to the Additional Insured under this endorsement is limited as follows:

   1.   Any coverage provided by this endorsement to the Additional Insured does not apply to "bodily injury", "property damage" or "personal and advertising injury" which takes place after your participation in the Trade Event ends.

   2.   In the event the written contract requires limits of insurance in excess of the Limits of Insurance provided by this Policy, the Limits of Insurance provided by this Policy shall apply and not the limits required by the written contract. This endorsement shall not increase the Limits of Insurance stated in the Declarations of this Policy.

   3.   Any insurance provided by this endorsement to an Additional Insured shall be excess over any other valid and collectible insurance available to the Additional Insured whether primary, excess, contingent or on any other basis unless a written contract specifically requires that this insurance apply on a primary or primary and noncontributory basis.

   4.   The person or organization qualifying as an Additional Insured under this endorsement becomes an Additional Insured on the later of the following dates:

      a.   The agreed upon date in the written contract that such person or organization was to be an Additional Insured on this Policy provided the written contract was executed prior to the agreed upon date; or

      b.   The effective date of this endorsement.

   Where there is no duty to defend the Named Insured, there is no duty to defend the Additional Insured. Where there is no duty to indemnify the Named Insured, there is no duty to indemnify the Additional Insured.

   6.   This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of the sole negligence of the Additional Insured or any employees of the Additional Insured.

Duties of the Additional Insured in the event of an "occurrence", offense, "claim" or "suit":

   1.   The Additional Insured must promptly give notice of an "occurrence", an offense which may result in a claim, a claim which is made or a "suit", to any other insurer which has insurance for a loss to which this insurance may apply.

2.  The Additional Insured must promptly tender the defense of any claim made or "suit" to any other insurer which also issued insurance to the Additional Insured as a Named Insured or to which the Additional Insured may qualify as an Additional Insured for a loss to which this insurance may apply.

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

## NOTICE OF TERRORISM INSURANCE COVERAGE

You are hereby notified that under the federal Terrorism Risk Insurance Act, as amended ("the Act"), the Company must make available insurance coverage for losses arising out of acts of terrorism, as defined in Section 102(1) of the Act. This policy includes such coverage for damages arising out of certified acts of terrorism and is limited by the terms, conditions, exclusions, limits, other provisions of the coverage quote or renewal application/questionnaire to which this offer is attached and by the policy, any endorsements to the policy and generally applicable rules of law.

The term "act of terrorism" means any act that is certified by the Secretary of the Treasury, in consultation with the Secretary of Homeland Security, and the Attorney General of the United States to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of an air carrier or vessel or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

YOU SHOULD KNOW THAT COVERAGE PROVIDED BY THIS POLICY FOR LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM, SUCH LOSSES MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT UNDER A FORMULA ESTABLISHED BY FEDERAL LAW. UNDER THE FORMULA, THE UNITED STATES GOVERNMENT GENERALLY REIMBURSES 85% THROUGH 2015; 84% BEGINNING ON JANUARY 1, 2016; 83% BEGINNING ON JANUARY 1, 2017; 82% BEGINNING ON JANUARY 1, 2018; 81% BEGINNING ON JANUARY 1, 2019 AND 80% BEGINNING ON JANUARY 1, 2020 OF COVERED TERRORISM LOSSES EXCEEDING THE STATUTORILY ESTABLISHED DEDUCTIBLE PAID BY THE INSURANCE COMPANY PROVIDING THE COVERAGE.

NO PREMIUM IS CHARGED FOR THIS COVERAGE NOR IS ANY CHARGE MADE FOR THE PORTION OF LOSS THAT MAY BE COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT.

*YOU SHOULD ALSO KNOW THAT THE ACT, AS AMENDED, CONTAINS A $100 BILLION CAP THAT LIMITS U.S. GOVERNMENT REIMBURSEMENT, AS WELL AS INSURERS' LIABILITY FOR LOSSES, RESULTING FROM CERTIFIED "ACTS OF TERRORISM" WHEN THE AMOUNT OF SUCH LOSSES IN ANY ONE CALENDAR YEAR EXCEEDS $100 BILLION. IF THE AGGREGATE INSURED LOSSES FOR ALL INSURERS EXCEED $100 BILLION, YOUR COVERAGE MAY BE REDUCED.*

*COVERAGE FOR "INSURED LOSSES" AS DEFINED IN THE ACT IS SUBJECT TO THE COVERAGE TERMS, CONDITIONS, AMOUNTS AND LIMITS IN THIS POLICY APPLICABLE TO LOSSES ARISING FROM EVENTS OTHER THAN "ACTS OF TERRORISM".*

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## SIGNATURE ENDORSEMENT

| Attached To and Forming Part of Policy<br>0100030739-0 | Effective Date of Endorsement<br>07/17/2015 12:01AM at the Named Insured<br>address shown on the Declarations | Named Insured<br>Good Nutrition LLC |
|---|---|---|
| Additional Premium:<br>$0 | Return Premium:<br>$0 | |

This endorsement modifies insurance provided under the following:

**ALL COVERAGE FORMS**

By signing and delivering this policy to you, we state that it is a valid contract when signed as below by our authorized representatives.

Secretary

President

ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL (OFAC)

## ADVISORY NOTICE TO POLICYHOLDERS

This Notice shall not be construed as part of your policy and no coverage is provided by this Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages your policy provides.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. Please read this Notice carefully.

The Office of Foreign Assets Control administers and enforces sanctions policy, based on Presidential declarations of national emergency. OFAC has identified and listed numerous Foreign Agents, Front Organizations, Terrorists, Terrorist organizations and Narcotics traffickers as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site—http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a "Specially Designated National and Blocked Person", as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments and no premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# EXHIBIT B



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed:**
**September 18, 2015 16:42**

By: MICHAEL N. UNGAR 0016989

Confirmation Nbr. 546990

PURUSHEALTH, LLC AND DR. SANGHEETA T.          CV 15 851394
MAHAJ, ET AL

      vrs.

GOOD NUTRITION LLC AND JOHN HUFF, ET AL          **Judge:**

DEENA R. CALABRESE

**Pages Filed:** 50

COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

PURUSHEALTH, LLC,                        )
3558 Lee Road                            )
Shaker Heights, Ohio 44120,              )
                                         )
        and                              )   JUDGE:
                                         )
DR. SANGEETA T. MAHAJAN                   )   Case No.:
19701 Shaker Boulevard                   )
Shaker Heights, Ohio 44122               )
                                         )
            *Plaintiffs*,                  )
                                         )
        v.                               )
                                         )
GOOD NUTRITION LLC,                      )   **COMPLAINT**
2000 Auburn Drive                        )   **WITH JURY DEMAND**
One Chagrin Highlands, Suite 200         )
Beachwood, Ohio 44122,                   )
                                         )
        and                              )
                                         )
JOHN HUFF,                               )
3120 Kingsley Road                       )
Shaker Heights, OH  44122                )
                                         )
            *Defendants*.                  )

PurUSHealth, LLC ("Purus" or "Company") and Dr. Sangeeta T. Mahajan (collectively "Plaintiffs") for their Complaint against Defendants Good Nutrition, LLC ("Good Nutrition") and John Huff (collectively "Defendants") state as follows:

**INTRODUCTION**

1.      Between July 28, 2014 and June 15, 2015 John Huff served as the managing member and chief executive officer of Purus, among other positions.

1

2. During his tenure at Purus, Mr. Huff knowingly facilitated and executed a series of transactions which resulted in Good Nutrition taking control of substantially all of Purus' assets for an amount substantially below fair market value.

3. The actions of Mr. Huff and Good Nutrition were carried out with the intent to cause harm to Purus, its owners, and its creditors and personally benefit Good Nutrition and Mr. Huff, who within a week of resigning from Purus became Good Nutrition's chief executive officer.

## PARTIES

4. Purus, a producer of nutrition bars, is an Ohio limited liability company with its principal place of business located at 3558 Lee Road, Shaker Heights, Ohio 44120. It also operates under the registered trade name Good Greens.

5. Dr. Mahajan is a resident of Shaker Heights, Cuyahoga County, Ohio, and a member and majority shareholder of Purus.

6. John Huff is a resident of Shaker Heights, Cuyahoga County, Ohio.

7. Good Nutrition, LLC is a Delaware limited liability company, registered to do business in the State of Ohio, with its principal place of business located at 2000 Auburn Drive, One Chagrin Highlands, Suite 200, Beachwood, Ohio 44122.

8. Bill Ross is the incorporator and chairman of Good Nutrition.

9. Upon information and belief, Good Nutrition was incorporated on June 1, 2015 by Bill Ross for the primary purpose of acquiring the assets of Purus and carrying on its business.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over Defendants and the subject matter of this action pursuant to R.C. §§ 2307.382(A)(1)-(4) and (A)(6), among other grounds. Venue is

2

proper in this court pursuant to Ohio Rules of Civil Procedure 3(B)(1), (B)(2), (B)(3), (B)(6), and (B)(12).

## FACTUAL BACKGROUND

### Mr. Huff's Relationship with Purus

11.     Mr. Huff served as managing member and chief executive officer of Purus pursuant to the terms of an employment agreement dated July 28, 2014 ("Employment Agreement"), attached as Exhibit A and incorporated as if fully rewritten herein.

12.     Mr. Huff held a 33.93% membership interest in Purus, pursuant to Membership Interest Purchase Agreement dated July 30, 2014 ("Membership Purchase Agreement"), attached as Exhibit B and incorporated as if fully rewritten herein.

13.     Mr. Huff served as Voting Trustee over a controlling share of Purus' interests pursuant to the Voting Trust Agreement dated July 30, 2014 attached as Exhibit C and incorporated as if fully rewritten herein.

14.     Pursuant to these agreements, Mr. Huff enjoyed the special trust and confidence of the Company and its other members.

### Misappropriation of Funds

15.     Pursuant to a letter agreement executed on August 26, 2014, Mr. Huff arranged for Dr. Mahajan and Mr. Pabley to be removed from Purus' bank account.

16.     Only Mr. Huff and Ms. Natalie Alesci (Purus' Controller) had access to the Purus bank account between August 26, 2014 and June 20, 2015.

17.     Between December 29, 2014 and June 15, 2015, Mr. Huff caused the unauthorized transfer of over $80,000 from the Purus account to his personal account.

18.     On June 16, 2015, the day after resigning, Mr. Huff transferred $155,000.00 to Good Nutrition without authority.

3

**Valuation of Purus**

19.     One of Mr. Huff's responsibilities as CEO of Purus was to raise additional equity capital for the company.

20.     In August 2014, Mr. Huff personally prepared and presented a term sheet for raising capital in which Purus was valued at an amount between $7.5 million and $10 million.

21.     On May 11, 2015, Mr. Huff confirmed a $7.5 million valuation of Purus in an email to Dr. Mahajan.

22.     Mr. Huff, in his capacity as CEO of Purus, received at least one offer from a disinterested third party to purchase Purus for $5 million.

23.     Mr. Huff failed to communicate this offer to any of the principals of Purus.

24.     As of May 2015, Mr. Huff knew the value of Purus to be between $5 million and $10 million.

**Transactions Leading to Improper Transfer of Purus' Assets**

25.     On or about February 17, 2015 Mr. Huff negotiated and executed a security agreement, promissory note, and letter agreement between Purus and Belmont Confections Inc. ("Belmont") ("Security Agreement").

26.     The Security Agreement described tangible and intangible assets belonging to Purus ("Assets") as collateral.

27.     The Security Agreement, as executed by Mr. Huff on behalf of Purus, differed materially from the form of agreement that had been approved by Dr. Mahajan.

28.     In May 2015, Mr. Huff knowingly misrepresented to Dr. Mahajan that Purus was in default under the terms of the Security Agreement.

4

29.     Mr. Huff further informed Dr. Mahajan that Belmont had moved to seize Purus' assets under the terms of the Security Agreement.

30.     At all times between February 2015 and June 9, 2015, Mr. Huff knew or should have known that Purus possessed funds sufficient to satisfy the amounts owed to Belmont, and thus Purus was capable of curing any alleged default of the Security Agreement.

31.     In May 2015, Dr. Mahajan contacted Belmont directly to resolve the alleged default of the Security Agreement. A preliminary resolution was reached with Belmont by which Purus would maintain its Assets.

32.     On May 28, 2015, Mr. Huff intentionally disrupted the resolution between Purus and Belmont and instructed Dr. Mahajan not to contact Belmont directly.

33.     Upon information and belief, Mr. Huff disrupted the resolution between Purus and Belmont because he had already agreed to transfer the Assets to Bill Ross and Good Nutrition.

34.     Mr. Huff and Mr. Ross, the founder of Good Nutrition, had been acting in concert for months leading up to the transfer of Assets.

35.     Upon information and belief, while still employed at Purus, Mr. Huff provided Mr. Ross with access to Purus's confidential information, including financial statements.

36.     Mr. Huff failed to disclose his involvement with Good Nutrition and/or Bill Ross to Purus.

37.     On June 1, 2015, Good Nutrition offered to purchase Purus' Assets from Belmont, prior to the existence of any Settlement Agreement.

5

38.     Good Nutrition's offer to purchase Purus' Assets was not communicated to Purus.

39.     On June 9, 2015, without notice or approval of the principals of Purus, Mr. Huff executed a settlement agreement ("Settlement Agreement") on behalf of Purus in which certain assets were transferred by Purus to Belmont for the stated purpose of Belmont reselling those assets to Good Nutrition for $400,000.

40.     Simultaneously, in an agreement also dated June 9, 2015, Purus' assets were sold by Belmont to Good Nutrition for $400,000, as proposed by Good Nutrition.

41.     To assist in the sale of Purus' assets, Mr. Huff executed an Acknowledgement dated June 9, 2015 ("Acknowledgement"), a copy of which is attached as Exhibit D and is incorporated as if fully rewritten herein.

42.     On June 15, 2015, Mr. Huff resigned from Purus.

43.     On June 16, 2015, Mr. Huff arranged for the unauthorized transfer of $155,000 from Purus' bank account to an account held by Good Nutrition.

44.     The money in Purus' bank account was not part of the sale of assets to Good Nutrition and belonged to Purus.

**Prior Litigation**

45.     On June 25, 2015, Good Nutrition instituted an action, Cuyahoga County Court of Common Pleas Case No. CV-15-847519, against Purus and its principal owners, Dr. Mahajan and Mr. Pabley, seeking, in part, an order for prejudgment attachment.

46.     The prior action directly related to the transactions and occurrences described in this Complaint.

6

47. Mr. Huff, as CEO of Good Nutrition, executed an affidavit in support of Good Nutrition's motion for prejudgment attachment containing false and misleading statements about Purus, Dr. Mahajan, and Mr. Pabley.

48. On July 2, 2015, based on the statements made in Good Nutrition's motion for prejudgment attachment and Mr. Huff's affidavit, Purus agreed to transfer Assets to Good Nutrition.

49. Good Nutrition voluntarily dismissed its action without prejudice on July 15, 2015 after it had successfully leveraged the litigation to obtain possession of Purus' Assets.

**COUNT I**
**Fraudulent Conveyance – Ohio Rev. Code §§1336.01 *et seq.***
(Against Huff and Good Nutrition)

50. Plaintiffs incorporate all previous allegations as if fully rewritten herein.

51. Huff conveyed Purus' Assets to Belmont with the intent to defraud and hinder Purus and its creditors.

52. Huff facilitated the conveyance of Purus' Assets to Good Nutrition with the intent to defraud and hinder Purus' creditors including Belmont.

53. At the time of the transactions executed by Huff, Dr. Mahajan had claims against Purus, including but not limited to outstanding payments in connection with the sale of a portion of her equity position in the company as well as compensation owed for her role as a consultant to Purus.

54. At the time of the transactions executed by Huff, litigation was pending between Belmont and Purus.

55. Huff, as CEO of Good Nutrition, has retained the benefit of controlling Purus' Assets.

7

56. Huff concealed his dealings with Belmont and Good Nutrition from Purus' principal owners.

57. The amount paid by Good Nutrition for Purus' Assets is substantially less than the commercially reasonable value.

58. Huff and Good Nutrition knew at the time the Assets were transferred that the amount paid by Good Nutrition for Purus' Assets was substantially less than the commercially reasonable value.

59. The transactions transferring Assets by Huff to Good Nutrition constituted a fraudulent conveyance pursuant to Ohio Revised Code § 1336.

60. As a result of the fraudulent conveyance Purus' has been injured and is entitled to the remedies provided for in Ohio Revised Code §1336.07.

**COUNT II**
**Breach of Member's Fiduciary Duties – Ohio Rev. Code §§1705.281(B) and (C)**
(Against Huff)

61. Plaintiffs incorporate all previous allegations as if fully rewritten herein.

62. Mr. Huff, as a member of Purus, enjoyed the special trust and confidence of the company and his fellow members.

63. Mr. Huff knowingly accepted that trust and confidence and undertook to advance Purus' interests above his own.

64. Purus relied upon Mr. Huff to exercise discretion and expertise in acting and making decisions for the company.

65. Mr. Huff failed to protect the interests of Purus by facilitating and executing the sale of assets Purus' assets to Good Nutrition, improperly motivated by his own future profit outside of Purus.

8

66.     Mr. Huff failed to account for his dealings with Good Nutrition or its principals to Purus and acted in concert with a party having an interest adverse to Purus.

67.     Mr. Huff failed to protect the assets of the company by failing to account for funds improperly transferred out of its bank accounts.

68.     As a direct and proximate result of Mr. Huff's tortious breach of his fiduciary duties owed to Purus and its members, Plaintiffs have suffered damages in excess of $25,000 in an amount to be proven at trial.

69.     In addition, Mr. Huff's breach of his fiduciary duties was undertaken with a conscious disregard for the rights of Purus or its members, in a manner that had a great probability of causing the company substantial harm, entitling Plaintiffs to punitive damages.

## COUNT III
### Breach of Manager's Fiduciary Duties – Ohio Rev. Code §§1705.29
(Against Huff)

70.     Plaintiffs incorporate all previous allegations as if fully rewritten herein.

71.     Mr. Huff, in addition to being a member of Purus, was appointed to the position of manager. Mr. Huff knowingly accepted the role of manager.

72.     As manager, Mr. Huff enjoyed the special trust and confidence of the company and his fellow members.

73.     As described above, in conducting Purus' business, Mr. Huff took actions he did not reasonably believe were in the best interests of Purus and failed to protect the interests of Purus.

74.     As a result of Mr. Huff's tortious breach of his fiduciary duties to Purus and its members, Plaintiffs have suffered damages in excess of $25,000, in an amount to be proven at trial.

9

75. In addition, Mr. Huff's tortious breach of his fiduciary duties to Purus and its members was undertaken with a conscious disregard for the rights of Purus and its members, in a manner that had a great probability of causing Plaintiffs substantial harm, entitling them to punitive damages.

## COUNT IV
### Conversion
(Against Huff and Good Nutrition)

76. Purus incorporates all previous allegations as if fully rewritten herein.

77. Through the actions described herein, Mr. Huff and Good Nutrition exercised dominion and control over Purus' property in a manner inconsistent with Purus' rights of ownership.

78. Specifically, Mr. Huff and Good Nutrition took possession of the Assets of Purus unlawfully, under false pretenses, and without giving full value.

79. Additionally, Mr. Huff transferred over $80,000 from Purus' bank account to his personal bank account without authority and transferred $155,000 from Purus' bank account after resigning from Purus.

80. Mr. Huff is also in possession of personal property belonging to Dr. Mahajan including, without limitation, a cellphone and laptop.

81. Mr. Huff is using the Assets, funds and personal property for his own personal benefit and/or the benefit of Good Nutrition, LLC.

82. Purus and Dr. Mahajan demanded the money and property be returned but Defendants have refused.

83. As a direct and proximate result of Mr. Huff's conversion, Plaintiffs have suffered damages in excess of $25,000 in an amount to be proven at trial.

10

## COUNT V
### Fraud
(Against Huff)

84.     Plaintiffs incorporate all previous allegations as if fully rewritten herein.

85.     Mr. Huff intentionally misrepresented to Plaintiffs that Purus was in default under the Security Agreement.

86.     Mr. Huff additionally omitted and concealed from Plaintiffs material facts concerning offers that had been made to acquire Purus, Mr. Huff's relationship and dealings with Bill Russ and Good Nutrition prior to the transfer of Assets, and Good Nutrition's negotiations with Mr. Huff and with Belmont concerning the transfer of Assets.

87.     These misrepresentations, omissions and concealments were done intentionally, and despite a duty of candor on the part of Mr. Huff to Plaintiffs, for the purpose of preventing Plaintiffs' disruption of Mr. Huff's scheme to transfer Assets to Good Nutrition.

88.     Plaintiffs reasonably relied on these misrepresentations, omissions and concealments by not taking steps to prevent the transfer of Assets.

89.     As a result of these actions, Purus has suffered damages in excess of $25,000 in an amount to be proven at trial.

90.     In addition, Mr. Huff's fraudulent actions were egregious in character and were undertaken maliciously and with a conscious disregard for the rights of Purus and its members, entitling them to punitive damages.

## COUNT VI
### Civil Conspiracy
(Against Good Nutrition and Huff)

91.     Purus incorporates all previous allegations as if fully rewritten herein.

92.     Defendants collectively engaged in a malicious combination and conspiracy to cause injury and damage to Plaintiffs.

11

93.     Defendants have engaged in and/or participated in various acts of tortious and illegal conduct in furtherance of their conspiracy to cause injury and damage to Purus and its owners including facilitating and executing the sale of substantially all of Purus assets to Good Nutrition and instituting an improper lawsuit against Purus to obtain Purus' assets.

94.     Good Nutrition and Mr. Huff acted maliciously and possessed the intent to harm Purus without justification or privilege.

95.     By virtue of the formation and operation of this conspiracy, Good Nutrition and Mr. Huff each as a participant in this conspiracy is liable as a joint tortfeasor for each of the wrongful acts committed by any of the others.

96.     Because of the conspiracy committed by Mr. Huff and Good Nutrition, Purus has suffered damages in excess of S25,000 in an amount to be proven at trial.

97.     In addition, Mr. Huff and Good Nutrition undertook the conspiracy with a conscious disregard for the rights of PurUSHealth in a manner that had and has a great probability of causing Purus substantial harm, entitling Purus to punitive damages.

### COUNT VII
### Breach of Employment Agreement
(Against Huff)

98.     Purus incorporates all previous allegations as if fully rewritten herein.

99.     The Employment Agreement is a valid and binding contract between Mr. Huff and Purus.

100.    Purus has fulfilled all of its obligations under the employment agreement.

101.    In the employment agreement, Mr. Huff agreed to perform his duties and responsibilities to the best of his abilities in a diligent, trustworthy, businesslike and efficient manner.

12

102.   As set forth above, Mr. Huff violated his obligations to perform his duties under the Employment Agreement.

103.   Mr. Huff also agreed to a confidentiality provision and a covenant not to compete as part of the Employment Agreement.

104.   Mr. Huff breached the confidentiality provisions and covenant not to compete by assisting, either directly or indirectly, a competitor of Purus during his employment.

105.   As a direct and proximate result of Mr. Huff's breaches of contract, Plaintiffs have suffered damages in excess of $25,000 in an amount to be proven at trial.

### COUNT VIII
### Breach of Voting Trust Agreement
(Against Huff)

106.   Purus incorporates all previous allegations as if fully rewritten herein.

107.   The Voting Trust Agreement is a valid and binding contract between Mr. Huff and Dr. Mahajan.

108.   Dr. Mahajan has fulfilled all her obligations under the Voting Trust Agreement.

109.   In the Voting Trust Agreement, Mr. Huff agreed to obtain prior written consent of Dr. Mahajan before taking certain actions including voting the interests to approve a liquidity event.

110.   Mr. Huff breached the Voting Trust Agreement by failing to notify Dr. Mahajan or obtain her consent prior to entering into the Settlement Agreement with Belmont and/or the Acknowledgement.

111.   As a direct and proximate result of Mr. Huff's breach of contract, Plaintiffs have suffered damages in excess of $25,000 in an amount to be proven at trial.

13

## COUNT IX
### Tortious Interference with Employment Relationships
(Against Good Nutrition)

112.    Purus incorporates all previous allegations as if fully rewritten herein.

113.    Good Nutrition knew that Mr. Huff was employed by Purus and that Purus expected that employment relationship to continue.

114.    Good Nutrition also knew that Purus intended to maintain the employment relationship with other sales, marketing and accounting employees.

115.    Nonetheless, Good Nutrition surreptitiously and wrongfully, without privilege to do so, solicited Mr. Huff to leave Purus.

116.    Additionally, Bill Ross, on behalf of Good Nutrition wrongfully entered Purus' office and informed Purus employees that they no longer worked for the Company.

117.    Because of Good Nutrition's tortious interference with these employment relationships, Purus has suffered damages in excess of $25,000, in an amount to be proven at trial.

## COUNT X
### Malicious Civil Prosecution/Abuse of Process
(Against Good Nutrition)

118.    Purus incorporates all previous allegations as if fully rewritten herein.

119.    Good Nutrition filed a complaint against Purus, Dr. Mahajan and Mr. Pabley in the Cuyahoga County Court of Common Pleas, without any probable cause or reasonable basis for doing so.

120.    Good Nutrition's institution of that proceeding was done with malice against the Plaintiffs.

121.    The lawsuit initiated by Good Nutrition was dismissed without prejudice only after Good Nutrition had obtained access to Purus' office to seize assets belonging to Purus.

14

122.    Because of Good Nutrition's malicious prosecution of the prior lawsuit, Plaintiffs have suffered damages in excess of $25,000 in an amount to be proven at trial.

## COUNT XI
### Defamation
(Against Huff)

123.    Plaintiffs incorporate all previous allegations as if fully rewritten herein.

124.    Mr. Huff made false and defamatory statements that were of or concerning Dr. Mahajan within an affidavit filed as part of the prior litigation described above.

125.    The false and defamatory statements were made or published to third parties, orally and/or in writing.

126.    The false statements constitute libel *per se* and/or slander *per se.*

127.    Mr. Huff knew the statements were false at the time they were made and/or acted with malice and/or reckless disregard for the truth or falsity of those statements.

128.    As a direct and proximate result of Mr. Huff's false and defamatory statements, Dr. Mahajan has suffered injury, including injury to her reputation, exposure to public contempt, shame or disgrace and has been affected adversely in her trade or business.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and for the following specific relief:

(A)    Avoiding the transfer of Purus' assets to Good Nutrition, LLC and directing the immediate return thereof or the immediate payment of the fair market value of Purus' assets, together with interest and costs, or any other remedy available under Ohio Revised Code §1336.07;

15

(B)    Award Plaintiffs compensatory damages and restitution in an amount in excess of $25,000 to be determined at trial as a result of the tortious acts of Good Nutrition and John Huff alleged herein;

(C)    Award Plaintiffs punitive damages as a result of the tortious acts of Good Nutrition and John Huff alleged herein;

(D)    Award Plaintiffs compensatory damages in an amount in excess of $25,000 to be determined at trial as a result of John Huff's breaches of contract as alleged herein;

(E)    Award Plaintiffs their costs and reasonable attorney's fees incurred in defending against the previous lawsuit filed by Good Nutrition as alleged herein;

(F)    Award Plaintiffs their costs and reasonable attorney's fees incurred in this action; and

(G)    Grant such other and further relief in favor of Plaintiffs as the Court deems just and proper.

Respectfully submitted,

/s/Michael N. Ungar
Michael N. Ungar (0016989)
Richard G. Hardy (0021920)
Nicholas B. Wille (0084604)
ULMER & BERNE LLP
Skylight Office Tower, Suite 1100
1660 West 2nd Street
Cleveland, Ohio 44113-1448
Telephone:    (216) 583-7000
Facsimile:    (216) 583-7001

*Attorneys for Plaintiffs PurUSHealth, LLC and Dr. Mahajan*

16

## JURY DEMAND

Plaintiff's PurUSHealth, LLC and Dr. Mahajan demand a jury trial on all issues so triable hereunder.

/s/Michael N. Ungar
One of the Attorneys for Plaintiff

CLEV1997 2172194v2

17

# EXHIBIT A

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This **AMENDED AND RESTATED EMPLOYMENT AGREEMENT** (this "Agreement") is made as of  July 28, 2014 (the "Effective Date"), by and between **PURUS HEALTH, LLC** (the "Company") and **JOHN HUFF** ("Huff").

### RECITALS

A.    Huff and Company are parties to an employment agreement dated as of March 25, 2013 (the "Original Agreement"), pursuant to which Huff was hired as the Company's Chief Operating Officer and Chief Financial Officer, and in which Huff was granted an option to purchase 5% of the Company.

B.    Since being hired under the Original Agreement Huff's employment with the Company has been continuous. HuffHuff

C.    Huff will now serve as the Company's Chief Executive Officer and Manager, and in connection with that new office the Company and Huff desire to amend and restate the Original Agreement in its entirety as provided herein.

NOW THEREFORE, in consideration of the foregoing, the agreements herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Employment**. Huff's employment by the Company commenced on the date of his original hire under the Original Agreement and it will continue uninterrupted by his change in office or by entering into this Agreement. The term of employment employment with the Company, upon the terms and conditions set forth in this Agreement, will be for the period beginning on the Effective Date and ending as provided in Section 5 (the "Employment Period").

2.    **Position and Duties**.  During the Employment Period, Huff will serve as Chief Executive Officer of the Company and as its sole manager. Huff will provide managerial, analytical, administrative, financial, sales, marketing, and other services consistent with that office to manage the affairs of the Company.  Huff will devote his best efforts and his full business time, efforts, skill, knowledge and attention (except for vacation periods and reasonable periods of illness or other incapacity) to the advancement of the business and interests of the Company , provided that Huff may (a) serve, (i) as a member of the board of directors or advisory boards (or their equivalents in the case of a non-corporate entity) of non-competing businesses and (ii) as a member of a board (or equivalent) or officer of any charitable organizations, (b) engage in charitable activities and community affairs, and (c) manage his personal investments and affairs, and manage the winding up of Assignor, except that Huff will limit the time devoted to the activities described in clauses (a), (b) and (c) so as not to materially interfere, individually or in the aggregate, with the performance of his duties and responsibilities hereunder.  Huff will perform his duties and responsibilities to the best of his abilities in a diligent, trustworthy, businesslike and efficient manner.

3.    **Salary and Benefits**.

(a)    Salary.  During the Employment Period, the Company will pay Huff salary at an initial rate equal to Two Hundred Thousand Dollars ($200,000) per year (pro-rated for the

remaining period of calendar year 2014) (such *per annum* salary, as in effect from time to time, the "Salary") as compensation for services.  The Salary will be payable in regular installments in accordance with the general payroll practices of the Company, but no less often than twice each month, and subject to applicable withholding requirements.  After calendar year 2014, the Salary will be subject to increases as agreed to by a the Company's members holding a majority of the interests in the Company (including the interests owned by Huff, a "Majority Vote").

(b)    Benefits.  During the Employment Period, the Company will continue to provide Huff with benefits as it provides to him at the Effective Date, and will add such retirement, medical, life, dental, vision, long-term Disability and short-term Disability insurance, and term-life insurance under such plans as it may establish by Majority Vote from time to time for senior executive officers of the Company, including any medical and dental coverage available for qualified dependents to the extent permitted under such plans (collectively, the "Benefits"). Participation in such plans will be subject to the terms of the applicable plan documents and generally applicable Company policies.

(c)    Vacations and Holidays.  Beginning on the Effective Date, Huff will be entitled to four (4) weeks of paid vacation each year during the Employment Period.  Huff will also be entitled to the paid holidays as set forth in the Company's policies, but no less than ten days of paid holidays, during the Employment Period.  Vacation days and holidays during any calendar year that are not used by Huff during such calendar year may not be used in any subsequent calendar year, nor will Huff be paid for unused vacation or holidays, except upon termination Without Cause as described in Section 5(b).

(d)    Reimbursement of Expenses.  During the Employment Period, the Company will advance or reimburse Huff for all reasonable out-of-pocket expenses incurred by him in the course of performing his duties under this Agreement that are consistent with the Company's policies and the Internal Revenue Service Code of 1986, as amended (the "Code") in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements and the Code with respect to reporting and documentation of such expenses.

(e)    Vehicle.  During the Employment Period, the Company shall provide Huff with $1,000 per month as an allowance to obtain a vehicle for Huff's use in furtherance of his duties and responsibilities described in Section 2 of this Agreement (the "Company Vehicle"). Huff will lease or own the Company Vehicle in his own name, and is obligated to maintain and pay for all insurance and maintenance on the Company Vehicle. Huff will submit tolls incurred and fuel used in Company business for reimbursement in accordance with Section 3(d).

(f)    Membership Interests.  The Company shall issue to Huff, and record the issuance in its books, a membership interest that represents 5% of the total interests of the Company at the time Huff designates (but no later than one year from the Effective Date), which interests acquired by Huff will be profits only on the terms provided in Exhibit A, but will otherwise be identical to all other interests in the Company outstanding at the Effective Date.

4.    Bonus.

(a)    Bonus.  During the Term, Huff will be eligible annually for a bonus up to 50% of his base salary subject to the achievement by the Company of performance targets calculated in accordance with Section 4(b) below (the "Bonus").  Any bonus due hereunder will be paid not later than thirty (30) days following the completion of the Company's audit for the

fiscal year for which the bonus was earned or as soon as administratively practicable within the meaning of Section 409A of the Internal Revenue Code, as amended ("Section 409A").

      (b)    Calculation.

      (i) Revenue Bonus. One-half of the Bonus shall be based upon achievement of the following criteria for the applicable year (the "Revenue Bonus"). Huff will be paid an amount equal to fifty percent (50%) of Huff's potential Bonus for the applicable year (i.e twenty-five percent (25%) of the Salary for such year) (the "Potential Revenue Bonus Amount") if the revenue for the target year is at least 35% greater than the revenue for the prior year (the "Revenue Target").If ninety percent (90%) of the Revenue Target for such year is met (the "Revenue Bonus Target Threshold"), then the Revenue Bonus shall be an amount equal to ten percent (10%) of the Salary for such year. For each one percent (1%) that the revenue for such year exceeds the Revenue Bonus Target Threshold, but not beyond the Revenue Target, the Revenue Bonus shall be increased by one and one-half percent (1.5%) of the Salary for such year. For example, if applicable revenue for such year equals ninety-five percent (95%) of the Revenue Target, the Revenue Bonus would be equal to seventeen and one-half percent (17.5%) of the Salary for such year (i.e. 10%, plus 1.5% times 5).

      (i)    Earnings Bonus. One-half of the Bonus shall be based upon achievement of the following criteria for the applicable year (the "Earnings Bonus"). Huff will be paid an amount equal to fifty percent (50%) of Huff's potential Bonus for the applicable year (i.e. twenty-five percent (25%) of the Salary for such year) (the "Potential Earnings Bonus Amount") if the earnings for the target year are at least 10% greater than the earnings from the prior year (the "Earnings Target"). No Earnings Bonus will be earned for such year unless the Company has earnings for such year at least equal to ninety percent (90%) of the Earnings Target for such year (the "Earnings Bonus Target Threshold"). If the Earnings Bonus Target Threshold is met, but not exceeded (i.e. exactly ninety percent (90%) of the Earnings Target was achieved), the Earnings Bonus shall be ten percent (10%) of the Salary for such year. For each one percent (1%) that the earnings for such year exceeds the Earnings Bonus Target Threshold, but not beyond the Earnings Target, the Earnings Bonus shall be increased by one and one-half percent (1.5%) of the Salary for such year. For example, if applicable earnings for such year equals ninety-five percent (95%) of the Earnings Target, the Earnings Bonus would be equal to seventeen and one-half percent (17.5%) of the Salary for such year (i.e. 10%, plus 1.5% times 5). As used herein, "earnings" means the Company's operating income less depreciation, amortization and other non-cash items of expense and before any bonus hereunder is calculated or paid, as derived from the Company's reviewed (or audited if applicable) financials kept in the ordinary course. Notwithstanding the foregoing, in any year that the Company's revenue is at least 100% greater than the prior year's revenue, an earnings have not grown or have decreased, the parties recognize that in such circumstances earnings are impacted by investment in revenue growth and the Earnings Bonus will automatically be payable as if the Earnings Bonus Target had been met.

    5.    Termination.

      (a)    The Employment Period will continue until the earlier of: (i) the end of the Term; (ii) Huff's resignation (A) for Good Reason or (B) for any other reason or no reason (a resignation described in this clause (ii)(B) being a resignation by Huff "Without Good Reason"), death, Disability; or (iii) the giving of notice of termination by the Company by Majority Vote for Cause.

      (b)    The Company may not terminate Huff at any time that Huff has voting

control over at least a majority of the Company's voting equity, and thereafter, the Company may only terminate Huff for Cause. If Huff resigns for Good Reason (other than in connection with a sale of the Company (whether by asset sale, interest sale, merger or otherwise) (a "Sale") where Huff is offered employment on at least as good terms as those provided herein, "Successor Employment") or the Company does not renew the Term of this Agreement other than for Cause, then, so long as Huff continues to comply with the restrictive covenants in this Agreement ("Noncompetition Agreement"), Huff will be entitled to receive (i) the greater of either the aggregate amount of months of Salary remaining until the expiry of the Term or the aggregate amount of twelve months of Salary (the greater correlating number of such months is referred to herein as the "Severance Period"), based on the *per annum* rate of the Salary in effect as of the Termination Date; (ii) an amount equal to any accrued and unpaid Bonus that is payable under Section 4 for the then current Fiscal Year and/or Fiscal Year prior to the Fiscal Year in which the Termination Date occurred; (iii) continued medical coverage (to the extent that Huff participated in such medical coverage during the Employment Period) at the Company's expense pursuant to COBRA, for so long as Huff may elect under COBRA; and (iv) all accrued and unpaid Salary and unused vacation time for the then-current annual period (with the right to vacation time being pro rated for such period through the Termination Date) and all unreimbursed business expenses incurred through the Termination Date and payable pursuant to Section 3(c) (all of the foregoing being "Severence"). Any Severance payments paid to Huff by the Company under Section 5(b)(i) will be paid over the Severance Period in accordance with the general payroll practices of the Company and subject to all applicable withholding requirements; provided, that Huff executes a release of all past, present and future claims against the Company and its owners, officers, directors and managers related to Huff's employment and/or termination as a condition to receiving such payments or any Benefits (other than claims arising out of Huff's status as a member of the Company or based a breach of this Agreement). If the Company fails to pay any amount due to Huff for Severence when it is due than all Severance amounts will be immediately due and payable to Huff in full in a single payment.

(c)     If the Employment Period terminates by reason of (i) the Company's termination with Cause, or (ii) Huff's resignation for any reason in connection with a Sale of the Company with Successor Employment, or Without Good Reason, (iii) Huff's death, Disability or other incapacity, or (iv) the expiry of the Term, then, so long as Huff continues to comply with the Noncompetition Agreement, Huff (or his estate in the case of his death) will be entitled to receive the amounts specified in Sections 5(b)(ii) and (iv), as well as any COBRA benefits to which Huff is entitled by law (at Huff's sole expense).

(d)     Upon the Termination Date, Huff will be deemed to have resigned from each position (if any) that he then holds as an officer, director or manager of the Company or any of its subsidiaries, and Huff will take any action that the Company or any of its subsidiaries may request in order to confirm or evidence such resignation.

(e)     Upon the events provided for in this Section 5, the payments and benefits, if any, required to be provided to Huff pursuant to any of the foregoing provisions of this Section 5 shall be in full and complete satisfaction of any and all obligations owing to Huff pursuant to this Agreement. If not already then exercised, Huff shall be entitled to exercise his option under 3(f) upon any event in this Section 5.

6.     **Representations and Warranties**.  Huff represents and warrants to the Company that: (a) Huff is not a party to or bound by any employment, noncompete, nonsolicitation, nondisclosure, confidentiality or similar agreement with any other Person that would materially affect his performance under this Agreement; and (b) this Agreement constitutes a valid and legally

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

binding obligation of Huff, enforceable against Huff in accordance with its terms. The Company represents that this Agreement constitutes a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms. All representations and warranties contained herein will survive the execution and delivery of this Agreement.

7.      **Certain Definitions**. When used in this Agreement, the following terms will have the following meanings:

"Bonus" means that bonus set forth in Section 4.

"Business Day" means a day that is not a Saturday, a Sunday or a statutory or civic holiday in the State of Ohio.

"Cause" means (i) Huff's failure (except where due to Disability or where performance of Huff's duties is prohibited by law), neglect or refusal to perform his duties hereunder which such failure, neglect or refusal has had or is reasonably expected to have a material adverse effect on the Company and is not corrected by Huff within thirty (30) days following receipt by Huff of written notice issued by Majority Vote of such failure, neglect or refusal, and the actions required to correct the same, or which such failure, neglect or refusal is repeated after having been once corrected; provided, that termination for poor financial performance of the Company is not Cause, (ii) a material breach of any obligation or agreement between Huff and the Company and the continuation of such breach for a period of thirty (30) days after notice to Huff of such breach and a request for cure or corrective action, (iii) Huff's use of illegal drugs or repeated public drunkenness, (iv) Huff's conviction of, or a plea of guilty or no contest or similar plea with respect to, a felony or crime involving dishonesty or moral turpitude, or commission of an act of fraud, theft or embezzlement, willful misconduct, material dishonesty with respect to the Company, misappropriation of property of the Company, failure to comply with applicable laws in the conduct of Huff's performance hereunder, or a material breach of fiduciary duty to the Company, or (vi) a material breach of any obligation or agreement under the Noncompetition Agreement.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985 as amended from time to time.

"Disability" has the meaning that such term has under the Company's long term disability insurance plan, if any. In furtherance and not in limitation to the above, "disability" shall be deemed to occur if Huff is unable to perform the essential functions of Huff's then existing position or positions under this Agreement with or without reasonable accommodation, due to the same illness or physical or mental disability for a period of one hundred twenty (120) consecutive days, or for a total of one hundred twenty (120) days, consecutive or not, during any twelve-month period. If any question shall arise as to whether during any period Huff is disabled so as to be unable to perform the essential functions of Huff's then existing position or positions with or without reasonable accommodation, Huff may, and at the request of the Company shall, submit to the Company a certification in reasonable detail by a physician selected by the Company to whom Huff or Huff's guardian has no reasonable objection as to whether Huff is so disabled or how long such disability is expected to continue, and such certification shall for the purposes of this Agreement be conclusive of the issue. Huff shall cooperate with any reasonable request of the physician in connection with such certification. If such question shall arise and Huff shall fail to submit such certification, the Company's determination of such issue shall be binding on Huff.

"Fiscal Year" means the fiscal year of the Company as in effect from time to time.

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

"Good Reason" means the material breach of this Agreement by the Company, or any other agreement between Huff, on the other hand, and the Company that remains uncured for fifteen (15) days after notice thereof by Huff to the members with a Majority Vote, (ii) any material reduction or alteration in compensation, benefits, services, perquisites and amenities in the aggregate to which Huff is entitled, or (iii) the Company requires Huff to relocate outside of a 60 mile radius of the location of Huff's employment as of the date hereof. Notwithstanding the foregoing, Good Reason shall not exist so long as Huff has voting control over at least a majority of the Company's voting equity.

"Noncompetition Agreement" means the restrictive covenants between Huff and the Company attached as Exhibit B.

"Term" means the period of time beginning on the Effective Date and terminating December 31, 2019.

"Termination Date" means the date on which the Employment Period ends pursuant to Section 5(a).

"Without Good Reason" is defined in Section 5(a).

8.    Key-Man Life Insurance. Huff agrees to submit to any reasonably requested physical examination in connection with the Company's purchase of a "key-man" insurance policy. Huff agrees to cooperate fully in connection with the underwriting, purchase and/or retention of a key-man life insurance policy by the Company.

9.    Noncompetition Nonsolicitation, Confidentiality and Proprietary Rights Agreement. Simultaneously with the execution of this Agreement and as a condition to Huff's employment with the Company, Huff and the Company have entered into the Noncompetition Agreement included herein.

10.    Additional Obligations. Both during and after the Term, Huff shall, upon reasonable notice, furnish the Company with such information as may be in Huff's possession, and cooperate with the Company, as may reasonably be requested by the Company (and, after the Term, with due consideration for Huff's obligations with respect to any new employment or business activity) in connection with any litigation in which the Company is or may become a party. The Company shall reimburse Huff for all reasonable expenses incurred by Huff in fulfilling Huff's obligations under this Section 10.

11.    Indemnification and Reimbursement of Expenses.

(a)    The Company shall indemnify Huff to the fullest extent permitted under applicable law and the Company's organizational documents if Huff is made or threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that Huff is or was a director, officer, manager or employee of the Company or any other company at which Huff serves because of its direct or indirect relationship with the Company, or is or was serving at the request of the Company as a director, trustee, officer, manager or employee of any other enterprise. The indemnification provided by this Section 11 shall not be deemed exclusive of any other rights to which Huff may be entitled under the Articles of Formation or the Company, or any agreement, or otherwise, from any other source for any other reason both as to action in Huff's official capacity and as to action in another capacity while holding such office, and shall continue as to Huff after Huff has ceased to be an officer, manager or employee of the Company and shall inure to the

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

benefit of the estate, heirs, executors, and administrators of Huff.

(b)    Expenses (including reasonable attorney's fees) incurred by Huff in defending any action, suit, or proceeding commenced or threatened against Huff for any matter to which Huff is entitled to indemnification under Section 11(a) shall be paid by the Company as they are incurred, in advance of final disposition of the action, suit, or proceeding upon receipt of an undertaking by or on behalf of Huff in which Huff agrees to reasonably cooperate with the Company concerning such action, suit, or proceeding, and (i) if the action, suit, or proceeding is commenced or threatened against Huff to repay the amount if it is proved by clear and convincing evidence in a court of competent jurisdiction after exhaustion of appeals that Huff's action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the Company or with reckless disregard for the best interests of then Company or (ii) if the action, suit, or proceeding is commenced or threatened against Huff to repay the amount if it is ultimately determined that Huff is not entitled to be indemnified. The obligation of the Company to advance expenses provided for in this Section 11(b) shall not be deemed exclusive of any other rights to which Huff may be entitled under the Articles of Formation or any Limited Liability Company or Operating Agreement of the Company (as each may be amended from time to time) or the organizational documents of any other entity, or any agreement, or otherwise.

12.    **Non-Disparagement**. During the Term and after termination of this Agreement for any reason, neither party will, directly or indirectly, as an individual or on behalf of a firm, corporation, partnership or other legal entity, make any disparaging or negative comment to any other person or entity regarding the other party or any of its affiliates, agents, attorneys, employees, officers and directors, Huff's work conditions or circumstances surrounding Huff's separation from the Company or otherwise impugn or criticize the name or reputation of the other party, its affiliates, agents, attorneys, employees, officers or directors, orally or in writing.

13.    **Miscellaneous**.

**Notices**. All notices, demands or other communications to be given or delivered by reason of the provisions of this Agreement will be in writing and will be given by email, mail, courier or personal delivery the address that the recipient regularly uses for business communications, and shall be deemed given when delivered to such address or if it is actually received by the recipient, or it is given to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

(a)    Consent to Amendments. No modification, amendment or waiver of any provision of this Agreement will be effective against any party unless such modification, amendment or waiver is approved in writing by all parties. No other course of dealing among the Company and Huff or any delay in exercising any rights hereunder will operate as a waiver by any of the parties hereto of any rights hereunder.

(b)    Binding Effect; Delegation of Huff's Duties Prohibited. This Agreement and the rights and duties hereunder may not be assigned or delegated and any attempt or agreement to do so is void. Subject to the foregoing, this Agreement shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective successors, assigns, heirs, and legal representatives,.

(c)    Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will

be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement; provided, that the agreement as whole is not materially altered.

(d)    Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same Agreement. Photocopied or scanned and printed executed counterparts are deemed originals for all purposes.

(e)    Descriptive Headings: Interpretation.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. The use of the word "including" in this Agreement will be by way of example rather than by limitation.

(f)Governing Law.    ISSUES AND QUESTIONS CONCERNING THE CONSTRUCTION, VALIDITY, ENFORCEMENT AND INTERPRETATION OF THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF OHIO, WITHOUT GIVING EFFECT TO ANY CONFLICT OF LAW RULES OR PROVISIONS (WHETHER OF THE STATE OF OHIO OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF OHIO. IN FURTHERANCE OF THE FOREGOING, THE INTERNAL LAW OF THE STATE OF OHIO WILL CONTROL THE INTERPRETATION AND CONSTRUCTION OF THIS AGREEMENT (AND ANY SCHEDULE HERETO), EVEN THOUGH UNDER OHIO'S CONFLICT OF LAW ANALYSIS, THE SUBSTANTIVE LAW OF SOME OTHER JURISDICTION WOULD ORDINARILY APPLY.

(g)    Service of Process.  WITH RESEPCT TO ANY AND ALL SUITS, LEGAL ACTIONS OR PROCEEDINGS ARISING OUT OF THIS AGREEMENT, EACH PARTY WAIVES PERSONAL SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER PROCESS AND AGREES THAT SERVICE THEREOF MAY BE MADE BY ANY MEANS SPECIFIED FOR NOTICE PURSUANT TO SECTION 14(a).

(h)    No Strict Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

(i)    Entire Agreement.  Except as otherwise expressly set forth in this Agreement or the other agreements and documents referenced herein, this Agreement is the complete agreement and understanding among the parties to this Agreement with respect to the subject matter of this Agreement, and it supersedes and preempt any prior understandings, agreements, or representations by or among the parties or their predecessors, written or oral, that may have related to the subject matter of this Agreement in any way.

(j)    Time.  Whenever the last day for the exercise of any privilege or the discharge or any duty hereunder falls upon a day that is not a Business Day, the party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day that is a Business Day.

(k)    Survival.  Provisions of this Agreement will survive any termination if so

provided in this Agreement or if necessary or desirable to accomplish the purposes of other surviving provisions, of if by their nature they survive, such as the right to payment of amounts due prior to termination. Expiration or termination of the Term, of employment, of the Employment Period and of this Agreement will be deemed equivalent terms as context requires.

(n)     Excess Parachute Payments.     Notwithstanding any provision of this Agreement to the contrary, in the event that any amounts payable to Huff hereunder, alone or together with other payments which Huff has a right to receive from Company or Holdings , would constitute an "excessive parachute payment" (as defined in Section 280G of the Code), then Company will pay the excise tax imposed by Section 4999 of the Code as well as any taxes that would be due from Huff as a result of Company's payment of the excise tax and the payment of such taxes, until the payments due to Huff are fully grossed-up.

*[The remainder of this page is intentionally left blank.]*

IN WITNESS WHEREOF, the parties hereto have executed this Huff Employment Agreement as of the date first written above.

COMPANY:

PURUS HEALTH, LLC

By: _____

Sangeeta T. Mahajan, M.D., Authorized Member

HUFF:

_____

John Huff

Exhibit A
Profits Only Terms

1. The membership interests issued to Huff hereunder shall not have any right to participate in any lidudation or capital distributions of the Comapany until all such distributions, regardless of when occurring or to whom they are made, meet the participation threshold ("Participation Threshold"). Huff shall be entitled to all other distributions, including liquidation or capital distributions in excess of the Participation Threshold.

2. The Participation Threshold shall be $4,300,000, which is the total fair market value of the Company at the Effective Date based on an arms length negotiated transaction and intended as a method permitted by the Internal Revenue Service ("IRS") for valuing similar intersts. Thus, the interests, assuming the same were vested as of the applicable date and assuming that the Company was liquidated as of the applicable date, would have no value to Huff whatsoever unless the distributions on the 5% interest upon the liquidation of the Company exceeded the Participation Threshold.

3. It is the intention and purpose of this Agreement that the interests shall be deemed to be at all relevant times exempt from compliance with Section 409A of the Internal Revenue Code of 1986, as amended, and all other applicable laws. This Agreement shall be so interpreted and is intended to be so administered. However, if the Company determines that on is needed, then the Company will have a 409A valuation on the intersts conducted.

4. Prior to or after the issuance of the interests pursuant to this Agreement, Huff may decide to execute and deliver to the IRS an election under Section 83(b) of the Code with respect to the interests (the "83(b) Election"). The Employee understands that under Section 83(b) of the Code, regulations promulgated thereunder, and certain IRS administrative announcements, in the absence of an effective election under Section 83(b) of the Code, the excess of the fair market value of any interests, on the date of which any forfeiture restrictions applicable to such interests lapse, over the price paid for such interests, could be reportable as ordinary income at that time. For this purpose, any "forfeiture restrictions" will be deemed lapsed and the interests may be taxed at the time received hereunder to the extent the fair market value of the interests exceeds the price for such interests ($0) and in order to be effective, the 83(b) Election must be filed with the IRS within thirty (30) days after the date of this Agreement.

Exhibit A
Profits Only Terms

1. The membership interests issued to Huff hereunder shall not have any right to particip te in any liquidation or capital distributions of the Comapany until all such distributions, regardless of when occurring or to whom they are made, meet the participation threshold ("Participation Threshold"). Huff shall be entitled to all other distributions, including liquidation or capital distributions in excess of the Participation Threshold.

2. The Participation Threshold shall be the amount equal to the higher of 5% of the total fair market value of the Company at the Effective Date or the date on which the interests are issued to Huff, the value being determined using a method permitted by the Internal Revenue Service ("IRS") for valuing similar intersts. Thus, the interests, assuming the same were vested as of the applicable date and assuming that the Company was liquidated as of the applicable date, would have no value to Huff whatsoever unless the distributions on the 5% interest upon the liquidation of the Company exceeded the Participation Threshold.

3. It is the intention and purpose of this Agreement that the interests shall be deemed to be at all relevant times exempt from compliance with Section 409A of the Internal Revenue Code of 1986, as amended, and all other applicable laws. This Agreement shall be so interpreted and is intended to be so administered. However, the Company will have a 409A valuation on the intersts conducted.

4. Prior to or after the issuance of the interests pursuant to this Agreement, Huff may decide to execute and deliver to the IRS an election under Section 83(b) of the Code with respect to the interests (the "83(b) Election"). The Employee understands that under Section 83(b) of the Code, regulations promulgated thereunder, and certain IRS administrative announcements, in the absence of an effective election under Section 83(b) of the Code, the excess of the fair market value of any interests, on the date of which any forfeiture restrictions applicable to such interests lapse, over the price paid for such interests, could be reportable as ordinary income at that time. For this purpose, any "forfeiture restrictions" will be deemed lapsed and the interests may be taxed at the time received hereunder to the extent the fair market value of the interests exceeds the price for such interests ($0) and in order to be effective, the 83(b) Election must be filed with the IRS within thirty (30) days after the date of this Agreement.

REVISED 12/1

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

Exhibit B
Non-Competition Agreement

1.     **Covenant Not to Compete**.

1.1     Definitions. Except as otherwise defined in this Agreement, capitalized terms used herein shall have the following meanings:

(a)     The term "Affiliate" means, with respect to any entity or person, any other entity or person that, directly or indirectly through one or more of its intermediaries, controls, is controlled by or is under common control with such entity or person.

(b)     The term "Business" means the business conducted by the Company during the Employment Period, including without limitation the design, manufacturing, sale, and/or distribution of wellness, health, and energy food bars.

(c)     The term "Compete" means to knowingly own, manage, operate, control or participate in, engage in, have any ownership interest in, make loans to, act as a guarantor, surety or indemnitor for, or aid or advise in as a contractor, administrative, supervisory, marketing, creative, production, or consulting capacity, or aid or advise as an employee, director, manager, officer, consultant, or otherwise, whether directly or indirectly, any business (whether a sole proprietorship, partnership, corporation, limited liability company, firm, joint venture, trust or other entity) which is engaged directly or indirectly in the Business.

(d)     The term "Confidential Information" means any data or information of the Company that is not publically disclosed by it, whether or not it rises to the level of a trade secret, including, but not limited to, any Works, Inventions, data or information, including, but not limited to, technical or nontechnical data, specifications, designs, plans, proposals, copyrightable work, financial, business and marketing plans or data, formulas, patterns, compilations, programs, devices, methods, techniques, drawings, processes, product plans, actual or potential customer or supplier lists and information, or other information similar to any of the foregoing, which derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can derive economic value from its disclosure or use, or any other information which may be a trade secret under applicable law, but does not include information that (i) is or becomes available to the public through no fault of Huff or anyone receiving information from Huff, or (ii) is compelled to be disclosed by process of law. Notwithstanding the foregoing, Confidential Information does not include any data or information Huff had prior to his employment by the Company.

(e)     The term "Restricted Area" shall mean any geographic area by state within the United States or by country outside of the United States in which the Business is now or hereafter regularly conducted by the Company.

(f)     The term "Restricted Period" means during the Employment Period and during the Severance Period thereafter for so long as Huff is paid Severance.

1.2     General Covenant. In order to further the Company's goals of maintaining the confidentiality of its Confidential Information, Huff represents, warrants, covenants and agrees that, during the Restricted Period, Huff will not directly or indirectly Compete with the

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

Company within the Restricted Area. Huff acknowledges that to adequately protect the interests of the Company, it is essential that the foregoing restrictive covenants cover the Business and the entire Restricted Area.

        1.3    Additional Covenants. Huff represents, warrants, covenants and agrees that, during the Restricted Period, Huff will not knowingly directly or indirectly (whether as owner, principal, employee, partner, lender, guarantor, surety, indemnitor, venturer with or consultant to any person, firm, partnership, corporation, limited liability company, or other legal entity) take any of the following actions :

(a)    solicit or accept, or attempt to solicit or accept any business from any customer of the Company, including any prospective customer, with regard to the Business;

(b)    cause or seek to cause any of the Company's suppliers, vendors, distributors, consultants, agents, contractors, or customers to cease transacting business with the Company;

(c)    cause or seek to cause any of the Company's prospective suppliers, vendors, distributors, consultants, agents, contractors, or customers not to transact business with the Company;

(d)    to the extent relating to the Business, solicit on behalf of any party doing business in the Restricted Area, other than the Company, any orders for the products or services now or hereafter during the Restricted Period sold by the Company from any person or entity located in the Restricted Area, whether a customer or potential customer of the Company;

(e)    to the extent relating to the Business, contact or communicate with, on behalf of any party other than the Company, regarding products or services now or hereafter during the Restricted Period sold by the Company any supplier, vendor, distributors, consultants, agent, contractors, or customer with whom the Company transacts business or with whom the Company anticipates transacting business; or

(f)    recruit or solicit, or attempt to recruit or solicit, or induce or attempt to induce, or take any action in order to (or that is likely to) induce, or attempt to induce, any employee or agent of Company to terminate an employment or other relationship with Company.

1.4    Permitted Activities. Except as set forth below, the foregoing shall not be deemed to prohibit the ownership by Huff of not more than one percent (1%) of the shares of corporations which are publicly traded on a national stock exchange or the over-the-counter markets.

1.5    Nature of Restrictions. Huff has carefully considered the nature and extent of the restrictions upon Huff, and the rights and remedies conferred upon the Company, under this Agreement, and hereby acknowledges and agrees that the same are reasonable in time and territory, are designed to eliminate competition which otherwise would be unfair to the Company, are fully required to protect the legitimate interests of the Company, and do not confer a benefit upon the Company disproportionate to the detriment to Huff.

2.    **Proprietary Rights.**

2.1    Works-Made-For-Hire. The parties acknowledge and agree that (i) it is their mutual intention that all right, title and interest in and to the Inventions (defined below), whether already created or to be created, be owned by the Company; (ii) it is their mutual intention that, to the

undertakings stated in this Section 2 shall survive the termination of this Agreement. Huff understands that all such Inventions and Proprietary Items shall be and remain the sole property of the Company (, as the case may be), unless expressly released in writing by the Company (), and the Company (, as the case may be) shall have all ownership rights in all such Inventions and Proprietary Items. Huff and the Company agree to execute appropriate instruments documenting such ownership rights, and Huff hereby grants the Company Huff's power of attorney to execute the same. Huff acknowledges that such power of attorney is coupled with an interest and is irrevocable. The provisions of this Article 2 shall be deemed to apply to any and all Works or other Proprietary Items which were created in whole or in part while Huff was employed or engaged as an independent contractor with Assignor, all of which shall be and remain the property of Company.

2.5     Cooperation. All intellectual property, proprietary information, Propriety Items, Confidential Information or Trade Secrets of the Company , including, without limitation, software programs, software and systems documentation, records, data, documents and other written materials created by Huff or coming into Huff's possession during the period of employment or engagement by the Company, whether or not the same are covered by any other section of this Agreement, shall be the sole and exclusive property of the Company and shall be delivered promptly to the Company (together with all copies thereof) upon termination of Huff's engagement by the Company or upon the request of the Company.

3.      Confidentiality and Non-Disclosure.

3.1     Non-Disclosure in General. As a consequence of Huff's employment by the Company, Huff will receive and deal with Confidential Information, trade secrets, Inventions and Proprietary Items. Huff further acknowledges that Confidential Information, trade secrets, Inventions and Proprietary Items, received or dealt with, and to be received or dealt with by Huff, is of such a value and nature as to make it reasonable and necessary for the protection of the Company that Huff not Compete with the Company within the Restricted Area during the Restricted Period, and that the Company will be irreparably damaged if Huff were to disclose any of the Confidential Information, Trade Secrets, Inventions or Proprietary Items that Huff has received or dealt with, or will receive or deal with, as a result of Huff's engagement with the Company. Huff acknowledges that all Confidential Information, Trade Secrets, Inventions and Proprietary Items and other information regarding the Company compiled or obtained by Huff or furnished to Huff in connection with Huff's engagement with the Company, is confidential information and the Company's exclusive property and shall not be disclosed to any person, firm, or entity, during the Restricted Period or thereafter. Upon demand by the Company, Huff will surrender to the Company all Confidential Information, Trade Secrets, Inventions and Proprietary Items and all other original and facsimile records, documents and data in Huff's possession or under Huff's control pertaining to the Company.

3.2     Trade Secrets. Huff acknowledges that trade secrets of the Company comprise a part of the Confidential Information as to which Huff has knowledge and access, and as to which Huff will have knowledge and access. Huff acknowledges the competitive value and confidential nature of such Trade Secrets, and recognizes and agrees that the disclosure or improper use of such Trade Secrets will cause serious and irreparable injury to the Company . Accordingly, in addition to the other restrictions contained in this Agreement, Huff hereby further covenants and agrees that Huff shall not, directly or indirectly: (i) communicate, disclose or divulge to any person, firm or other party, or use, for Huff's own benefit or the benefit of others, any Trade Secrets which Huff may now know or hereafter come to know; or (ii) except as required in the

normal course of the duties and responsibilities of Huff to the Company, copy, remove from the premises of the Company or retain, without the prior written consent of the Company, any written Trade Secrets, including, but not limited to, financial data, customers, accounts, vendor or referral source lists (or any other information with regard to such persons or entities), pricing schedules or other information, memoranda or copies or extracts of any of the foregoing.

4. **Inadequate Remedy at Law; Injunctive Relief**. Huff acknowledges that if Huff or any of Huff's Affiliates breach any of the obligations contained in this Agreement, the injury that will be suffered by the Company will be irreparable and the Company will not have an adequate remedy at law. Huff agrees, on Huff's behalf and on behalf of Huff's respective Affiliates, that in the event of such a breach, the Company shall be entitled to relief by way of injunction from any court of proper jurisdiction, without notice or bond, to enforce this Agreement, in addition to all other rights that the Company may have at law, in equity, under this Agreement, under any other agreement, or otherwise.

5. **Independent Significance**. The restrictive covenants contained herein shall be construed as independent of the other provisions of this Agreement, and the existence of any claim or cause of action of Huff or any of Huff's Affiliates against the Company , whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any of the covenants and obligations set forth herein.

6. **Extension of Restricted Period**. In the event Huff breaches any obligations, representations, warranties or covenants set forth in this Noncompetition Agreement, such breach shall suspend and toll the running of the Restricted Period from the date of such breach until such time as such violation ceases.

7. **Non-Circumvention**. Huff shall not, in any manner, directly or indirectly, circumvent or attempt to circumvent this Agreement, including, without limitation, forming, joining, or in any way participating in any corporation, partnership, limited partnership, limited liability company, syndicate or other firm, entity or group (or otherwise acting in concert with any person, firm or entity) for the purpose of taking any action in circumvention of this Agreement or which is restricted or prohibited under this Agreement.

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

# EXHIBIT B

<u>MEMBERSHIP INTEREST PURCHASE AGREEMENT</u>

**THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT** (this "Agreement") is made and entered into by and between John Huff ("Buyer") and Sangeeta T. Mahajan, M.D. ("Seller").

## Background

A.   PurUS Health, LLC (the "Company"), was formed upon the filing of its Articles of Organization with the Ohio Secretary of State on June 28, 2011. Buyer is the Company's Chief Operating Officer and Seller is the Company's founder and owns an 89.3% percentage interest in Company.

B.   The Company has been in a negotiation to close a transaction in which its assets would be assigned to a new entity at a negotiated $4 million valuation and a new investor group would invest $5 million to obtain 100% of the new entity's voting control and 67% of the new entity's equity and the Company would own 33% of the new entity's equity and would receive $1.5 million in cash net of approximately $500,000 in expenses, all to restructure the Company's ownership and business in order to better carry out its business plans.

C.   In connection with the transaction the Company made a Cognovit Promissory Note to Scott Cohen dated February 27, 2014 in the principal amount of $400,000 (the "Bridge Note"). To secure the Note the Company granted security interests in its assets to Payee, Seller pledged her interests in the Company to payee and Seller and her husband guaranteed payment and performance of the Note, all pursuant documents of even date with the Note. Pursuant to the Note, it is a default, among other events, if the Company or Seller sell or transfer any membership interests in the Company.

C.   The transaction did not close and to better permit the Company to pursue alternate financing or restructuring plans Seller desires to sell (the "Transfer") to Buyer a 33.93% percentage interest in the Company (the "Interest"). The Company, Seller and Buyer being mindful of the terms of the Note and the related security documents desire only to engage in the transactions contemplated hereunder, including the Transfer, if, and only when, the Note is paid in full (the time and date at which the Note is so fully paid is referred to as the "Effective Date"), and the parties desire to enter into this Agreement to govern the terms of the Transfer.

## Agreement

NOW, THEREFORE, in consideration of the foregoing, the agreements made herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

1 **Acquisition of Interest**

1.1 Subject to the terms and conditions herein, effective at the Effective Date, Buyer shall purchase and Seller will sell and transfer to Buyer good and marketable title to the Interest free and clear of Encumbrances (defined herein) ("Closing") and thereupon, automatically and without further action by any person or entity, Buyer will own a 33.93% percentage interest in the Company and Seller will retain a 55.37% percentage interest in the Company.

1.2 The ownership interests of the members of the Company are recorded in the books of the Company, and are not certificated. Buyer and Seller shall direct the Company to enter the Transfer into its books and to register the Interest to Buyer and register Buyer as a member as of the Effective Date. This Agreement constitutes Seller's Membership Interest Transfer Power and is her instruction to the Company to record the Transfer of the Interests on its books.

1.3 Buyer and Seller shall direct the Company to make any required adjustments on its books to transfer to Buyer the portion of Seller's capital account associated with the Interest and to prorate the allocative share of the Company's income or losses and distributive share of any net available cash flow associated with the Interest as of the Effective Date, and to thereafter issue tax returns and statements, or amendments to tax returns and statements if required, that reflect these transactions.

1.4 The aggregate purchase price for the acquisition by Buyer of the Interest is $1,459,000. The purchase price will be paid by Promissory Note in the form attached as **Exhibit A**, dated the Effective Date, and made by Buyer to Seller.

2 **REPRESENTATIONS AND WARRANTIES OF SELLERS**. Seller represents and warrants to Buyer as follows:

2.1 She has full power and authority to enter into this Agreement, and to perform her obligations hereunder, and she requires no third-party consents. This Agreement and all other agreements required hereunder are the valid binding obligations of Seller enforceable against her in accordance with their terms.

2.2 The Interest is duly authorized and validly issued, fully paid and nonassessable, and Seller holds good, valid and marketable title thereto, free and clear of any lien, pledge, security interest, adverse claim or right, charge, covenant, restriction, voting trust, trust, or similar arrangement, equity or other encumbrance of any type or nature whatsoever including no Claims (defined herein) (collectively, an "Encumbrance"). Seller is the sole owner of the Interest, she has not transferred or otherwise caused a change in legal or beneficial ownership of the Interest, in whole or in part, she has not granted any right, subscription, warrant, call, preemptive right, conversion right, option or other agreement, plan or arrangement of any type or nature in the Interest, and she has entered into no agreements to do any of the foregoing, and no other person

Electronically Filed 09/18/2015 16 42 / / CV 15 851394 / Confirmation Nbr 546990 / CLMKO
Electronically Filed 07/15/2016 09 36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

has or claims any direct or indirect interest whatsoever in the Interest, and Seller has the right to sell and transfer Interest to the Buyer in accordance with this Agreement.

2.3     There are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body, and there are no actions, suits or claims or legal, administrative or arbitral proceedings or investigations (whether or not the defense thereof or liabilities in respect thereof are covered by insurance) pending, or threatened, against or involving Seller or the Interest, whether or not they could have a material adverse effect upon the transactions contemplated hereby ("Claims").

2.4     Seller is the majority owner of the Company and as such she is fully aware of all information relating to the Company that is material to this transaction, including all information regarding its business and financial affairs, and she acknowledges that she has relied solely on her own knowledge in determining whether to enter into this Agreement and consummate these transactions, and he has not relied on any representation or warranty of any person, other than those expressly made herein.

2.5     Seller acknowledges that other than the purchase price provided for herein, and any amounts allocated by the Company to the Interest prorated to the Effective Date, no other amount is due to her in connection with her acquisition, ownership or disposition of the Interest.

2.6     There is no agent, broker, person or firm acting on behalf of Seller and no person is or will be entitled to any commission or broker's or finder's fees on any amount to be paid to Seller hereunder.

2.7     If she so desired, prior to entering into this Agreement Seller has had the opportunity to consult with counsel, other than any counsel that has represented Buyer, the Company or Seller's husband in any matters whatsoever, regarding this Agreement and the transaction and other documents contemplated hereby.

2.8     All documents and other papers delivered by or on behalf of Seller in connection with this Agreement and the transactions contemplated hereby are true, complete and authentic. No representation or warranty of Seller contained in this Agreement contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements made, in the context in which made, not materially false or misleading. The representations and warranties of Seller contained in this Section 2, and elsewhere in this Agreement are true at signing and at Closing.

3       REPRESENTATIONS AND WARRANTIES OF BUYER.  Buyer represents and warrants to Seller as follows:

3.1     Buyer has the full legal right and power and all authority and approval required to enter into, execute and deliver this Agreement, and to perform fully his obligations hereunder. This Agreement has been duly executed and delivered by Buyer. This Agreement is the valid and binding obligation of Buyer enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights, or by limitations and the availability of the remedy of specific performance or injunctive relief.

3.2     Buyer is acquiring the Interest for investment for Buyer's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that Buyer has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, Buyer further represents that Buyer does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participation to such person or to any third person, with respect to the Interest.

3.3     Buyer understands that the Interest is not registered under the Securities Act of 1933 or under any state laws. Buyer represents that he is experienced in evaluating and investing in securities of companies such as the Company and acknowledges that his investment in the Interest involves a high degree of risk and that he can bear the economic risk of his investment. Buyer is an "accredited investor" and "sophisticated" within the meaning of Rule 501 of Regulation D, under the Securities Act, as presently in effect. Buyer understands that the Interest may not be sold, transferred or otherwise disposed of without registration under the Securities Act or an exemption therefrom, and that in the absence of an effective registration statement covering the membership interest or an available exemption from registration under the Securities Act, the Interest must be held indefinitely.

3.4     Buyer is the Chief Operating Officer of the Company and as such he is fully aware of all information relating to the Company that is material to this transaction, including all information regarding its business and financial affairs, and he acknowledges that he has relied solely on his own knowledge in determining whether to enter into this Agreement and consummate these transactions, and he has not relied on any representation or warranty of any person, other than those expressly made herein.

3.5     There is no agent, broker, person or firm acting on behalf of Buyer and no person is or will be entitled to any commission or broker's or finder's fees on any amount to be paid to Seller hereunder.

3.6     All documents and other papers delivered by or on behalf of Buyer in connection with this Agreement and the transactions contemplated hereby are true, complete and authentic. No representation or warranty of Buyer contained in this Agreement contains an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements made, in the context in which made, not materially false or misleading. The

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

representations and warranties of Buyer contained in this Section 3, and elsewhere in this Agreement are true at signing and at Closing.

4      FURTHER ASSURANCES.  Each of the parties shall execute such documents and other papers and take such further actions as may be reasonably required to carry out the provisions of this Agreement and the transactions contemplated hereby.

5      SURVIVAL OF REPRESENTATIONS AND WARRANTIES. All representations, warranties, covenants and agreements herein shall survive for a period of twelve (12) months from the Effective Date.

6      MISCELLANEOUS.

6.1      Any notice or other communication required or permitted hereunder must be in writing and may be delivered personally, sent by e-mail, mail, or by a nationally recognized overnight delivery service. A notice is deemed given when tendered at the recipients regular home delivery or email address, or if actually received.  Any party may, by notice given in accordance with this Section to the other parties, designate a specific address or person for receipt of notices hereunder.

6.2      This Agreement is the entire agreement between the parties with respect to the sale and purchase of the membership interest and supersedes all prior agreements, written or oral, with respect thereto.

6.3      This Agreement may be amended, superseded, cancelled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by Buyer and Seller.  No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.  Nor shall any waiver on the part of any party of any such right, power or privilege, nor any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies that any party may otherwise have at law or in equity.

6.4      This Agreement shall be governed and construed in accordance with the laws of the State of Ohio without regard to conflicts of law.

6.5      Neither this Agreement nor any right or obligation hereunder may be assigned or delegated, in whole or in part and any attempt to do so shall be void. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, estates, legal representatives, successors and assigns.

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr  546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

6.6    All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context may require. This Agreement will not be construed more favorably against one party over the other in the event of a dispute. The headings in this Agreement are for reference only, and shall not affect the interpretation of this Agreement.

6.7    This Agreement may be in multiple counterparts. Scanned and printed, or photocopied, executed counterparts shall be deemed originals and may be enforced as such.

[Signature Page Follows]

Page 6 of 7

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

IN WITNESS WHEREOF the parties have executed this Agreement as of the Effective Date.

Sangeeta T. Mahajan, M.D.

John Huff

# EXHIBIT C

## VOTING TRUST AGREEMENT

This Voting Trust Agreement (this "Agreement") is entered into by and among Sangeeta T. Mahajan, M.D. ("Beneficiary"), John Huff ("Huff" or "Trustee") and PurUS Health, LLC (the "Company").

### Background

A.    The Company was formed upon the filing of its Articles of Organization with the Ohio Secretary of State on June 28, 2011. Beneficiary is the Company's founder and owns an 89.3% percentage interest in Company.

B.    Immediately prior to the effectiveness of this Agreement, pursuant to a certain Membership Interest Purchase Agreement (the "Purchase Agreement"), Huff purchased from Beneficiary a 33.93% percentage interest in the Company from Beneficiary, and Beneficiary retained a 55.37% percentage interest in the Company (together with all interests in the Company into which they are converted or for which they are exchanged, and any additional interests in the Company that are issued respect to them, the "Interests").

C.    To better permit the Company flexibility in pursuing financing or restructuring plans Beneficiary now desires to place the voting rights associated with the Interests in trust pursuant to this Agreement.

### Agreement

NOW, THEREFORE, in consideration of the foregoing, the agreements made herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    **TRANSFER IN TRUST.**

1.1.    Automatically and without further action by Trustee, Beneficiary or the Company, at the Effective Date (as defined in the Purchase Agreement) Beneficiary transfers in trust to Trustee all right, title and interest in the Interests now owned by Beneficiary or as to which Beneficiary hereafter becomes the legal or beneficial owner, or as to which she otherwise obtains voting power, and Trustee agrees to hold and administer the Interests pursuant to the terms of this Agreement. The Company shall enter this transfer into its books and will register the Interests in the name of Trustee as of the Effective Date, noting in the ownership records of the Company that the Interests are held in trust for the benefit of Beneficiary, subject to this Agreement. The transfer of the Interests to Trustee in trust and the grant of powers to Trustee set forth herein are irrevocable.

1.2.    The ownership interests of the members of the Company are recorded in the books of the Company, and are not certificated. If the Interests are ever certificated then the certificates evidencing the Interests transferred in trust hereby will be impressed with a legend noting that the Interests are subject to this Agreement. The ownership records of the Company will record that the Interests are held in trust subject to this Agreement regardless of whether the Interests are certificated or uncertificated. Any certificates will be delivered to Trustee to hold during the term of this Agreement.

2.    **TERM.** The term of this Agreement and the trust created hereby is the period commencing on the Effective Date and ending on the earlier to occur of: (a) the Trustee's election to terminate

DEB0762483CLEVELAND
Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

the Trust; (b) the final winding up of the Company following dissolution; (c) a sale of the Company by an asset sale or the sale of at least a 90% percentage interest in the Company to a single purchaser in an arm's length transaction for fair value; (d) a merger or consolidation of the Company with another company in which the Company is not the survivor; (e) the resignation of Trustee as an employee of the Company, or (f) December 31, 2019.

3.   **POWERS OF TRUSTEE.**

3.1.   Pursuant to the terms of this Agreement and the laws of the State of Ohio, Trustee shall have the sole right to vote the Interests, in person, or by proxy, or by written consent.  In particular and without limitation, Trustee shall have full power and authority to attend any and all meetings of the members of the Company, to waive notices of such meetings, to execute consents with reference to the Interests, to vote the Interests for the election of managers, officers, directors, as applicable, of the Company (including designations to be made pursuant to the Company's Operating Agreement if adopted) and upon any other matter that may be brought before any meetings of the members of the Company or any adjournments thereof, as in each case he deems proper.

3.2.   Trustee shall exercise his own judgment in voting for or taking any action on matters that may come before him, whether at meetings of members or otherwise. Beneficiary on her own behalf and on behalf of her successors and assigns hereby agrees to defend, indemnify and hold Trustee harmless for any action or failure to act by him as voting trustee hereunder, other than for his own intentional wrongful conduct or fraud or any breach by him of this Agreement, and Beneficiary acknowledges and agrees, without limiting the foregoing, that Trustee is not responsible for the performance of the Company or any other results from his decision to vote or not vote the Interests or any other interests in the Company one way another or not at all. Trustee is under no obligation to communicate or forward to Beneficiary any communication by the Company to its security holders.

3.3.   Without limitation and except as provided in Section 3.4 hereof, Trustee may: (a) be, and receive compensation as, a manager, director, officer, agent, and employee of the Company and of any subsidiary, parent or affiliate of the Company; (b) engage in any business for his own benefit or the benefit of others; and (c) buy, sell or deal in securities of the Company in the same manner as though he was not the trustee hereunder, and he need not administer his own interests in the Company in the same manner as he administers the Interests.

3.4.   Notwithstanding the foregoing, without the prior written consent of Beneficiary, Trustee shall not have the power to do any of the following: (i) sell, transfer, pledge or otherwise encumber the Interests in any way; (ii) vote the Interests in favor of incurring indebtedness in excess of the Company's then trailing twelve months gross revenue, in the aggregate, that is secured by the assets or rights of the Company; (iii) vote the Interests in order to increase the Trustee's compensation or to amend the terms or conditions of the Trustee's employment agreement with the Company; (iv) vote the Interests in favor of any transaction with a member of the Company or any affiliate of any such member, other than as part of a transaction that otherwise can be voted on without consent under clause (v) hereunder; (v) vote the Interests to approve any transaction that would constitute a Liquidity Event (as defined in that certain promissory note of even date herewith by and between Trustee and Beneficiary provided that for these purposes a Liquidity Event shall be deemed to occur regardless of whether such a transaction results in any member of the Company being paid cash or other property ); provided, that Trustee can vote for any Liquidity Event transaction at a total enterprise value of no less than $35,000,000 and that is no less than twice the

Page 2 of 4

5K22079MHCLEVELAND

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

Company's then twelve month trailing revenue without consent; (vi) vote the Interests to create or issue any new Interests in the Company without the terms of conditions of such an offering approved by the Beneficiary, other than as part of a transaction that otherwise can be voted on without consent under clause (v); or (vii) vote the Interests in order to amend, restate or replace the Company's Operating Agreement or its Certificate of Organization other than as part of a transaction that otherwise can be voted on without consent under clause (v). The Interests are not subject to any debts or obligations of Trustee or to any claims of his creditors and Trustee shall take all reasonable actions to protect and defend the Interests against such claims or obligations.

4.    **BENEFICIARY'S RIGHTS.**

4.1.    The intention of this Agreement is to provide the Trustee the voting rights in the Interests, and Beneficiary has all other beneficial rights to the Interests free of trust, including all economic rights and the right to receive promptly and free of trust all dividends and distributions on the Interests of any kind, for any reason, whether in cash or in property, whether distributions of income, or of capital or otherwise, distributed by the Company and Trustee and agrees to administer the Interests accordingly. In the event that the Interests are sold, all proceeds from such sale shall be the property of the Beneficiary free of trust. For purposes of clarification, this Trust is not intended to and shall not hold any cash or other economic benefits or rights arising from the Interests. Any cash payable on or from the Interests shall be paid directly to the Beneficiary free of trust.

4.2.    Beneficiary shall have the right to transfer or otherwise encumber the Interests for estate planning purposes provided that such efforts to do not terminate, inhibit or otherwise alter the Trustee's voting rights as granted under this Trust. The Trustee and the Beneficiary agree to work together in good faith in order to provide for any estate planning that the Beneficiary wishes to take in connection with the Interests.

4.3.    In the event that any income of the Company or other amounts are allocated to the Trustee for tax purposes, then Trustee is entitled to have all taxes on such amounts paid by Beneficiary immediately on demand, and if amounts are distributed by the Company to pay such taxes Trustee may apply such distributions to payment of those taxes.

4.4.    In the event that the Company is reorganized or recapitalized or any other action is taken, the result of which is that Interests are substituted or exchanged for, or are transformed into, other voting securities of the Company or its successors, or there is a dividend or split, or if for any other reason there is a distribution of equity in respect to the Interests, then such new, substitute or additional Interests shall be subject to this Agreement and will he held and administered by Trustee in trust hereunder. To the extent that a portion but not all of the Interests are sold or otherwise transferred, such portion shall automatically not be subject to this Trust.

5.    **TERMINATION.** Trustee may resign by delivering a written resignation to the Company and Beneficiary. In the event of such a resignation, the termination or resignation of Trustee as a director, officer or as an employee of the Company, the death or incapacity of the Trustee (as defined in the Trustee's employment agreement with the Company), or the Trustee otherwise ceases to serve for any other reason, then the Trust shall terminate and the Interests shall automatically revert to Beneficiary or her designated heirs and the Company will record such transfer on its books. Should the trust created hereunder expire or terminate for any reason, the Interests shall automatically revert to Beneficiary or her designated heirs and the Company will record such transfer on its books.

PCCOPPGARKKCLEVELAND

Electronically Filed 09/18/2015 16:42 / / CV 15 851394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

6. MISCELLANEOUS.

6.1. The captions of the various sections or subsections are not part of this Agreement and shall not limit or govern its interpretation.

6.2. This Agreement is governed by and construed and enforced in accordance with the laws of the State of Ohio, without regard to conflicts of law.

6.3. This Agreement may not be modified or changed in whole or in part, and no provisions waived, except in a writing signed by Trustee and Beneficiary. If any provision of this Agreement or the application of such provision is held invalid, the remainder of this Agreement shall remain in full force and effect.

6.4. This Agreement is the entire agreement between the parties with respect to the subject matter hereof, and no prior representations, inducements or agreements, oral or written, are enforceable.

6.5. Notices must be given in writing, including by email, and are effective when delivered.

6.6. Neither this Agreement nor any right or obligation hereunder may be assigned or delegated without the written consent of all parties, and any attempt or agreement to do so is void. Subject to the foregoing, this Agreement is binding upon and benefits the estates, heirs, executors, administrators, personal representatives, successors and assigns of the parties.

6.7. This Agreement may be executed in multiple counterparts. Scanned and printed, or photocopied, executed counterparts of this Agreement will be deemed originals for all purposes.

IN WITNESS WHEREOF, Beneficiary, Trustee and the Company have executed this Voting Trust Agreement as of the Effective Date.

COMPANY:

PurUS Health, LLC

By _____
Karen Keith Pabley, Manager and Chief Executive Officer

TRUSTEE:

_____
John Huff

BENEFICIARY

_____
Sangeeta T. Mahajan, M.D.

Page 4 of 4

CLEVELAND

Electronically Filed 09/18/2015 16:42 / / CV 15 651394 / Confirmation Nbr. 546990 / CLMKO
Electronically Filed 07/15/2016 09:36 / / CV 16 866246 / Confirmation Nbr. 803401 / CLJML

# EXHIBIT D